FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2016 SEP -9  PM 2: 58

N. MIYATA
CLERK

Margery S. Bronster  #4750
Robert M. Hatch  #7724
mbronster@bfrhawaii.com
BRONSTER FUJICHAKU ROBBINS
1003 Bishop Street, Suite 2300
Honolulu, HI 96813
Telephone: (808) 524-5644
Facsimile: (808) 599-1881

Richard D. McCune, CA Bar No. 132124*
rdm@mccunewright.com
McCUNEWRIGHT LLP
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Taras Kick, CA Bar No. 143379*
Taras@kicklawfirm.com
THE KICK LAW FIRM, APC
201 Wilshire Boulevard
Santa Monica, California 90401
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

*Pro Hac Vice applications to be submitted

Attorneys for Plaintiff
Rodney Smith and the Putative Class

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| RODNEY SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF HAWAI'I and DOES 1 through 10,<br><br>Defendants. | CIVIL NO. 16-1-1712-09 GWBC<br>(Other Civil Action)<br><br>**CLASS ACTION COMPLAINT;<br>DEMAND FOR JURY TRIAL;<br>SUMMONS** |

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

EXHIBIT "A"

## CLASS ACTION COMPLAINT

Plaintiff Rodney Smith ("Plaintiff"), by his attorneys, hereby brings this class and representative action against Bank of Hawai'i and DOES 1 through 10 (collectively "BOH" or "Defendant").

## NATURE OF THE ACTION

1.     All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or his counsel.   Allegations pertaining to Plaintiff or his counsel are based upon, inter alia, Plaintiff or his counsel's personal knowledge, as well as Plaintiff or his counsel's own investigation.     Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.     This is a class and representative action brought by Plaintiff to assert claims in his own right, and in his capacity as the class representative of all others persons similarly situated, and in his capacity as a private attorney general on behalf of the members of the general public.   BOH wrongfully charged Plaintiff and the class members overdraft fees.

3.     This class action seeks monetary damages, restitution, and injunctive relief due to BOH's policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft fees breaches BOH's contract with its customers, who include

Plaintiff and the members of the Class.

4.     In addition, BOH failed to describe its actual overdraft service in its opt-in notice (because the language in its opt-in notice describes an overdraft service that assesses overdraft fees based on the ledger-balance method as opposed to the available-balance method actually used by BOH). In doing so it violated Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*), which prohibits BOH from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)).

## PARTIES

5.     Plaintiff is a citizen of the State of Hawai'i, residing in Honolulu, Hawai'i, and was a customer of BOH at all times relevant to the class action allegations.

6.     At all times herein mentioned, Defendant BOH is and has been a commercial bank chartered in the State of Hawai'i, with its principal place of business located in Honolulu, Hawai'i, and branches located throughout the State of Hawai'i.

7.     Without limitation, Defendants Does 1 through 10 include agents, partners, joint ventures, subsidiaries and/or affiliates of BOH and, upon information and belief, also own and/or operate BOH branch locations. As used herein, where appropriate, the term "BOH" is also inclusive of Defendants Does 1 through 10.

8.     Plaintiff is unaware of the true names of Defendants Does 1

through 10. Defendants Does 1 through 10 are thus sued by fictitious names, and the pleadings will be amended, as necessary, to obtain relief against Defendants Does 1 through 10 when the true names are ascertained, or as permitted by law or by the Court.

9.     At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendants' ordinary business and affairs.

11.    As to the conduct alleged herein, each act was authorized, ratified, or directed, by Defendants' officers, directors, or managing agents.

## VENUE AND JURISDICTION

12.    This Court has subject matter jurisdiction to hear the claims in this Complaint pursuant to Haw. Rev. Stat. § 603-21.5.

13.     This Court has personal jurisdiction over the Defendants pursuant to Haw. Rev. Stat. § 634-25.  Among other things, Defendants, in person and/or through agents, are subject to service of process within the State of Hawai'i.

14.     Venue is appropriate in this Circuit pursuant to Haw. Rev. Stat. § 603-36.

## FACTUAL ALLEGATIONS

### A.      BOH's Unlawful Overdraft Program

15.     BOH is a commercial bank with 65 branches in Hawai'i, holding approximately $15 billion in assets.  BOH offers its consumer banking customers a checking account.  One of the features of a BOH checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a BOH checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

16.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), BOH assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

17.     Overdraft fees constitute the primary fee generators for banks and credit unions.  In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.

18.   The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled, "Overdraft America: Confusion and Concerns about Bank Practices," at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014, Pew Charitable Trust report entitled, "Overdrawn," at p.8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*Id.*, at p. 5), and more than two-thirds of customers would have preferred that their financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee. (*Id.*, at p. 10).

19.   Unfortunately, the customers who incur these types of fees tend to be the most vulnerable customers.   Younger, lower-income, and non-white account holders are among those who are more likely to be charged overdraft fees.  (*Id.*, at p. 1).  A 25 year-old is 133% more likely to pay an overdraft fee than a 65 year-old.  (*Id.*, at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id.*, at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites. (*Id.*, at p. 3).

20.   As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs

with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

21.    At all relevant times, BOH has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contract with members; (2) contrary to BOH's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

22.    BOH entered in an agreement with Plaintiff and the class members titled, "Agreements and Disclosures," which is attached hereto as Exhibit 1 and is referred to hereinafter as the "Account Agreement."   In the "Overdrafts" section of the Account Agreement, BOH promised that it would only assess an overdraft fee when it pays a transaction itself because the customer's account does not contain enough money to complete the transaction.

23.    BOH entered into a second agreement with Plaintiff and the class members, which governs the terms under which BOH may assess Plaintiff overdraft fees for ATM and non-recurring debit card transactions (a requirement of Regulation E of 12 C.F.R. § 1005.17).  See "Opt in Agreement" attached hereto as Exhibit 2.  BOH provided this agreement to Plaintiff, and to the class members, and ostensibly all parties consented to be bound by it. However, the Opt-in-Agreement did not accurately describe the procedure

---

[1]http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements _ Notice_of_Proposed_ Rulemaking.pdf , at p. 74-75.

utilized by BOH in assessing overdraft fees.

24.    Nonetheless, the Opt-In Agreement contains promises to which BOH is contractually bound.  In the Opt-In Agreement, BOH promised that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  This promise means that BOH is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction.

25.    The Account Agreement and the Opt-In Agreement are hereinafter referred to as the "Customer Agreements."  BOH's contractual promises in its Customer Agreements to assess overdraft fees only when there is not enough money in the account to cover the item was also repeated to customers in other disclosures and marketing materials.

26.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

27.    However, directly contrary to these promises, BOH's policy and practice is to ignore whether there is money in the account or a negative balance.  Instead, BOH's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation called the available-balance method rather than the ledger-balance method.

28.    The available balance is not the customer's actual balance (ledger

balance).   Rather, it is the actual balance of a customer's account (ledger balance) minus anticipated future debits (debits that may or may not occur) and minus credit holds. Not only is the practice of using the available-balance method rather than the ledger-balance method to determine whether a transaction results in an overdraft, and thus is subject to an overdraft fee directly contrary to BOH's Opt-In Agreement, but such practices have resulted in BOH improperly charging, and continuing to charge its members, including Plaintiff and the members of the Class, unlawful overdraft fees. Whether a financial institution uses the ledger-balance method versus the available-balance method is a primary concern for the Consumer Financial Protection Bureau ("Bureau") due to the substantial harm it causes to customers.  As the Bureau concluded from its studies of actual financial institutions in its Supervisory Highlights, Winter 2015, at p.8[2]:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method.

When the balance calculation method is not adequately disclosed, the Bureau has found the use of available balance instead of ledger balance a deceptive

---

[2] http://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf

practice, as it results in "customers being misled" because this information is "material to a reasonable consumer's decision-making and actions," and consumers are thereby "substantially injured." (*Id.* at p. 9.)

29.    BOH's practice of charging overdraft fees, even when there is money in the account to cover a transaction presented for payment, is inconsistent with how BOH expressly describes the circumstances under which overdraft fees are assessed in its Customer Agreements. Further, BOH has failed to inform its customers, including Plaintiff and the members of the Class, of the conditions under which overdraft fees will be assessed in the Customer Agreements.

30.    Consequently, BOH has violated Haw. Rev. Stat. Chapter 480 by the very act of charging the Plaintiff and the class members overdraft fees. The Opt-in Agreement states that overdraft fees will be assessed only when there is not enough money in the account to cover the transaction at issue, it does not describe BOH's actual overdraft service. As BOH did not provide an accurate "brief description of the financial institution's overdraft services," as required by Regulation E, 12 C.F.R. § 1005.1, it was not authorized to charge Plaintiff and the class members overdraft fees on ATM and non-recurring debit card transactions.

31.    Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods. The ledger balance is the official balance of the account. It is the

balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.

32.    Further, based on information and belief, it is the balance used by BOH to report the deposits to regulators, shareholders and the public.  It is the deposit balance provided to regulators in call reports and reserve reports.  It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of BOH.

33.    When BOH refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the ledger balance.  In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the ledger balance and not the available balance, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive."  The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p. 9).

34.    Therefore, Plaintiff, on behalf of himself and all others similarly situated, seeks relief as set forth below.

**B.    Unlawful Overdraft Fees Assessed to Plaintiff Rodney Smith**

35.   Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in his account to cover the transaction. Plaintiff entered into an agreement with BOH when he opted-in to the overdraft program with BOH, wherein BOH contracted to charge overdraft fees on certain transactions only if his account did not have money to cover the transaction. By nonetheless charging Plaintiff overdraft fees, BOH breached its contract with Plaintiff.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee.   However, to give just one example, on September 9, 2015, Plaintiff had $297.05 in his account when he made a debit card purchase for $229.32, leaving him with a positive balance of $67.73.  Despite the fact that Plaintiff had sufficient funds in his account to cover the transaction, BOH assessed a $26 overdraft fee.   Plaintiff has a reasonable belief that a complete review of BOH's records will show multiple instances in which BOH improperly charged Plaintiff overdraft fees despite having money in his account to cover the transactions.

36.   Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in, and aggressively causing, subsequent transactions, which otherwise would not have been overdrafting, to be improperly treated as transactions for which BOH assessed further overdraft fees.  This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, at pp. 8-9.)   A complete evaluation of BOH's records is necessary to determine the full extent of Plaintiff's harm from this practice.

37.   Additionally, because the opt-in notice did not describe BOH's actual overdraft service, BOH violated Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*) by assessing overdraft fees on ATM and non-recurring debit card transactions. By failing to provide the full and accurate disclosures to Plaintiff required by Regulation E, BOH failed to obtain Plaintiff's fully informed consent and authorization to be charged such overdraft fees. Because BOH was not legally authorized to enroll Plaintiff into the Courtesy Payment program for non-recurring debit card and ATM transactions, BOH also violated Haw. Rev. Stat. §

480 when it assessed any overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.

38.     Plaintiff was harmed by this practice when he was assessed overdraft fees for nonrecurring debit card and ATM transactions.  As noted, Plaintiff's records indicate that on September 9, 2015, Defendant assessed a $26 overdraft fee against Plaintiff due to a point of sale nonrecurring debit card transaction.  A complete evaluation of BOH's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

39.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

40.     Plaintiff brings this case, and each of his respective causes of action, as a class action pursuant to Hawai'i Rule of Civil Procedure 23(b)(1)(A)&(B), (b)(2), and (b)(3) on behalf of the following class.

41.     The "Class" is comprised of two potential classes:

**The Positive Balance Class:**

> **All persons who have or have had accounts with BOH who incurred overdraft fees for transactions when the ledger balance in the checking account was sufficient to cover the transactions in the six years preceding the filing of this Complaint.**

**The Regulation E Class:**

> **All persons who have or have had accounts with**

**BOH who incurred overdraft fee(s) for ATM or non-recurring debit card transactions since August 15, 2010.**

42.     Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

43.     This action has been brought and may be properly maintained on behalf of each member of the Class proposed herein under Hawai'i Rule of Civil Procedure 23.

44.     **Numerosity of the Class, Hawai'i Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of the members of the Class is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that BOH holds approximately $15 billion in assets and operates 65 branches in the State of Hawai'i.

45.     Upon information and belief, Defendants have databases and/or other documentation detailing its customers' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of BOH's customers have been harmed by its practices and thus, which customers qualify as Class members.    Further, the Class

definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify him or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

46. **Commonality, Hawai'i Rule of Civil Procedure 23(a)(2).** This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class members include, but are certainly not limited to the following:

a. Whether, pursuant to the Customer Agreements, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

b. Whether Defendant breached the Customer Agreements by assessing overdraft fees for transactions when customers' checking accounts contained enough money to cover the transactions;

c. Whether the language in the Opt-In Agreement—"An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."—described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees using an available-balance method instead

of a ledger-balance method;

d.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received;

e.      Whether Defendant's conduct violated state consumer protection laws; and

f.      Whether Defendant's conduct violated Haw. Rev. Stat. Chapter 480.

g.      Whether Defendant's Conduct violated Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*)

47.     **Typicality, Hawai'i Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Customer Agreements, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue are uniform for Plaintiff and all Class members. Accordingly, in pursuing his own self-interest in litigating his claims, Plaintiff will also serve the interests of the other Class members.

48.     **Adequacy, Hawai'i Rule of Civil Procedure 23(a)(4).** Plaintiff will

fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and his counsel intend to prosecute this action vigorously.

49. **Predominance and Superiority, Hawai'i Rule of Civil Procedure 23(b)(3).** The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish

incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

50. Plaintiff is not aware of any separate litigation instituted by any of the class members against Defendant. Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class members and that he will adequately represent the Class. This particular forum is a desirable forum for this litigation because Plaintiff resides in Honolulu, Hawai'i, Defendant is headquartered in Honolulu, Hawai'i, and the claims arose from activities which occurred in or around Honolulu, Hawai'i. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

51. Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any

further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

52. This matter is properly maintained as a class action pursuant to Rule 23(b) of the Hawai'i Rules of Civil Procedure, in that:

a. Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

1. Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

2. Adjudication with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b. Common questions of law and fact exist as to the members of

the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1. The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2. The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION
### (Violation of Haw. Rev. Stat. Chapter 480)

53.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

54.    Plaintiff and each of the Class members are consumers within the meaning of Hawai'i's Unfair and Deceptive Practices Act, Chapter 480.  Plaintiff and each class member are natural persons who primarily for personal, family, or household purposes purchased banking account services from Defendant.

55.    The actions and omissions of Defendant were unfair or deceptive

acts or practices as prohibited by Haw. Rev. Stat. Chapter 480. Defendant's use of the available balance to assess overdraft fees instead of the ledger balance was a deceptive act or practice because it would have the tendency to mislead a reasonable consumer. In addition, Defendant's use of the available balance to assess overdraft fees instead of the ledger balance was an unfair act or practice because it was oppressive and caused substantial harm to consumers.

56.    In addition, BOH's overdraft service in its opt-in agreement does not describe its actual overdraft service as required by Regulation E. The description states that an overdraft occurs "when you do not have enough money in your account to cover a transaction." This language describes an overdraft service where overdrafts are based on the ledger-balance method (i.e., the actual balance) as opposed to the available-balance method actually used by BOH.

57.    In misrepresenting the actual nature of its overdraft protection, BOH failed to obtain the informed consent of the enrollees to the program. This deliberate misrepresentation precludes BOH's from assessing any overdraft fees. (See Regulation E). This unlawful taking constitutes unfair and deceptive practices in violation of Haw. Rev. Stat. Chapter 480.

58.    Defendant's actions and omissions were in the conduct of trade or commerce.

59.    As a proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the Class members have been damaged in an amount to

be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

60.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

61.    Plaintiff and each of the Class members entered into two contracts with Defendant, which have been identified herein as the Customer Agreements.  Each of the Customer Agreements was drafted by and is binding upon Defendant.

62.    In each of the Customer Agreements, Defendant promised that BOH would assess overdraft fees only when there was not enough money in the account to cover the transaction.  However, this was not the actual practice of BOH.

63.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendants' misconduct.

64.    Defendants breached the express terms of the contract by, inter alia, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

65.    As a proximate result of Defendants' breach of these contracts, Plaintiff and the Class members have been damaged in an amount to be proven

at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

66.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

67.   Plaintiff and each of the Class members entered into two contracts with Defendant, which have been identified herein as the Customer Agreements. Each of the Customer Agreements was drafted by and is binding upon Defendant.

68.   In each of the Customer Agreements, Defendant promised that BOH would assess overdraft fees only when there was not enough money in the account to cover the transaction. However, this was not the actual practice of BOH.

69.   Good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

70.   The material terms of the contracts also included the implied

covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contract.

71.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

72.    Defendant breached the implied covenant of good faith and fair dealing based on its practice of assessing fees when there was enough money in the account to cover the transaction, and failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions.  In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant executed a contractual obligation in bad faith, depriving Plaintiff and the Class members of the full benefit of the contract.

73.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

**FOURTH CAUSE OF ACTION**

## (Unjust Enrichment/Restitution)

74.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

75.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

76.    The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices.   In the CFPB Bulletin 2013-07[3], at p. 2, it defined Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition." This definition was elaborated upon in the CFPB Supervisory Highlights, Winter 2015, at p. 9  stating that "because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair."

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

77.   Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.   Should they be allowed to retain such funds, Defendant will be unjustly enriched.   Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION
### (Money Had and Received)

78.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

79.   Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

80.   As a result, Defendant has in its possession money, which in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members.   Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## SIXTH CAUSE OF ACTION
### (Violation of Electronic Fund Transfers Act (Regulation E) 12 C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))

81.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

82.   By charging overdraft fees on ATM and nonrecurring transactions, BOH violated the UCL by violating Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq.*), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights." (15 U.S.C. §1693(b)).

83.   Specifically, the charges violated what is known as the "Opt In Rule" of Reg E.  (12 C.F.R. §1005.17.)  The Opt In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. (*Id.*) Such notice "shall be clear and readily understandable."  (12 C.F.R. §205.4(a)(1)).  To comply with the affirmative consent requirement, a financial institution must provide segregated writing of its overdraft practices that are accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

84.   The intent and purpose of this opt-in notice is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u>

.... by <u>explaining</u> the institution's overdraft service ... in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948). This is "the CFPB's official interpretation of its own regulation" and "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E (*Strubel v. Capital One Bank (USA)*, 2016 U.S.Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

85.    The description of BOH's overdraft service in its opt-in agreement does not describe its actual overdraft service as required by Reg E.  The description states that an overdraft occurs "when you do not have enough money in your account to cover a transaction."  This language, simply copy-and-pasted from Reg E's Model Form A-9, describes an overdraft service where overdrafts are based on the ledger-balance method (i.e., the actual balance) as opposed to the available-balance method actually used by BOH.

86.    BOH failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  BOH has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including misstating its overdraft practices in the overdraft notice in by stating that it would assess an overdraft fee only when there is not enough money in the account to cover

the transaction.  In actual practice, Defendant assesses overdraft fees even when there is money in the account to cover the transaction.  Furthermore, upon information and belief, Defendant failed to meet some or all of the other requirements of 12 C.F.R. § 1005.17 in obtaining opt-ins of its customers to enter the overdraft fee program.

87.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions, BOH has harmed Plaintiff and the Class.

88.    Due to BOH's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class members pray for judgment against Defendants as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For treble compensatory damages pursuant to Haw. Rev. Stat § 480-13.

4.    For an order requiring Defendants to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

5.    For an order enjoining the wrongful conduct alleged herein;

6.    For costs;

7.    For pre-judgment and post-judgment interest as provided by law;

8.    For attorneys' fees under the common fund doctrine, the customer Account Agreement, and all other applicable law; and

9.    For such other relief as the Court deems just and proper.

DATED:   Honolulu, Hawai'i, September 9, 2016.

Respectfully submitted,

Margery S. Bronster
Robert M. Hatch
BRONSTER FUJICHAKU ROBBINS

Richard D. McCune
McCUNEWRIGHT LLP

Taras Kick
THE KICK LAW FIRM, APC

Attorneys for Plaintiff
Rodney Smith and the Putative Class

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| RODNEY SMITH, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>BANK OF HAWAI'I and DOES 1 through 10,<br><br>     Defendants. | CIVIL NO. 16-1-1712-09 GWBC<br>(Other Civil Action)<br><br>**DEMAND FOR JURY TRIAL** |

## DEMAND FOR JURY TRIAL

  Plaintiff and the Class members demand a trial by jury on all issues so triable.

  DATED:  Honolulu, Hawai'i, September 9, 2016.

Margery S. Bronster
Robert M. Hatch
BRONSTER FUJICHAKU ROBBINS

Richard D. McCune
McCUNEWRIGHT LLP

Taras Kick
THE KICK LAW FIRM, APC

Attorneys for Plaintiff
Rodney Smith and the Putative Class

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| RODNEY SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF HAWAIʻI and DOES 1 through 10,<br><br>Defendants. | CIVIL NO. ___16-1-1712-09 GWBC___<br>(Other Civil Action)<br><br>**SUMMONS** |

## **SUMMONS**

STATE OF HAWAII

TO THE ABOVE-NAMED DEFENDANT(S):

You are hereby summoned and required to file with the Court and serve upon Margery S. Bronster, Esq., Robert M. Hatch, Esq., Plaintiffs' attorneys, whose address is BRONSTER, FUJICHAKU ROBBINS, 1003, Bishop Street, Suite 2300, Honolulu, HI 96813, an answer to the Class Action Complaint which is herewith served upon you, within twenty (20) days after service of this Summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be rendered against you for the relief demanded in the Class Action Complaint.

This Summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the

above-entitled court permits, in writing on this Summons, personal delivery during those hours.

A failure to obey this Summons may result in an entry of default and default judgment against the disobeying person or party.

DATED: Honolulu, Hawaii, _____ SEP 0 9 2016 _____ .



_____
N. MIYATA
CLERK OF THE ABOVE ENTITLED COURT

---

In accordance with the Americans with Disabilities Act and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the First Circuit Court Administration Office at PHONE NO. 539-4333, FAX 539-4322, or TTY 539-4853, at least ten (10) working days prior to your hearing or appointment date.

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2016 SEP 13  PM 1: 24

N. MIYATA
CLERK

BANK OF HAWAII
RECEIVED

SEP 1 4 2016

LEGAL & CUSTODY
#095

Margery S. Bronster  #4750
Robert M. Hatch  #7724
mbronster@bfrhawaii.com
BRONSTER FUJICHAKU ROBBINS
1003 Bishop Street, Suite 2300
Honolulu, HI 96813
Telephone: (808) 524-5644
Facsimile: (808) 599-1881

Richard D. McCune, CA Bar No. 132124*
rdm@mccunewright.com
McCUNEWRIGHT LLP
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Taras Kick, CA Bar No. 143379*
Taras@kicklawfirm.com
THE KICK LAW FIRM, APC
201 Wilshire Boulevard
Santa Monica, California 90401
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

*Pro Hac Vice applications to be submitted

Attorneys for Plaintiff
Rodney Smith and the Putative Class

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| RODNEY SMITH, individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>   v.<br><br>BANK OF HAWAI'I and DOES 1 through 10,<br><br>           Defendants. | CIVIL NO. 16-1-1712-09 GWBC (Other Civil Action)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT; EXHIBITS 1 & 2; DEMAND FOR JURY TRIAL; SUMMONS** |

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

## FRIST AMENDED CLASS ACTION COMPLAINT

Plaintiff Rodney Smith ("Plaintiff"), by his attorneys, hereby brings this class and representative action against Bank of Hawai'i and DOES 1 through 10 (collectively "BOH" or "Defendant").

## NATURE OF THE ACTION

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or his counsel.   Allegations pertaining to Plaintiff or his counsel are based upon, inter alia, Plaintiff or his counsel's personal knowledge, as well as Plaintiff or his counsel's own investigation.    Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiff to assert claims in his own right, and in his capacity as the class representative of all others persons similarly situated, and in his capacity as a private attorney general on behalf of the members of the general public.   BOH wrongfully charged Plaintiff and the class members overdraft fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to BOH's policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment.   The charging for such overdraft fees breaches BOH's contract with its customers, who include

2

Plaintiff and the members of the Class.

4.      In addition, BOH failed to describe its actual overdraft service in its opt-in notice (because the language in its opt-in notice describes an overdraft service that assesses overdraft fees based on the ledger-balance method as opposed to the available-balance method actually used by BOH).  In doing so it violated Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*), which prohibits BOH from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)).

## PARTIES

5.      Plaintiff is a citizen of the State of Hawai'i, residing in Honolulu, Hawai'i, and was a customer of BOH at all times relevant to the class action allegations.

6.      At all times herein mentioned, Defendant BOH is and has been a commercial bank chartered in the State of Hawai'i, with its principal place of business located in Honolulu, Hawai'i, and branches located throughout the State of Hawai'i.

7.      Without limitation, Defendants Does 1 through 10 include agents, partners, joint ventures, subsidiaries and/or affiliates of BOH and, upon information and belief, also own and/or operate BOH branch locations.  As used herein, where appropriate, the term "BOH" is also inclusive of Defendants Does 1 through 10.

8.      Plaintiff is unaware of the true names of Defendants Does 1

through 10. Defendants Does 1 through 10 are thus sued by fictitious names, and the pleadings will be amended, as necessary, to obtain relief against Defendants Does 1 through 10 when the true names are ascertained, or as permitted by law or by the Court.

9.    At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendants' ordinary business and affairs.

11.    As to the conduct alleged herein, each act was authorized, ratified, or directed, by Defendants' officers, directors, or managing agents.

## VENUE AND JURISDICTION

12.    This Court has subject matter jurisdiction to hear the claims in this Complaint pursuant to Haw. Rev. Stat. § 603-21.5.

13.   This Court has personal jurisdiction over the Defendants pursuant to Haw. Rev. Stat. § 634-25.  Among other things, Defendants, in person and/or through agents, are subject to service of process within the State of Hawai'i.

14.   Venue is appropriate in this Circuit pursuant to Haw. Rev. Stat. § 603-36.

## FACTUAL ALLEGATIONS

**A.   BOH's Unlawful Overdraft Program**

15.   BOH is a commercial bank with 65 branches in Hawai'i, holding approximately $15 billion in assets.  BOH offers its consumer banking customers a checking account.  One of the features of a BOH checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a BOH checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

16.   In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), BOH assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

17.   Overdraft fees constitute the primary fee generators for banks and credit unions.  In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.

18.    The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled, "Overdraft America: Confusion and Concerns about Bank Practices," at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014, Pew Charitable Trust report entitled, "Overdrawn," at p.8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*Id.*, at p. 5), and more than two-thirds of customers would have preferred that their financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee. (*Id.*, at p. 10).

19.    Unfortunately, the customers who incur these types of fees tend to be the most vulnerable customers.   Younger, lower-income, and non-white account holders are among those who are more likely to be charged overdraft fees.  (*Id.*, at p. 1).  A 25 year-old is 133% more likely to pay an overdraft fee than a 65 year-old.  (*Id.*, at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id.*, at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id.*, at p. 3).

20.    As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs

with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

21.   At all relevant times, BOH has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contract with members; (2) contrary to BOH's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

22.   BOH entered in an agreement with Plaintiff and the class members titled, "Agreements and Disclosures," which is attached hereto as Exhibit 1 and is referred to hereinafter as the "Account Agreement."   In the "Overdrafts" section of the Account Agreement, BOH promised that it would only assess an overdraft fee when it pays a transaction itself because the customer's account does not contain enough money to complete the transaction.

23.   BOH entered into a second agreement with Plaintiff and the class members, which governs the terms under which BOH may assess Plaintiff overdraft fees for ATM and non-recurring debit card transactions (a requirement of Regulation E of 12 C.F.R. § 1005.17).   See "Opt in Agreement" attached hereto as Exhibit 2.   BOH provided this agreement to Plaintiff, and to the class members, and ostensibly all parties consented to be bound by it. However, the Opt-in-Agreement did not accurately describe the procedure

---

[1]http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements _ Notice_of_Proposed_ Rulemaking.pdf , at p. 74-75.

utilized by BOH in assessing overdraft fees.

24.    Nonetheless, the Opt-In Agreement contains promises to which BOH is contractually bound.  In the Opt-In Agreement, BOH promised that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  This promise means that BOH is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction.

25.    The Account Agreement and the Opt-In Agreement are hereinafter referred to as the "Customer Agreements."  BOH's contractual promises in its Customer Agreements to assess overdraft fees only when there is not enough money in the account to cover the item was also repeated to customers in other disclosures and marketing materials.

26.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

27.    However, directly contrary to these promises, BOH's policy and practice is to ignore whether there is money in the account or a negative balance.  Instead, BOH's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation called the available-balance method rather than the ledger-balance method.

28.    The available balance is not the customer's actual balance (ledger

balance).    Rather, it is the actual balance of a customer's account (ledger balance) minus anticipated future debits (debits that may or may not occur) and minus credit holds. Not only is the practice of using the available-balance method rather than the ledger-balance method to determine whether a transaction results in an overdraft, and thus is subject to an overdraft fee directly contrary to BOH's Opt-In Agreement, but such practices have resulted in BOH improperly charging, and continuing to charge its members, including Plaintiff and the members of the Class, unlawful overdraft fees. Whether a financial institution uses the ledger-balance method versus the available-balance method is a primary concern for the Consumer Financial Protection Bureau ("Bureau") due to the substantial harm it causes to customers.  As the Bureau concluded from its studies of actual financial institutions in its Supervisory Highlights, Winter 2015, at p.8[2]:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method.

When the balance calculation method is not adequately disclosed, the Bureau has found the use of available balance instead of ledger balance a deceptive

---

[2] http://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf

practice, as it results in "customers being misled" because this information is "material to a reasonable consumer's decision-making and actions," and consumers are thereby "substantially injured." (*Id.* at p. 9.)

29.   BOH's practice of charging overdraft fees, even when there is money in the account to cover a transaction presented for payment, is inconsistent with how BOH expressly describes the circumstances under which overdraft fees are assessed in its Customer Agreements. Further, BOH has failed to inform its customers, including Plaintiff and the members of the Class, of the conditions under which overdraft fees will be assessed in the Customer Agreements.

30.   Consequently, BOH has violated Haw. Rev. Stat. Chapter 480 by the very act of charging the Plaintiff and the class members overdraft fees. The Opt-in Agreement states that overdraft fees will be assessed only when there is not enough money in the account to cover the transaction at issue, it does not describe BOH's actual overdraft service. As BOH did not provide an accurate "brief description of the financial institution's overdraft services," as required by Regulation E, 12 C.F.R. § 1005.1, it was not authorized to charge Plaintiff and the class members overdraft fees on ATM and non-recurring debit card transactions.

31.   Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods. The ledger balance is the official balance of the account. It is the

balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.

32.   Further, based on information and belief, it is the balance used by BOH to report the deposits to regulators, shareholders and the public.  It is the deposit balance provided to regulators in call reports and reserve reports.  It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of BOH.

33.   When BOH refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the ledger balance.  In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the ledger balance and not the available balance, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive."  The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p. 9).

34.   Therefore, Plaintiff, on behalf of himself and all others similarly situated, seeks relief as set forth below.

**B.   Unlawful Overdraft Fees Assessed to Plaintiff Rodney Smith**

35.     Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in his account to cover the transaction. Plaintiff entered into an agreement with BOH when he opted-in to the overdraft program with BOH, wherein BOH contracted to charge overdraft fees on certain transactions only if his account did not have money to cover the transaction. By nonetheless charging Plaintiff overdraft fees, BOH breached its contract with Plaintiff.   It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee.   However, to give just one example, on September 9, 2015, Plaintiff had $297.05 in his account when he made a debit card purchase for $229.32, leaving him with a positive balance of $67.73.   Despite the fact that Plaintiff had sufficient funds in his account to cover the transaction, BOH assessed a $26 overdraft fee.   Plaintiff has a reasonable belief that a complete review of BOH's records will show multiple instances in which BOH improperly charged Plaintiff overdraft fees despite having money in his account to cover the transactions.

36.     Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in, and aggressively causing, subsequent transactions, which otherwise would not have been overdrafting, to be improperly treated as transactions for which BOH assessed further overdraft fees.   This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, at pp. 8-9.)   A complete evaluation of BOH's records is necessary to determine the full extent of Plaintiff's harm from this practice.

37.    Additionally, because the opt-in notice did not describe BOH's actual overdraft service, BOH violated Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*) by assessing overdraft fees on ATM and non-recurring debit card transactions. By failing to provide the full and accurate disclosures to Plaintiff required by Regulation E, BOH failed to obtain Plaintiff's fully informed consent and authorization to be charged such overdraft fees.  Because BOH was not legally authorized to enroll Plaintiff into the Courtesy Payment program for non-recurring debit card and ATM transactions, BOH also violated Haw. Rev. Stat. §

480 when it assessed any overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.

38.     Plaintiff was harmed by this practice when he was assessed overdraft fees for nonrecurring debit card and ATM transactions.  As noted, Plaintiff's records indicate that on September 9, 2015, Defendant assessed a $26 overdraft fee against Plaintiff due to a point of sale nonrecurring debit card transaction.  A complete evaluation of BOH's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

39.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

40.     Plaintiff brings this case, and each of his respective causes of action, as a class action pursuant to Hawai'i Rule of Civil Procedure 23(b)(1)(A)&(B), (b)(2), and (b)(3) on behalf of the following class.

41.     The "Class" is comprised of two potential classes:

**The Positive Balance Class:**

> **All persons who have or have had accounts with BOH who incurred overdraft fees for transactions when the ledger balance in the checking account was sufficient to cover the transactions in the six years preceding the filing of this Complaint.**

**The Regulation E Class:**

> **All persons who have or have had accounts with**

**BOH who incurred overdraft fee(s) for ATM or non-recurring debit card transactions since August 15, 2010.**

42.   Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

43.   This action has been brought and may be properly maintained on behalf of each member of the Class proposed herein under Hawai'i Rule of Civil Procedure 23.

44.   **Numerosity of the Class, Hawai'i Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of the members of the Class is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that BOH holds approximately $15 billion in assets and operates 65 branches in the State of Hawai'i.

45.   Upon information and belief, Defendants have databases and/or other documentation detailing its customers' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of BOH's customers have been harmed by its practices and thus, which customers qualify as Class members.   Further, the Class

definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify him or herself as having a right to recover. Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

46. **Commonality, Hawai'i Rule of Civil Procedure 23(a)(2).** This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class members include, but are certainly not limited to the following:

a.   Whether, pursuant to the Customer Agreements, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

b.   Whether Defendant breached the Customer Agreements by assessing overdraft fees for transactions when customers' checking accounts contained enough money to cover the transactions;

c.   Whether the language in the Opt-In Agreement—"An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."—described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees using an available-balance method instead

of a ledger-balance method;

   d. Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received;

   e. Whether Defendant's conduct violated state consumer protection laws; and

   f. Whether Defendant's conduct violated Haw. Rev. Stat. Chapter 480.

   g. Whether Defendant's Conduct violated Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*)

  47. **Typicality, Hawai'i Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Customer Agreements, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue are uniform for Plaintiff and all Class members. Accordingly, in pursuing his own self-interest in litigating his claims, Plaintiff will also serve the interests of the other Class members.

  48. **Adequacy, Hawai'i Rule of Civil Procedure 23(a)(4).** Plaintiff will

fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and his counsel intend to prosecute this action vigorously.

49.   **Predominance and Superiority, Hawaiʻi Rule of Civil Procedure 23(b)(3).** The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish

incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.   Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

50.   Plaintiff is not aware of any separate litigation instituted by any of the class members against Defendant.  Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class members and that he will adequately represent the Class. This particular forum is a desirable forum for this litigation because Plaintiff resides in Honolulu, Hawai'i, Defendant is headquartered in Honolulu, Hawai'i, and the claims arose from activities which occurred in or around Honolulu, Hawai'i.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

51.   Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members.   Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.   To the extent that any

further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

52. This matter is properly maintained as a class action pursuant to Rule 23(b) of the Hawai'i Rules of Civil Procedure, in that:

    a. Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

        1. Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        2. Adjudication with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

    b. Common questions of law and fact exist as to the members of

the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1. The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2. The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION
### (Violation of Haw. Rev. Stat. Chapter 480)

53. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

54. Plaintiff and each of the Class members are consumers within the meaning of Hawaiʻi's Unfair and Deceptive Practices Act, Chapter 480. Plaintiff and each class member are natural persons who primarily for personal, family, or household purposes purchased banking account services from Defendant.

55. The actions and omissions of Defendant were unfair or deceptive

acts or practices as prohibited by Haw. Rev. Stat. Chapter 480. Defendant's use of the available balance to assess overdraft fees instead of the ledger balance was a deceptive act or practice because it would have the tendency to mislead a reasonable consumer. In addition, Defendant's use of the available balance to assess overdraft fees instead of the ledger balance was an unfair act or practice because it was oppressive and caused substantial harm to consumers.

56.   In addition, BOH's overdraft service in its opt-in agreement does not describe its actual overdraft service as required by Regulation E.  The description states that an overdraft occurs "when you do not have enough money in your account to cover a transaction."  This language describes an overdraft service where overdrafts are based on the ledger-balance method (i.e., the actual balance) as opposed to the available-balance method actually used by BOH.

57.   In misrepresenting the actual nature of its overdraft protection, BOH failed to obtain the informed consent of the enrollees to the program. This deliberate misrepresentation precludes BOH's from assessing any overdraft fees. (See Regulation E).  This unlawful taking constitutes unfair and deceptive practices in violation of Haw. Rev. Stat. Chapter 480.

58.   Defendant's actions and omissions were in the conduct of trade or commerce.

59.   As a proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the Class members have been damaged in an amount to

be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

60.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

61.   Plaintiff and each of the Class members entered into two contracts with Defendant, which have been identified herein as the Customer Agreements.  Each of the Customer Agreements was drafted by and is binding upon Defendant.

62.   In each of the Customer Agreements, Defendant promised that BOH would assess overdraft fees only when there was not enough money in the account to cover the transaction.  However, this was not the actual practice of BOH.

63.   Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendants' misconduct.

64.   Defendants breached the express terms of the contract by, inter alia, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

65.   As a proximate result of Defendants' breach of these contracts, Plaintiff and the Class members have been damaged in an amount to be proven

at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION
**(Breach of the Covenant of Good Faith and Fair Dealing)**

66.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

67.    Plaintiff and each of the Class members entered into two contracts with Defendant, which have been identified herein as the Customer Agreements. Each of the Customer Agreements was drafted by and is binding upon Defendant.

68.    In each of the Customer Agreements, Defendant promised that BOH would assess overdraft fees only when there was not enough money in the account to cover the transaction. However, this was not the actual practice of BOH.

69.    Good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

70.    The material terms of the contracts also included the implied

covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contract.

71.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

72.    Defendant breached the implied covenant of good faith and fair dealing based on its practice of assessing fees when there was enough money in the account to cover the transaction, and failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions.  In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant executed a contractual obligation in bad faith, depriving Plaintiff and the Class members of the full benefit of the contract.

73.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

**FOURTH CAUSE OF ACTION**

## (Unjust Enrichment/Restitution)

74.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

75.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

76.    The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices.   In the CFPB Bulletin 2013-07[3], at p. 2, it defined Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition." This definition was elaborated upon in the CFPB Supervisory Highlights, Winter 2015, at p. 9  stating that "because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair."

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

77.    Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should they be allowed to retain such funds, Defendant will be unjustly enriched. Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

### FIFTH CAUSE OF ACTION
#### (Money Had and Received)

78.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

79.    Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

80.    As a result, Defendant has in its possession money, which in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members. Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

### SIXTH CAUSE OF ACTION
#### (Violation of Electronic Fund Transfers Act (Regulation E) 12 C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 et seq.))

81.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

82.     By charging overdraft fees on ATM and nonrecurring transactions, BOH violated the UCL by violating Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq.*), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights." (15 U.S.C. §1693(b)).

83.     Specifically, the charges violated what is known as the "Opt In Rule" of Reg E.  (12 C.F.R. §1005.17.)  The Opt In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. (*Id.*) Such notice "shall be clear and readily understandable."  (12 C.F.R. §205.4(a)(1)).  To comply with the affirmative consent requirement, a financial institution must provide segregated writing of its overdraft practices that are accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

84.     The intent and purpose of this opt-in notice is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u>

.... by <u>explaining</u> the institution's overdraft service ... in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948). This is "the CFPB's official interpretation of its own regulation" and "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E (*Strubel v. Capital One Bank (USA)*, 2016 U.S.Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

85.    The description of BOH's overdraft service in its opt-in agreement does not describe its actual overdraft service as required by Reg E.  The description states that an overdraft occurs "when you do not have enough money in your account to cover a transaction."  This language, simply copy-and-pasted from Reg E's Model Form A-9, describes an overdraft service where overdrafts are based on the ledger-balance method (i.e., the actual balance) as opposed to the available-balance method actually used by BOH.

86.    BOH failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  BOH has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including misstating its overdraft practices in the overdraft notice in by stating that it would assess an overdraft fee only when there is not enough money in the account to cover

the transaction. In actual practice, Defendant assesses overdraft fees even when there is money in the account to cover the transaction. Furthermore, upon information and belief, Defendant failed to meet some or all of the other requirements of 12 C.F.R. § 1005.17 in obtaining opt-ins of its customers to enter the overdraft fee program.

87.   As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions, BOH has harmed Plaintiff and the Class.

88.   Due to BOH's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class members pray for judgment against Defendants as follows:

1.   For an order certifying this action as a class action;

2.   For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.   For treble compensatory damages pursuant to Haw. Rev. Stat § 480-13.

4.   For an order requiring Defendants to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

5. For an order enjoining the wrongful conduct alleged herein;

6. For costs;

7. For pre-judgment and post-judgment interest as provided by law;

8. For attorneys' fees under the common fund doctrine, the customer Account Agreement, and all other applicable law; and

9. For such other relief as the Court deems just and proper.

DATED: Honolulu, Hawai'i, September 13, 2016.

Respectfully submitted,

Margery S. Bronster
Robert M. Hatch
BRONSTER FUJICHAKU ROBBINS

Richard D. McCune
McCUNEWRIGHT LLP

Taras Kick
THE KICK LAW FIRM, APC

Attorneys for Plaintiff
Rodney Smith and the Putative Class

Exhibit 1

# Consumer Deposit Account Agreement and Disclosure Statement and Bankoh Consumer Electronic Financial Services Agreement and Disclosure Statement



**Bank of Hawaii**

## Table of Contents

**Section I: Consumer Deposit Account Agreement and Disclosure Statement**

DEPOSIT AGREEMENT ..............................................................................................4

ACCOUNTS ..............................................................................................................4

DEPOSITS ...............................................................................................................7

FUNDS AVAILABILITY ...............................................................................................8

SUBSTITUTE CHECK POLICY DISCLOSURE FOR CONSUMER CHECKING ACCOUNT CUSTOMERS ................................................................................9

INTEREST ON DEPOSITS ..........................................................................................10

WITHDRAWALS .......................................................................................................11

ACCOUNT LIMITATIONS ...........................................................................................12

FEES .......................................................................................................................13

ADDITIONAL TERMS AND CONDITIONS ....................................................................13

Account Number ....................................................................................................13

Adjustments ...........................................................................................................14

Amendments/Changes In Account Terms ...............................................................14

Attorneys' Fees ......................................................................................................14

Cashing Checks for Others .....................................................................................14

Changes In Account Ownership, Address or Authorized Signers ..............................14

Checks and Deposit Tickets ....................................................................................14

Checks Bearing Notations ......................................................................................14

Check Endorsement ...............................................................................................15

Check Processing Cutoff Hour .................................................................................15

Check SafeKeeping and Image Enclosure ...............................................................15

Check Signature Verification ...................................................................................15

Checks Lost or Stolen .............................................................................................15

Compliance ............................................................................................................15

Conflicting Demands/Disputes ................................................................................15

Consent to Gather Information .................................................................................16

Death or Adjudication of Incompetence ...................................................................16

Deposit Insurance...................................................................................................16

Disclosure of Account Information............................................................................16

Electronic Fund Transfer Services ...........................................................................16

Facsimile Signatures ..............................................................................................16

Fax Instructions/Voice Mail/E-Mail ..........................................................................16

Foreign Checks ......................................................................................................16

Governing Law ...........................................................................................................17

Inactive, Dormant and Abandoned Accounts .........................................................17

Indemnification .........................................................................................................17

Internal Policies and Procedures .............................................................................17

Jury Trial Waiver. ......................................................................................................17

Legal Process ............................................................................................................17

Limitation on Time to Sue .......................................................................................17

New Account Verification ........................................................................................18

Other Agreements .....................................................................................................18

Overdrafts ..................................................................................................................18

Photocopies ...............................................................................................................18

Plan Documents ........................................................................................................18

Plan Termination .......................................................................................................18

Postdated or Undated Checks ..................................................................................18

Power of Attorney .....................................................................................................19

Preauthorized Drafts ................................................................................................19

Records ......................................................................................................................19

Returned Items/Transactions ...................................................................................19

Setoff and Security Interest .....................................................................................19

Severability ................................................................................................................20

Stale-Dated Checks ..................................................................................................20

Statements, Notices and Checks .............................................................................20

Stop Payment Orders ................................................................................................20

Subaccounts ..............................................................................................................21

Telephone and Electronic Communication Monitoring/Recording .......................21

Telephone Instructions .............................................................................................21

Termination/Closing Your Account .........................................................................21

Transfers/Assignments .............................................................................................21

Unauthorized Transactions ......................................................................................22

Waivers ......................................................................................................................22

WITHHOLDING OF INCOME TAX ......................................................................22

QUESTIONS OR COMMENTS ...............................................................................23


**Section II: Bankoh Consumer Electronic Financial Services
  Agreement and Disclosure Statement** ..............................................23


**Section III: Wire and Other Fund Transfers** ...............................................35

# DEPOSIT AGREEMENT

This booklet, our Privacy Statement for consumers, your signature card or online application, account interest rate and fee schedules, the Individual Retirement Account Application and Custodial Agreement (if applicable), agreements for additional services (if applicable), and (if applicable) the time deposit receipt that you receive when you open your account, represent our agreement with you and contain important information about your account. Please read them carefully. By signing our signature card or opening an account online, requesting an account or maintaining an account, you acknowledge that you have reviewed, understand and agree to be governed by this agreement. YOUR ATTENTION IS DRAWN TO THE AUTHORIZED SIGNERS PROVISION ON PAGE 11 and the JURY TRIAL WAIVER ON PAGE 17. You agree not to use your account or account services in a manner that violates applicable law, including (without limitation) the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control. We may freeze funds or block transactions if we have reason to believe a transaction may violate any law. You also agree to use your account or account services only for personal, family and household purposes, and will not use the account or account services for any business or commercial purpose.

**AVAILABILITY OF PRODUCTS AND SERVICES.** The products and services described in this Agreement may not be available to all customers, or available in all areas that Bank of Hawaii serves. Please consult your Bank of Hawaii branch for more information.

**Terms.** In this booklet, the words "you" and "your" refer to the owners and authorized signers/users of an account; "we," "us" and "Bank" refer to Bank of Hawaii.

**Our Relationship.** Unless otherwise expressly agreed in writing, our relationship with you will be that of debtor and creditor. No fiduciary, quasi-fiduciary or other special relationship exists between you and us. We owe you a duty of ordinary care.

# ACCOUNTS

We offer a variety of accounts to suit your needs. In addition to our traditional checking, savings and time deposit accounts, we offer the following products:

**Bankohana Account.** This is a tiered-rate, interest-bearing checking account that provides you with multiple benefits for having multiple account relationships with us. The monthly service fee is waived if you maintain the account's designated combined balance requirement. Depending on the account balance you agree to maintain, you will receive various products and services free or at a reduced cost. Although your related account balances are combined with your Bankohana account for qualification and statement purposes, each related account continues to be a separate account. All references to "Bankohana Account" shall mean this tiered-rate, interest-bearing checking account. The Bankohana Account is required in order to receive any Bankohana benefit and to establish related accounts. An account holder may have only one interest-bearing Bankohana checking account in which they are the primary account holder.

Combined Balance Requirement. There are three types of Bankohana accounts. Each provides its own set of services and benefits. The first account, Bankohana - Level I, is for customers who agree to maintain a combined average daily balance of $6,000 in all related accounts (Bankohana deposits and qualifying loans) during the month (the "Level - I Account"). The second account, Bankohana - Level II, is for customers who agree to maintain a combined average daily balance of $20,000 in all related accounts during the month (the "Level - II Account"). The third account, Bankohana - Level III, is for customers who agree to maintain a combined average daily balance of $50,000 in all related accounts during the month (the "Level - III Account"). If you maintain a Level - I Account, you will receive the services and benefits applicable to that account, even if you maintain a combined balance of $20,000 or more from time to time. Likewise, if you maintain a Level - II Account, you will receive the services and benefits applicable to that account, even if you maintain a combined balance of $50,000 or more from time to time.

Related Accounts. Funds in the following "related accounts," in addition to the interest-bearing Bankohana checking account, may be used to meet the balance requirements, provided the first person named in the title (the "primary owner") of your Level - I Account, Level - II Account or Level - III Account is also the primary owner of the related account and his/her taxpayer identification number is used for the related account:

- *Bank deposits* - All Bankohana savings, Bankohana Time Deposit or Bankohana Individual Retirement Account Plan ("IRA Plan").

- *Qualifying loans* - Outstanding balances in your consumer loans (except residential mortgages) and consumer lines of credit (except Bankoh CoverCheck). If your Bankohana account is in the State of Hawaii, we also count the outstanding balances of your Bank of Hawaii issued credit cards, the Bank of Hawaii Hawaiian Airlines® Visa Signature® Credit Card and the Bank of Hawaii Hawaiian Airlines Visa® Platinum Credit Card. Although you may open a Bankoh CoverCheck account to be used in conjunction with your Bankohana Account, the CoverCheck Account will not be counted towards the balance requirement.

- *Additional qualifying loans and Investment accounts for a Level - II Account or a Level - III Account* - You also may include a Bank residential mortgage loan (up to $10,000) and/or qualifying Bankoh Investment Services, Inc. ("BISI") Brokerage accounts. Qualifying BISI Brokerage accounts are determined from time to time by BISI. Please contact BISI at (808) 694-8500 for a description of current qualifying BISI Brokerage accounts. If you have more than one residential mortgage loan, we will only count the mortgage with the highest outstanding balance up to $10,000 towards the balance requirement. Note: SOME RESTRICTIONS APPLY. BANKOH INVESTMENT SERVICES, INC. (BISI) IS A NON-BANK SUBSIDIARY OF BANK OF HAWAII AND MEMBER FINRA/SIPC. BANKOH INVESTMENT SERVICES, INC. INVESTMENTS AND INSURANCE PRODUCTS: ARE **NOT** FDIC INSURED, ARE **NOT** INSURED BY ANY FEDERAL GOVERNMENT AGENCY, ARE **NOT** DEPOSITS OR OTHER OBLIGATIONS OF (OR GUARANTEED OR INSURED BY) BANK OF HAWAII OR ITS AFFILIATES, MAY **NOT** BE REQUIRED FOR PURCHASE IN ORDER TO OBTAIN CREDIT FROM BANK OF HAWAII OR ANY OF ITS AFFILIATES, AND MAY INVOLVE INVESTMENT RISKS INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED. The official securities position statements for BISI accounts will be sent by BISI's clearing firm, National Financial Services, LLC (NFS), which is considered the original statement of record.

Balance Calculation. We determine the combined average daily balance in your related Bankohana accounts on the second-to-the-last business day before month-end by adding together the following amounts:

(1) The average daily balance of your Bankohana account,

(2) The average daily balance of your related deposit accounts and

(3) The outstanding principal balance of all qualifying loans.

If you have a Level - II Account or a Level - III Account, the following additional balances (on the second-to-the-last business day before month-end) will be included in the combined balance requirement:

(4) The outstanding principal balance of one related mortgage account (up to a maximum of $10,000) and

(5) The balance of all of your qualifying accounts at BISI.

Account Benefits. Account benefits may change from time to time and may be subject to prior credit qualification. Here is a summary of some of the benefits that existed at the time this disclosure was printed.

- *Bank of Hawaii CoverCheck Account.* If you open a new or designate an existing Bank of Hawaii CoverCheck Account as a related account, we will waive the annual fee.

- *Personal Checks.* We will waive the fee for the Bankoh Collection Series Checks that we issue to you.

- *Safe Deposit Box Rental.* You will receive a $30 credit against safe deposit box rental fees at the time your rental payment is due if you have a Level - II Account or a Level - III Account, and a $15.00 credit if you have a Level - I Account. Rental is subject to availability. Automatic payment of your rental fee from a Bank of Hawaii checking or savings account is required.

- *Bill Pay Service.* We will waive the monthly fee for e-Bankoh Bill Pay services. (Other fees may apply.)

- *Check/EFT Stop Payment Orders.* We will waive the fee for Check/EFT stop payment orders you make in connection with your Bankohana Account or related accounts.

▪ *Additional Interest.* If you maintain a Level - II Account or a Level - III Account, you may receive an increased rate of interest on a related Bankohana Time Deposit, Savings Account and/or Money Market Savings Account. The amount of the increase is subject to change without notice at our discretion. You can obtain information on the current rate increase for any related account by contacting your branch of account. Any increase on an existing Bankohana Time Deposit Account is subject to change at renewal. Unless we specifically state otherwise, any additional interest or special interest promotion that we offer to the public will not apply to these accounts.

*Other Services.* If you maintain a Level - II Account or a Level - III Account, we will waive our service fees for traveler's cheques, Bank cashier's checks, notary services and incoming wire transfers. If your Level – II or Level - III Account is in the State of Hawaii, for the Bankoh Hawaiian Airlines® Visa® Check Card: we will discount your monthly fee by $2 for the Level – II Account; we will waive the monthly fee for the Level – III Account. These benefits will end if your Bankohana Account is closed for any reason. Any additional interest that you receive on a Bankohana Savings or a Bankohana Money Market Savings Account will end when your Bankohana Checking Account is closed, and on a Bankohana Time Deposit Account at the next renewal of the account.

<u>Monthly Statements.</u> We will send you a consolidated monthly statement that itemizes the activity for your Bankohana Account and any related deposit accounts you designate, provided you are listed as the primary owner on the accounts. Bankohana combined statements display the name of the Bankohana checking account owners only. Owners of any related Bankohana accounts are not displayed on the statement but are listed on the signature card or the account's governing documents you signed when you opened your account and are reflected on our customer information system. You will continue to receive your statements for your related loan, mortgage and qualifying BISI Brokerage account(s).

**Bonus Rate Savings, Bankohana Bonus Rate Savings and Bankohana Bonus Rate Saving Plus Accounts.** These accounts offer an increased rate of interest if you meet certain requirements.

<u>Requirements.</u> In order for your account to be paid the Bonus Rate (described below), you must (a) make the minimum deposit described below each month, and (b) not withdraw any funds (including but not limited to the following: through teller transaction, electronic bill pay, ATM withdrawal, loan payment, safe deposit box rental fee, clearinghouse debit, transfer debit, or wire transfer debit) from your account during the month (the "Bonus Rate Requirements"). Note: Unless we specifically state otherwise, any bonus interest or special interest promotion that we may offer separately to the public will not apply to these accounts.

If you have a Bankohana Bonus Rate Savings Account or Bankohana Bonus Rate Savings Plus Account and a Bankohana Checking is no longer maintained, we have the right to convert your account to a "regular" Bonus Rate Savings Account, which will then be subject to all the terms and conditions governing "regular" Bonus Rate Savings Accounts that are in effect at that time, including all applicable balance requirements, fees, charges, and interest rate(s).

<u>Interest.</u> You will be paid a tiered interest rate (the "Regular Rate") on your entire account balance each month. This means that, for each range of account balances indicated on the interest rate schedule we gave you when you opened your account, we will pay the corresponding interest rate and annual percentage yield on the entire balance in your account. You will also be paid a bonus interest rate (the "Bonus Rate") each month if you satisfy the Bonus Rate Requirements. If you do not satisfy the Bonus Rate Requirements during a month, your account for that month will only be paid interest at the Regular Rate. The Regular Rate, Bonus Rate and their corresponding annual percentage yields may change at any time at our discretion.

<u>Deposits.</u> A minimum qualifying monthly deposit, totaling the amount set forth in the Fee Schedule, must be made to your account each month in order to qualify for the Bonus Rate that month. If you withdraw any funds from your account during the month, you will not satisfy the Bonus Rate Requirements, and your account will only be paid interest at the Regular Rate.

**Kids Only Savings Accounts.** You must be under 17 years of age to open a Kids Only Savings Account. All the terms and conditions of the Regular Savings Account apply to this account, except that the minimum daily balance requirement and the monthly service fee will be waived. Upon your 17th birthday, your Kids Only Savings Account will automatically convert to a Regular Savings Account, and will then be subject to all of the terms and conditions

governing Regular Savings Accounts, including but not limited to the balance requirements and all fees that are in effect at that time.

**55+ Checking Accounts.** This is an interest-bearing checking account. You must be 55 years of age or older to open a 55+ Checking Account, and you are required to have a direct deposit of payroll, pension or social security ("direct deposit") made during the statement cycle in order to receive a monthly service fee waiver. If you do not have a direct deposit during a statement cycle, you will be charged the monthly service fee listed on our Fee Schedule. Trusts are not eligible for 55+ Checking Accounts.

**Retirement Savings and Retirement Time Deposit Accounts.** To open these accounts, you must have signed and submitted an Individual Retirement Account Application to us asking us to establish a Bankoh Retirement Plan in your name or you must be a participant in a Bankoh Business Retirement Plan (the "Plan"). Under the Plan, you may open one or more retirement savings and/or retirement time deposit account as your investment options under the Plan. You must deposit the amount specified in our Interest Rate Schedule to open your account, and your account is also subject to the applicable balance requirements and service fees listed in our Fee Schedule and the Plan Documents.

## DEPOSITS

**Source.** We may accept items payable to any of you for deposit to your account from any source without questioning the authority of the person making the deposit, and give cash back to any authorized signer(s) or designated agent on any check payable to any one or more of you, whether or not it is endorsed by you. If you make a deposit or payment that is not accompanied by instructions indicating how or where it is to be credited, we may apply it at our discretion to any loan or deposit account any of you maintains with us.

**Endorsements.** We may endorse and/or collect items deposited to your account without your endorsement, but may require your personal endorsement prior to accepting an item for deposit. If you deposit an item that bears the endorsements of more than one person or persons who are not known to us, we may refuse the item, require all endorsers to be present, or require that the endorsements be guaranteed by another financial institution acceptable to us before we accept the item.

You agree that we are not responsible for failing to complete a deposit to your account if the information you gave us with respect to the deposit is not correct or if you fail to provide us with any additional information we reasonably request. You further agree to reimburse us for any loss we incur because you fail to endorse a check or item exactly as drawn.

**Manner of Deposit.** You may deposit funds to your account in person at any of our branches. If you have a properly encoded Bank of Hawaii Visa® Check Card, Bankoh Hawaiian Airlines® Visa® Check Card, Bank of Hawaii Black Visa® Check Card or Bankoh BankCard, you may make deposits to your account at any automated teller machine branded as Bank of Hawaii ATM. You may also deposit funds to your account by mail. However, currency should not be sent by mail. We are not responsible for deposits made by mail until we actually receive the deposits. If you deposit a check or other item at a Bank of Hawaii ATM or by mail, you should endorse it "For Deposit Only" followed by the endorsement of all payees and your account number. Deposits made at a Bank of Hawaii branch located outside the jurisdiction where your account is domiciled will be credited to your account when they are received at your branch's processing center.

**Cutoff Hour.** If we receive an item for deposit or payment on a Saturday, Sunday or a U.S. federal holiday or after 2:00 p.m. on a business day, we may treat it as if we had received it on the next business day for processing purposes (see page 8 for a description of the funds availability cutoff hour).

**Accepting Items For Collection.** We may refuse to accept an item for deposit or may accept it on a collection basis. We generally take foreign or damaged items on a collection basis. If we accept an item on a collection basis, we may not credit your account with the funds until we receive payment from the payor financial institution. If we elect to credit your account before then, we may charge the amount back against your account if we do not receive payment for any reason. Note: We may reverse any credit we give for a foreign check that is accepted for deposit if we decide to send it on a collection basis. Foreign items also may be subject to a longer hold than is described in the 'Funds Availability' section. We will impose a fee in connection with sending and receiving an item for collection, whether

or not the item is paid. The institution upon which the item is drawn may also charge a fee in connection with the collection.

**Verification and Collection.** Any item that we accept for deposit or encashment is subject to later verification and final payment. We may deduct funds from your account if an item is lost, stolen or destroyed in the collection process, or if it is returned to us unpaid, or if it was improperly paid, even if you have already used the funds. Cash deposits are also subject to later verification. You waive any right to notice of nonpayment, dishonor or protest regarding any items credited to your account.

**Electronic Deposits.** Credit for an automated clearinghouse ("ACH") transfer is provisional until the receiving financial institution obtains final settlement. If final settlement doesn't occur, the originator of the transfer is not deemed to have made payment to the beneficiary, and the beneficiary's bank is entitled to a refund of the provisional credit. If we give you provisional credit for an ACH transfer, but do not receive final payment, you become obligated to us for the full amount without prior notice or demand.

We are not required to give you a separate notice of our receipt of an ACH transfer. If we accept ACH credits to your account, you will receive notice of the credit on your next regular periodic statement. Although we may send notice of a non-ACH incoming funds transfer (e.g., a wire), we assume no obligation to do so. Transfers to your account will be reflected on your regular periodic statement. You also can contact your branch of account during normal business hours to determine if a transfer has been credited to your account.

**Remotely Created Checks.** We may refuse to accept remotely created checks or demand drafts for deposit to an account with us. Upon our request, you agree to provide us with evidence of your authorization to create and/or deposit such items. You agree to indemnify, defend and hold us harmless from every loss, expense, cost (including attorney's fees), claim and liability related to or arising from such items, including (without limitation) claims that they were not authorized by the persons on whose accounts the items were drawn. In addition, you authorize us to charge any account you maintain with us if we are required to make any reimbursement concerning a remotely created check you deposited, for the amount of any reimbursement we make and any other amounts associated with the remotely created check.

## FUNDS AVAILABILITY

In some circumstances, we may either wait to credit your account, or credit your account but place a "hold" on the amount of a deposited check or item until final disposition is made with respect to the check or item. If your account is a State of Hawaii branch account and we do this, we will do so in accordance with the "Additional Rules for Accounts in the State of Hawaii" provisions in the following section, and we will provide you with an estimate of the number of days we will maintain the "hold" on the amount of the check or item, or when your account will be credited. We may place a hold or send for collection any check drawn on a foreign or remote bank, and in addition, if your account is a non-State of Hawaii branch account, we may place a hold on the amount of a deposited check or item, for example, if a deposited check is for a large amount. If we do this, we will give you an estimate of the number of business days we will maintain the "hold" on the amount of the check or item. Please understand, however, that these estimates will not always be accurate because of uncertainties in the check collection process which we cannot predict or control. Please ask if you need to be sure when funds from a deposit will be available.

For accounts opened online, funds from electronic transfers-used to open the account online will be available within 2 to 4 business days after the date your online account was credited.

### Additional Rules for Accounts in the State of Hawaii

**Your Ability To Withdraw Funds.** Our general policy is to make funds from your cash and check deposits available to you for withdrawal immediately (on the day of your deposit). Electronic direct deposits also will be available on the day we receive the deposit. Once they are available, you can withdraw the funds in cash, and we will use the funds to pay checks that you have written.

For determining the availability of deposits, every day is a business day except Saturdays, Sundays and U.S. federal holidays. If you make a deposit at a Bank of Hawaii branch or at a Bank of Hawaii ATM on a business day that we are open before the cutoff hour we establish for that location (Note: Some offices have a cutoff hour as early as 3:00 p.m., Bank of Hawaii ATMs have a cutoff hour as early as 12:00 noon), we will consider that day to be the day of your deposit. Cutoff hours are posted on Bank of Hawaii ATMs and vary by location. Information on the cutoff hour

is available from each branch. If your deposit is made at a Bank of Hawaii ATM, your deposit may not be considered received until the next business day.

**Longer Delays May Apply.** In some cases, we will not make all of the funds that you deposit by check available to you immediately. For example, if you make your deposit by mail, at an Instant Teller, or after the cutoff hour, your funds will be available on the first business day after the day of your deposit. Also, depending on the type of check you deposit, funds may not be available for withdrawal until the third business day after the day of your deposit. However, if you make a deposit to your checking account, the first $200 of your deposits will be available for withdrawal on the first business day after the day of your deposit.

If we are not going to make all of the funds from your deposit available immediately or by the first business day after the day of your deposit, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the first business day after we receive your deposit. If you will need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

- We believe a check you deposit will not be paid.
- You deposit checks totaling more than $5,000 on any one day.
- You redeposit a check that has been returned unpaid.
- You have overdrawn your account repeatedly in the last six months.
- There is an emergency, such as failure of computer or communications equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the eighth business day after the day of your deposit.

**Deposits Made at a Non-State of Hawaii branch.** If you make a deposit to your State of Hawaii account at a Pacific Island branch, we may delay your ability to withdraw funds. Your funds will generally be available no later than the twentieth business day after the day of deposit.

**Special Rules For New Accounts.** If you are a new customer, the following special rules may apply during the first 30 days your account is open.

Funds from electronic direct deposits to your account will be available on the day we receive the deposit. Funds from deposits of cash, wire transfers and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you. The excess over $5,000 will be available on the eighth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

Funds from all other check deposits will be available on the eighth business day after the day of your deposit.

## SUBSTITUTE CHECK POLICY DISCLOSURE FOR CONSUMER CHECKING ACCOUNT CUSTOMERS
### Substitute Checks and Your Rights

The Check Clearing for the 21st Century Act, also known as the "Check 21 Act," affects all U.S. banks and is designed to improve the overall efficiency of our nation's payment system.

**Substitute Check.** To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

We are not required to accept substitute checks from non-bank entities, such as individuals, companies, governmental units, trusts or other organizations.

## INTEREST ON DEPOSITS

**Interest Rates.** Interest rates paid on our accounts are based on market conditions and other business factors. Except for time deposit accounts (which earn the same interest rate through maturity), the interest rate and Annual Percentage Yield on deposits can change as often as daily, at our discretion, without prior notice to you. For current rates, please go to www.boh.com, visit one of our branches, or call us at:

- In Hawaii, U.S. Mainland and Canada, call our 24-hour Bankoh by Phone at 1-888-643-3888

- In Guam and Saipan, call our 24-hour Bankoh by Phone at 1-877-553-2424

- In Palau, call (680) 488-2602

Interest on tiered-rate accounts is determined by the interest tier into which the end-of-day balance falls. Different rates may apply to different tiers. This means that, for each range of account balances indicated on the interest rate schedule, we will pay the corresponding interest rate and annual percentage yield on the entire balance in your account.

The Annual Percentage Yield stated for time deposit accounts with terms greater than one year assumes that interest is transferred out and does not remain on deposit until maturity.

**Interest Calculations.** Interest is calculated on an actual/365-day basis (366-day basis for the Bonus Interest on a Bonus Rate Savings, Bankohana Bonus Rate Savings, and Bankohana Bonus Rate Savings Plus account in a leap year) and begins to accrue no later than the business day we receive credit for the deposit of noncash items (for example, checks). For regular and retirement time deposit accounts, interest begins to accrue on the business day you deposit the funds. However, if your deposit is made at a Bank of Hawaii branch located outside the jurisdiction in which your account is located, interest will begin to accrue on the deposit when it is received at your branch's processing center or on the business day we receive credit for the deposit, whichever is earlier.

We use the daily-balance method to calculate the interest on your account. This method applies a daily periodic rate to the principal in the account each day.

However, for Bonus Rate Savings, Bankohana Bonus Rate Savings and Bankohana Bonus Rate Savings Plus accounts, interest paid to your Account at the Bonus Rate will be calculated using the average-daily-balance method. This method applies a periodic rate to the average daily balance in your Account for the month. The average daily balance is calculated by adding the principal in your Account for each day of the month and dividing that figure by the number of days in the month.

**Payment of Interest.** Depending on the account, interest may be credited to your account at the end of your monthly or quarterly cycle, at maturity or when your account is closed. See our interest rate schedule and/or your time deposit receipt for interest rates. For time deposit accounts, interest is paid up to, but not including, the maturity date. Interest may be lost on some accounts if the account is closed prior to the end of the statement period or the regular interest payment date.

If your account is a Regular Savings Account, Bankohana Savings Account, Kids Only Savings Account, Personal Money Market Savings Account, Bankohana Money Market Savings Account, Personal Money Management Checking Account, Bankohana Checking Account, or 55+ Checking Account, interest is compounded daily and credited monthly. If you maintain a Bonus Rate Savings Account, Bankohana Bonus Rate Savings Account or Bankohana Bonus Rate Savings Plus Account, the Regular Rate is compounded daily and credited monthly, and the Bonus Rate (if applicable) is compounded and credited to your account monthly. In all cases, if you close your account or transfer your account to Pending Close Status (see page 21 of the Deposit Agreement) before interest is credited to your account, you will not receive the accrued interest. If your account has a zero balance after accrued interest is paid and any applicable service charges are assessed, your account may automatically close.

If your account is a regular time deposit account or Bankohana time deposit account with a term of one year or less, interest is not compounded and will be credited and paid in accordance with the payment instructions you made on

your Receipt. If your time deposit account has a term greater than one year and you have instructed us to pay interest to your time deposit account, interest is credited to your account annually and compounded, and paid at maturity.

If your account is a retirement time deposit account or Bankohana retirement time deposit account and has a term of six (6) months, interest for your account is not compounded. If your retirement time deposit account has any other term, except for an 18 month term, interest for your account will be compounded daily. For all retirement time deposit accounts other than an 18 month retirement time deposit account, interest will be credited to your account (i) on June 30 and December 31, (ii) when your account is closed; and (iii) at maturity. If your retirement time deposit account has a term of 18 months, interest for your account will be compounded quarterly and credited to your account at the end of each calendar quarter. If you have a Retirement Savings account, interest is compounded daily and credited monthly.

**Matured Time Deposit Accounts.** Time deposit accounts stop earning interest at maturity, unless our agreement with you provides otherwise. We reserve the right to change the rate of interest for automatically renewable accounts at each renewal period. If we elect not to permit the renewal of an automatically renewable time deposit account, we will notify you in advance. Unless specifically stated otherwise, any bonus or special promotion we are offering will not apply to automatically renewing time deposit accounts. For example, if your account is a "Bankohana TDA Special" it will renew as a Bankohana time deposit account.

At maturity, certain time deposit accounts will automatically renew for a new term at the rate then in effect for accounts of the same type, amount and duration. Except for time deposit accounts with a term of 31 days or less, you have a 10-calendar-day grace period after maturity during which a full withdrawal can be made without penalty on such accounts. Time deposit accounts with a term of 31 days or less have a 1-business day grace period after maturity during which a full withdrawal can be made without penalty. Time deposit accounts which do not automatically renew stop earning interest at maturity.

**Additional Deposits to and Early Withdrawals from Time Deposit Accounts.** Time deposit account customers agree to keep funds on deposit for a fixed period of time. Unless otherwise provided, partial withdrawals and additional deposits are not permitted. However, if your account is a retirement time deposit account and has a term of 18 months, you may make additional deposits of $25 or more into your account. If we permit an early withdrawal of principal from a time deposit, we may impose an early withdrawal penalty (see page 13). Tax penalties also may apply to premature distributions from IRAs and similar tax deferred accounts.

## WITHDRAWALS

**Manner.** If your account is a checking account, you may withdraw funds from your account by writing checks on your account. There is no limit on the number of checks you can write. If the person cashing a check you write does not have a Bank of Hawaii account, we may charge that person the check-cashing service fee listed in our current Fee Schedule for cashing the check at a Bank of Hawaii branch. You agree that we do not have to cash the check if the person cashing the check refuses to pay the fee. If your account is a savings account, you may not write checks on your account. We have the right to reject and return any check drawn on your savings account.

**Authorized Signers.** Your signature card/online application identifies who is authorized to make withdrawals, write checks, transfer funds, stop payments, obtain ancillary services and otherwise give us instructions regarding your account. Although your card may indicate that more than one signature is required on checks and for the withdrawal or transfer of funds, that notation is principally for your own purposes. We do not assume a duty to support multiple signature requirements, and we may act upon the instructions of any one authorized signer. As such, we assume no duty to confirm that two or more (or any combination) of authorized signers have approved any transaction despite any communication to us or any notation on your signature card to the contrary.

We may pay any check that bears a signature or endorsement (including a facsimile signature) resembling an authorized signature on file with us. You agree that signatures by your authorized agents (e.g., persons acting under a power of attorney) are valid, even if the principal-agent relationship is not indicated on the check or instruction.

We may honor checks drawn against your account by authorized signers, even if the checks are made payable to them, to cash or for deposit to their personal accounts. We have no duty to investigate or question withdrawals or the application of funds.

**Requirements.** We may refuse to pay any check that does not have the required number of signatures or that bears a signature that (in our opinion) does not satisfactorily compare with the specimen signature on file with us. All checks written on your account must be drawn in U.S. Dollars. If your checks are presented for payment or acceptance on a weekend, a holiday or after our processing cutoff hour, we may treat them as if we had received them on the next business day. We may process your checks and other transactions in any order we choose. We may refuse any check or other item drawn on your account or used to withdraw funds from your account if it is not on a form approved by us.

**Limitations.** We may refuse or limit withdrawals from any branch that is not your branch of account. We may (but are not obligated to) require suitable identification for any withdrawal or account closure. At our discretion, we may require all of your signatures for the withdrawal of funds and/or the closing of an account. We also may require non-customers to present suitable identification, including a fingerprint, in connection with any transaction.

Certain accounts are subject to transaction limitations and penalties for early withdrawal (see page 13). We may refuse to honor any withdrawal or order if funds on deposit are insufficient or unavailable to cover the request or order (see page 18) or there is a dispute or question as to the ownership of account funds (see page 15).

**Advance Notice.** Pursuant to federal law, we reserve the right to require 7 days advance written notice of an intended transfer or withdrawal from money market deposit accounts, interest bearing checking accounts, savings accounts, and savings subaccount. We currently do not exercise this right and have not exercised it in the past.

**Electronic Presentment/Posting.** We may charge your account on the day that a check or other transaction is presented (or returned) to us directly or electronically for payment. We also may charge your account or place a hold on funds at an earlier time if we receive notice that an item or transaction has been deposited for collection in another institution or is being processed against your account by a merchant (e.g., at a point-of-sale terminal). Please note: Some merchants may obtain authorizations in advance for point-of-sale transactions in an amount greater than the final transaction amount. This could affect the funds available in your account to cover other transactions.

**Remotely Created Checks.** If you provide your account number to a third party in order to charge your account by means of one or more remotely created checks or demand drafts (i.e., items which do not bear the maker's signature, but purport to be drawn with the maker's authorization), you authorize us to pay such items, even though they do not contain your signature and may exceed the amount you authorized to be charged. The provision shall not obligate us to honor such items. We may refuse to honor such items without cause or prior notice, even if we have honored similar items in the past

## ACCOUNT LIMITATIONS

**Deposits.** We may refuse to accept a deposit or an addition to an account, limit its size or return all or part of it to you. We reserve the right to limit the amount of funds that may be maintained in an account.

**Cash Withdrawals.** In addition to the limitations set forth below and in the "Withdrawal" and "Electronic Fund Transfers" sections, cash withdrawals may be limited due to the limited amount of currency available at a particular office.

**All Savings Accounts.** Transactions involving these accounts are limited by law. You may only make up to six withdrawals and/or transfers out of the account each monthly statement cycle by preauthorized or automatic transfer (e.g., automatic payments to an insurance company), draft, point-of-sale debit card, telephone and/or electronic banking. If you exceed these limitations, we may refuse to honor the excessive transactions, remove your transfer privileges, close the account without prior notice, convert it to another type of account, and/or impose a fee for exceeding the limits (see the Fee Schedule).

We may refuse or limit telephone and mail withdrawals at our discretion. The law does not limit the number of withdrawals you can make in person at your branch of account, at any of our Bank of Hawaii ATMs, at other automated teller machines, or transfers made for the purpose of repaying loans at Bank of Hawaii. Nor is there any limit on the number of deposits that can be made to your account each month (e.g., in person or by preauthorized or automatic transfer).

**Early Withdrawals from Time Deposit Accounts.** Unless our written agreement with you says otherwise, you are making an additional contribution to the Plan, or your account is an investment option under the Plan with a term of 18 months, you do not have a right to make early or partial withdrawals from, or additional deposits to your account during the term of your account. If you make an early withdrawal from your account, we will close your account and may impose the following penalty:

For Regular Time Deposit Accounts and Bankohana Time Deposit Accounts:

- For deposits with a term of 7 to 31 days, an amount equal to the greatest of: (i) the interest accrued on the amount withdrawn from the date of deposit or most recent withdrawal; (ii) the interest that would have accrued on the amount withdrawn for one-half of the term of your account; or (iii) 7 days interest on the amount withdrawn.

- For deposits with a term of 32 days up to and including 1 year, an amount equal to 2 months of interest on the amount withdrawn.

- For deposits with a term of more than 1 year, but less than 4 years, an amount equal to 8 months of interest on the amount withdrawn.

- For deposits with a term of 4 years or more, an amount equal to 11 months of interest on the amount withdrawn.

For Retirement Time Deposit Accounts and Bankohana Retirement Time Deposit Accounts:

- For deposits with a term of 6 months, an amount equal to 3 months of interest will be imposed.
- For deposits with a term of more than 1 year, an amount equal to 6 months of interest will be imposed.

We will add to the penalty any cash bonus that is paid to you upon the opening (or latest renewal) of your account.

If the penalty exceeds the amount of accrued interest at the time of withdrawal, we may deduct the difference from the principal. We will not impose a penalty if a withdrawal is made following the death or court-declared incompetence of any owner.

**Early Withdrawals from Retirement Savings and Retirement Time Deposit Accounts.** If your account is a retirement savings and/or retirement time deposit account under the Plan, any early withdrawal you make from your account may also be subject to the Federal tax penalties described in the Plan Documents. The Federal tax penalty generally does not apply if a withdrawal is made: (a) after you are age 59-½; (b) because of your death or disability; (c) as a qualifying rollover; (d) as a return of nondeductible contributions; (e) as part of a series of substantially equal periodic payments over your life expectancy or the joint life expectancy of you and your beneficiary; (f) for medical expenses which exceed 7-½% of your adjusted gross income; (g) for health insurance payments after you terminate employment and receive unemployment compensation for at least twelve (12) consecutive weeks; (h) for qualified higher education expenses; (i) for first-home purchases (up to a life-time maximum of $10,000); (j) due to an IRS levy; or (k) due to a qualified reservist distribution.

## FEES

Our Fee Schedule - Personal Checking and Savings Account ("Fee Schedule") describes the most frequently encountered fees associated with our accounts and services. Some services are negotiated separately and may be subject to other written agreements with us. Information on fees for services not covered by the Fee Schedule is available upon request. Certain fees may change without specific notice to you. Account owners must promptly pay the fees and charges associated with their accounts and services, and are jointly and severally liable for such fees. We may deduct account fees automatically from your accounts.

## ADDITIONAL TERMS AND CONDITIONS

**Account Number.** We will assign an account number to you for your account. Your account number must be encoded on checks and deposit tickets in magnetic ink to facilitate processing by electronic equipment. All notices, correspondence or inquiries about your account must include that number. If your account is a retirement time deposit account, all of your accounts under the Plan, which have the same term, will have the same account number and a

unique deposit identification number. For example, if you have three (3) retirement time deposit accounts, each with a term of six (6) months, they will all have the same account numbers; however the maturity and renewal dates will be determined based on the date each account was opened.

**Adjustments.** We may make adjustments to your account whenever a correction or change is required. Adjustments might occur, for example, if deposits are recorded in the wrong amount or items you deposit are returned unpaid. We may elect, at our discretion, not to make an adjustment to your account to correct an error which you or a third party (e.g., another financial institution) cause if the adjustment is less than $10 or our cost to make the adjustment is greater than the amount in question.

**Amendments/Changes In Account Terms.** We may change (add to, delete or alter) the terms of our agreement with you at any time. We may notify you of a change by mailing or delivering a notice, a statement message or an amended agreement to any of you at the last address on file for you, your account or the service in question. Unless otherwise required by law, we may amend the agreement without prior notice (e.g., by posting the information in our offices or otherwise making it available to you).

We may substitute similar services or discontinue currently offered services for certain accounts by giving you prior notice. We do not have to notify you, however, of any changes that are beneficial to you (e.g., a reduction or waiver of any fees or the addition of services) or if the change is necessary for security reasons.

**Attorneys' Fees.** If you break any promise under this agreement and we institute a lawsuit against you to collect any amount that you owe us, or if we become involved in any other litigation or proceeding initiated by a third party related to your account, you agree to reimburse us for any costs and expenses we incur, including our reasonable attorneys' fees, together with interest at the maximum rate allowed by law, and you further agree that we may charge those amounts against your account without prior notice to you.

**Cashing Checks for Others.** You should not use your account to cash checks for others who are not well known to you. Although we may make funds provisionally available to you and may take steps to determine whether a check will be paid, you are responsible for any loss that occurs if the check is returned to use for any reason (e.g., because it is counterfeit). Our employees cannot promise that checks drawn on or issued by other institutions, including cashier's checks, will be paid.

**Changes In Account Ownership, Address and Authorized Signers.** You agree to notify us immediately in writing of any change in your name, address or the authorized signers on your account. We may require a new signature card before any change in ownership or authorized signers becomes effective.

If the authorized persons on your account change, we may continue to honor items and instructions given earlier by any previously authorized person(s) until we receive specific notice from you in writing not to do so. (Note: A new or updated signature card, by itself, does not constitute notice to terminate any pre-existing payment or transfer plan.) In some instances we may require you to close your account or provide us with stop payment orders in order to prevent transactions from occurring. There may be a delay in implementing a change in the authorized persons on our records, and you agree that we will be given a reasonable opportunity to make the changes necessary.

**Checks and Deposit Tickets.** Check prices vary according to the types of checks you select. You can obtain information on the current price of checks by contacting your branch of account. Check charges may vary from time to time without specific notice to you. You are responsible for checking the accuracy of all information shown on your checks and deposit tickets. If you find an error, please notify us immediately. We are not liable for losses resulting from incorrectly printed checks and/or deposit tickets.

If you arrange for the printing of your own checks, the form, encoding and format of the checks must follow our check specification requirements and be approved by us in advance. We make checks available that include fraud prevention features and high quality MICR-ink. If you choose not to use them, you agree to assume a heightened degree of responsibility for safeguarding your checks, and for reviewing all statements as soon as you receive them.

**Checks Bearing Notations.** Although we are not obligated to, we may pay or accept checks and other items bearing restrictions or notations (e.g., "Void after 6 months," "Void over $50," "Payment in Full" and the like), whether on the front or back, in any form or format. If you cash or deposit an item or write a check with such a notation, you agree that it applies only between you and the payee or maker. The notation will have no effect on us, and you agree to accept responsibility for payment of the item. You agree to indemnify and hold us harmless from any claim or

alleged loss of any maker or payee involving such notations, whether you are the maker or payee or the funds are otherwise deposited into an account in which you have an interest.

**Check Endorsement.** U.S. federal regulations require that the top 1½ inches on the back (when read vertically from the trailing edge) of the check is designated for your endorsement as payee. If you or a prior endorser endorse a check in the area outside of the endorsement area, mark or otherwise obscure the other area, or make an endorsement which is illegible or incomplete, you agree to hold us harmless from any loss, delay, liability, claim or damage which occurs as a result.

**Check Processing Cutoff Hour.** Our processing cutoff hour with respect to any knowledge, notice, stop payment order or legal process received by us involving a check is one hour after the opening of the business day following the business day on which we receive the check. The cutoff hour with respect to setoffs exercised by us is the close of the business day following the business day we receive a check. The cutoff hour determines our obligation under state law to pay or return certain checks that have been received (but not finally paid) by us on the previous business day.

**Check SafeKeeping and Image Enclosure.** If you elect Check SafeKeeping, we will provide information regarding your checks on your statement. If you elect our Image Enclosure option, we will provide that same information on your statement and include an enclosure containing images of your items such as canceled checks. Please see your Fee Schedule for the Image Enclosure fee. You will not be assessed this fee during any statement cycle for which you have no Image Enclosure.

Your canceled checks will not be returned to you. We will maintain an image of each check for seven years. You can obtain copies of your checks by sending us a written request with the following information: your name, account number, check number, the amount of the check and (if known) the date the check was paid. We will not be responsible for any special or consequential damages you may incur under any circumstances if we are unable to provide copies of checks. Our liability, if any, will not exceed the face amount of the check in question. You agree to provide us with reasonable proof of any loss. You agree that by following this procedure, we have made your statements and canceled checks available to you for purpose of examination to discover unauthorized signatures, alterations or other irregularities.

**Check Signature Verification.** We may process certain checks mechanically, based on the information encoded on the items. This means that we may not visually examine each of your checks to determine if they are properly completed and endorsed. Although we may review checks from time to time, you understand that reasonable commercial standards do not require us to do so.

**Checks Lost or Stolen.** You agree to safeguard your checks, and to take reasonable steps to prevent their unauthorized use. If your checks are lost or stolen, you agree to notify us immediately. For security reasons, we reserve the right to close your account and transfer the balance to a new account. If we do, all checks written but not yet paid may be returned to payees as "Account Closed" or "Refer to Maker." You will be responsible for issuing any replacement checks.

When you cash or deposit a check or other item with us, we act as your agent to collect the item. The risk of loss of an item in the process of collection is on you. We may reverse any credit given and any interest earned or accrued for a deposited item that is lost in transit and we may recover from any account you maintain with us the funds given to you for a cashed item which is lost in transit. You will do everything reasonably within your ability to promptly assist us to find, identify or replace a lost item, including but not limited to maintaining a record of the maker of items delivered to us for deposit and collection. We shall not be liable to you if an item is lost in the process of collection provided we exercised ordinary care in handling the item. In no event shall we be liable to you if you cannot identify the maker of the lost item.

**Compliance.** You agree to comply with applicable law. You may not use your account or services for an illegal activity.

**Conflicting Demands/Disputes.** If conflicting demands over the ownership or control of an account arise or we are unable to determine any person's continuing authority to give instructions, we may, at our sole discretion: (1) freeze the account (less amounts due us) and withhold payment from all of you until we receive written proof (in form and substance satisfactory to us) of your right and authority over the account and its funds; (2) require the signatures of all of you for the withdrawal of funds, the closing of an account, or any change in the account regardless of the number

of authorized signers on the account; (3) request instructions from a court of competent jurisdiction at your expense regarding the ownership or control of the account; and/or (4) continue to honor checks and other instructions given to us by the individuals who appear as authorized signers according to our records. In no event will we be liable for any delay or refusal to follow instructions that occurs as a result of a dispute or uncertainty over the ownership or control of your account. We may return checks and other items, marked "Refer to Maker" (or similar language), in the event there is a dispute or uncertainty over an account's ownership or control.

**Consent to Gather Information.** Each of you authorizes us to obtain information from time to time regarding your credit history from credit reporting agencies and other third parties.

**Death or Adjudication of Incompetence.** You agree to notify us immediately of the death or court-declared incompetence of any owner, authorized signer or designated beneficiary on your account. You agree that we may disregard any notice of incompetence unless the person in question has been declared incompetent by a court of appropriate jurisdiction and we receive written notice and instructions from the court regarding the account. We also may freeze, offset, refuse and/or reverse deposits and transactions (e.g., governmental or retirement benefit payments payable to the deceased) if an owner dies or is adjudicated incompetent.

If your account is held in two or more names, your account and all funds, checks and other items belong to you as joint tenants, and upon the death of any owner, the deceased owner's share passes automatically to the surviving owner(s). Accounts that are held in an informal trust for the benefit of others ("In trust for" accounts) pass automatically (and in equal shares unless otherwise indicated in our records) to the named beneficiaries who survive the last surviving owner.

If we have any question as to the ownership of funds or the amount of funds that belong to any person upon the death of an owner, we may freeze all or part of the account pending receipt of proof (satisfactory to us) of each person's right to the funds.

**Deposit Insurance.** Your accounts with us are insured to the regulatory limits by the Federal Deposit Insurance Corporation (FDIC). For further information regarding insurance of accounts, you may write to the FDIC at 550 17th Street, NW, Washington, DC 20429, telephone the FDIC's toll-free consumer hotline at 1-877-ASK-FDIC (1-877-275-3342) or visit its website at www.fdic.gov.

**Disclosure of Account Information.** We may release information about your deposit, investment and loan accounts and the transactions you perform to third parties: where it is necessary or helpful in verifying or completing a transaction; to disclose the existence, history and condition of your account to consumer reporting agencies; when you give us your consent; to comply with the law or a court or governmental order; to our affiliated companies; to local, state and federal authorities if we believe a crime may have been committed involving your account; and as permitted by law. Please see our Privacy Statement for additional details.

**Electronic Fund Transfer Services.** Any authorized signer/user on an account may apply for any electronic fund transfer services we offer from time to time on behalf of all of you. Once an electronic fund transfer service is established, any authorized signer on your account may act alone in conducting electronic fund transactions, regardless of the number of required signers indicated on the signature card.

**Facsimile Signatures.** We may refuse to accept or may pay items bearing facsimile signatures. You agree to assume full responsibility for any and all payments made by us in reliance upon signatures that resemble the actual or facsimile signature(s) that any of you provide to us in connection with your accounts or services. You agree to indemnify, defend and hold us harmless from any and all actions, claims, losses, damages, liabilities and expenses (including attorneys' fees) arising directly or indirectly from the misuse or the unlawful or unauthorized use or copying of facsimile signatures (whether affixed manually, by stamp, mechanically, electronically or otherwise).

**Fax Instructions/Voice Mail/E-Mail.** We may, but are not required to, act upon instructions received by fax transmission, voice mail or e-mail. We may not review your message until the business day after its receipt. As such, it may not be appropriate to use these methods of communication if you need to reach us with time-sensitive information.

**Foreign Checks.** We may refuse to accept checks for deposit or collection if they are payable in a foreign currency. If we accept a foreign check, you assume all the risk of loss associated with currency value fluctuations and late returns. We may use our current buying or selling rate, as applicable, when processing foreign currency items and may

recover from your account any loss incurred in connection with our processing of such items. See 'Accepting Items for Collection' under the "Deposits" section for additional information.

**Governing Law.** Your account will be governed by this agreement and the laws of the jurisdiction in which your account is located. We may comply with applicable clearinghouse, Federal Reserve Bank and correspondent bank rules in processing certain transactions. You agree that we may act in accordance with those rules and that we do not have to notify you of a change in such rules, except to the extent required by law.

**Inactive, Dormant and Abandoned Accounts.** Please see our Fee Schedule for service fees associated with "inactive, and "abandoned" accounts. Unless we provide otherwise in our Fee Schedule, inactive, dormant, or abandoned accounts will be subject to the same fees as active accounts. If you have not made or do not make any transactions to or from your checking account for 12 consecutive months, or to or from your savings account for 24 consecutive months, we will classify your account as inactive.

Beginning one month following the date your account became inactive, and while your account remains inactive, we will charge your account the monthly Inactive Fee contained in the Fee Schedule. If you make a transaction to or from your account, or contact us to request a change to active status, we will reclassify your account as active. However, all Inactive Fees are non-refundable even if your account is subsequently reclassified as active. In addition, if you have not made any transactions to or from your account for the time period prescribed by applicable law, we will charge your account the special handling fee for abandoned accounts listed in the Fee Schedule and we will turn over the funds to governmental authorities as required by law. For security reasons, we may refuse a withdrawal or transfer from accounts we internally classify as inactive, dormant or abandoned if we cannot reach you in a timely fashion to confirm the transaction's authorization. If you have a Bankohana account, each of your related accounts will remain a separate account for determination of "inactive", "dormant" or "abandoned" status.

**Indemnification.** Except as otherwise set forth in this Agreement, you agree to indemnify, defend and hold us harmless from all claims, actions, proceedings, fines, costs and expenses (including, without limitation, attorney fees) related to or arising out of: (a) your actions or omissions in connection with your accounts or our services, or (b) our actions or omissions, provided that they are taken/omitted in accordance with this Agreement or your instructions. This provision shall survive the termination of this Agreement.

**Internal Policies and Procedures.** Any internal policies or procedures that we maintain in excess of commercial standards and general banking usage are solely for our own benefit and shall not impose a higher standard of care than otherwise would apply in their absence.

**Jury Trial Waiver. You and we each waive our respective rights to a trial before a jury in connection with any disputes related to your account or account services. This includes any claim by us or by you, claims brought by you as a class representative on behalf of others, and claims by a class representative on your behalf as a class member (so-called "class action" suits).**

**Legal Process.** We may comply with any writ of attachment, execution, garnishment, tax levy, restraining order, subpoena, warrant or other legal process which we believe (correctly or otherwise) to be valid. We may notify you of such process by telephone, electronically or in writing. If we are not fully reimbursed for our record research, photocopying and handling costs by the party that served the process, we may charge such costs to your account, in addition to fee listed in our Fee Schedule.

You agree to indemnify, defend and hold us harmless from all actions, claims, liabilities, losses, costs, attorneys' fees and damages associated with our compliance with any process that we believe to be valid. Accounts opened with trust or fiduciary designations (e.g., Personal Representative, Trustee or Conservator) may be subject to levies and other legal process against your property unless our records clearly reflect the existence of an express written trust or court order.

We will not pay interest on any funds we hold or set aside in response to legal process.

**Limitation on Time to Sue.** An action or proceeding by you to enforce an obligation, duty or right arising under this agreement or by law with respect to your account or any account service must be commenced within one year after the cause of action accrues.

**New Account Verification.** Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Therefore, when you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. In addition, we may use a third party service to verify and obtain information regarding your previous banking relationships. We also may report the status, history and/or closure of your account to such third party services.

**Other Agreements.** You may have another agreement with us which, by its terms, supersedes parts of this agreement.

**Overdrafts.** If you do not have sufficient available funds on deposit to cover the amount of a check or transaction (e.g., an in-person withdrawal, automatic payment, ATM withdrawal, BankCard or Check Card purchase, or other electronic transfer), we may return the check or reject the transaction without payment. We may elect, however, in our sole discretion to create an overdraft by paying the check or permitting the transaction. Either way, there may be a service fee for each item or transaction as stated in our Fee Schedule. We also may impose a Continuing Negative Balance fee for each seven-day period that your account remains in a negative balance condition at the end of each day (See your Fee Schedule). You will be charged no more than three Overdraft and/or Returned Item fees on any one day per account. Although no Overdraft or Returned Item fee will be imposed on any day that your ending account balance is or would have been overdrawn by less than $5, continuing overdrafts in any amount will be subject to the Continuing Negative Balance fee.

If you make a deposit on the same day that an item, service charge or transaction creates an overdraft (a "temporary" or "intra-day overdraft"), we may charge the fee for the overdraft since the covering deposit may not be posted until the end of the business day. In some cases (e.g., deposits received after our processing cutoff hour), the deposit may not be deemed received until the next business day.

If we permit an overdraft or otherwise allow your account balance to drop below zero, you agree to pay the amount of the overdraft promptly, without notice or demand from us. Note: Overdraft fees will not apply to ATM or everyday debit card transactions by consumers who have not authorized such fees.

Each account owner is jointly and severally responsible for paying any overdrafts created by any authorized signer(s) or party to the account, whether or not the owner participates in the transaction or benefits from its proceeds. You agree that subsequent deposits and other credits to the account may be used to satisfy an overdraft, regardless of the source of such deposit including, without limitation, deposits of government, welfare, retirement or social security benefits.

Our payment of any checks or allowance of transactions that create overdrafts in no way obligates us to continue that practice at a later time. We may discontinue permitting overdrafts without cause or notice to you.

We discourage the practice of overdrawing accounts. If you anticipate the possibility of repeated overdrafts, please consider applying for our CoverCheck or overdraft protection service, which is more dependable and may be less expensive.

**Photocopies.** Checks and other items are sometimes lost during processing or while in transit. If a photocopy of a check or other item that appears to be drawn on your account is presented to us for payment in place of the original, we may pay the photocopy if it is accompanied by a representation from another financial institution that the original item has been lost or destroyed. We will not incur any liability in the event the original item is later presented to and paid by us, unless a stop payment order is in effect for the check.

**Plan Documents.** If your account is a retirement savings and/or retirement time deposit account, your account is also subject to all of the terms and conditions contained in the documents governing the Plan (the "Plan Documents") which were given to you or the Plan sponsor when the Plan was established.

**Plan Termination.** Subject to the terms of this Agreement and the Plan Documents, you may terminate the Plan and withdraw the funds from your account at any time by notifying us. However, if you terminate the Plan within 180 days after the Plan is opened, your account will be subject to the early closing fee listed in the Fee Schedule.

**Postdated or Undated Checks.** We may pay or return any properly payable postdated or undated check upon presentation to us. You agree that we will not be liable to you for charging your account before the

indicated date on a properly payable but postdated check unless your account is located in the state of Hawaii and you notify us of a postdated check. Your notification must include the exact amount (dollars and cents), account number, check number, date of check, and the name of the payee. If you provide us with a postdated check notification in a timely manner which affords us a reasonable opportunity to act on it, we will not pay the item and may return it (marked 'payment stopped,' 'postdated' or otherwise) if it is presented to us prior to the date indicated in the notification (up to six months from the date of the notification). After six months, the notification is no longer effective and must be renewed. We may impose a fee for each notification. If we re-credit your account after paying a postdated check over a valid and timely postdated check notification, you agree to transfer to us all of your rights against the payee or other holder of the check, and to assist us in legal action taken against that person.

We may require you to submit or confirm an oral postdated check notification in writing. Our records will be conclusive evidence of the existence, details of and our decision regarding any oral postdated check notification or its revocation.

**Power of Attorney.** Any owner may provide us with a power of attorney. You should notify us in advance if you plan to create a power of attorney involving your account. Upon request, we may provide you with an appointment of agent form for that purpose. You can revoke your appointment of agent by sending a written notice to us at your branch of account. We will not be liable to you for following or refusing to follow the instructions of an attorney-in-fact or agent, whether or not the attorney-in-fact relationship is noted in the instruction (e.g., on any check signed by the attorney-in-fact).

**Preauthorized Drafts.** If you provide your account number to a third party in order to charge your account by means of one or more demand drafts (i.e., items which do not bear your actual signature, but purport to be drawn with your authorization), you authorize us to pay such drafts, even though they do not contain your signature and may exceed the amounts you authorized to be charged. This provision shall not obligate us to honor demand drafts. We may refuse to honor demand drafts without cause or prior notice, even if we have honored similar items previously. We are not under any obligation to verify whether the name and account number shown on a demand draft are consistent. You may not deposit demand drafts to an account with us without our prior, express written consent. We may discontinue accepting demand drafts at any time without cause or prior notice.

**Records.** We will keep records of your account to the extent and for the time required by law. We may convert paper records to images (e.g. microfilm and electronic files) or store records outside of the geographic area where your branch is located.

**Returned Items/Transactions.** If we are notified that an item you cashed or deposited is being returned unpaid, we may attempt to reclear the item, place a hold on the funds in question (see "Funds Availability") or charge your account for the amount (and any interest earned on it), whether or not the return is proper or timely. This also applies to checks drawn on us which are not paid for any reason. We may assess a fee for each returned item and notify you of the return orally, electronically, or in writing. We are authorized to pursue collection of previously dishonored items, and in so doing we may permit the payor bank to hold an item beyond our deadline.

If we receive an affidavit or a declaration under penalty of perjury stating that an endorsement on an item deposited to your account is forged (or that the item contains an alteration), we may charge the item back against your account or place a hold on the funds pending an investigation, without prior notice to you.

Any credit we give you with respect to an automated clearinghouse entry is provisional until we receive final settlement for the entry. If we do not receive final settlement, you understand and agree that we may charge your account for the amount, and that the party making payment to you (i.e., the originator of the transfer) shall not be deemed to have paid you the amount of the transfer.

**Setoff and Security Interest.** We may set off funds in your account for any direct, indirect and/or acquired obligations that any owner owes us, to the fullest extent permitted by law and regardless of the source of the funds in the account. You grant us a security interest in your account for amounts owing to us by any owner. This provision does not apply to IRA Plan or tax-deferred Keogh retirement accounts or to consumer credit card obligations.

**Severability.** If any of the provisions of this agreement are determined to be void or invalid, the remainder of the agreement shall remain in full force and effect.

**Stale-Dated Checks.** You agree that we may pay or reject a check which is presented to us for payment more than six months after its date (a "stale-dated" check), even if the presentation occurs after the expiration of a stop payment order. We normally do not examine the date on checks presented for payment. You agree that we are not required to identify stale-dated checks or to seek your permission to pay them.

**Statements, Notices and Checks.** If we provide you with a statement, electronically or otherwise, you must promptly and carefully review it to determine if any errors or problems exist. You agree to notify us immediately of any error, discrepancy or unauthorized transaction you discover on any statement, notice or check. If you fail to do so, you may become responsible for the losses resulting from such failure. We may deny a claim for monetary loss due to forged, altered or unauthorized checks if you fail to follow these procedures.

Statements are normally mailed to the last address listed with us for your account unless you have requested otherwise and/or requested online statements. If you ask us to hold statements and notices for you, we may mail them to you or, to the extent allowed by law, destroy them if they are not picked up by the next statement date. Notify us promptly if you do not receive your statement by the date you normally would expect to receive it.

Statements and notices sent or made available to any of you are deemed to be received by all of you. If we hold them at your request or if you fail to provide us with a current address, they will be deemed delivered to you when they are prepared, or otherwise made available for you. We may stop sending statements and notices to your last known address if the Post Office notifies us that mail to such address is undeliverable and you have not notified us of a new address. If your paper statement is returned with no forwarding address, a Returned Statement fee will be assessed (see your Fee Schedule). At our discretion, and to the extent allowed by law, we may destroy mail that is returned to us or determined to be undeliverable. If you have elected to receive statements electronically, we will send to the email address you provided, a notice alerting you of the statement's availability and Internet web site location where the statement is available. The statement will be available for at least 90 days from the date the statement first becomes available or from the date of the notice alerting you of the statement, whichever comes later. If our electronic communication is returned undelivered, we will take reasonable steps to attempt redelivery using information in our files.

You must mail or deliver all notices to us in writing at the branch(es) where you maintain your account(s) or at such other address(es) as we designate. Notices sent elsewhere may be delayed or may not reach the correct office. You should include your account number with any correspondence regarding your account.

**Stop Payment Orders.** Any owner or authorized signer on your account may request us to stop payment on a check or transaction. Your stop payment order must include the account number, check number, exact amount (dollars and cents), check or transaction date and the name of the payee. We will not be liable for paying a check or transaction over a stop payment order if the order is incomplete or incorrect. We must receive stop payment orders at a time and in a manner in which affords us a reasonable opportunity to act upon them.

There is a per-check/transaction charge for each stop payment order. Stop payment orders are valid for six months. After that time, the check may be paid and charged to your account unless you renew the stop payment order for an additional fee.

We are not required to accept oral stop payment orders for every type of transaction, but may elect to do so, and if we do, may require you to submit or confirm the oral stop payment in writing. Our records will be conclusive evidence of the existence, details of and our decision regarding any oral stop payment order or its revocation.

You may not stop payment on electronic point-of-sale debit card transactions, cashier's checks or checks or payments guaranteed by us. Under certain circumstances, however, you may be able to claim a refund on lost, stolen or destroyed cashier's checks 90 days following the date of their issuance. Please note that electronic stop payment requests (through our automated telephone or home banking system) may not be effective in stopping the payment of checks that have been posted to, but not finally paid from, your account on the preceding day. In order to ensure that those checks are not paid, you must contact one of our customer representatives in person, by telephone or in writing within one hour after we open on the day following the day we post the items to your account. You also should

contact a representative if you wish to stop the payment of a check that has been converted to an electronic transaction by a merchant.

You agree to indemnify, defend and hold us harmless from all actions, claims and damages related to or arising from our action in stopping payment on any check or transaction pursuant to your stop payment order.

**Subaccounts.** For regulatory reporting and reserve purposes, we divide checking accounts into two subaccounts: a checking subaccount and a savings subaccount. If your checking account earns interest, we will pay the same interest rate on both subaccounts. If it does not earn interest, no interest will be paid on either subaccount. In either case, your account will continue to operate, from your perspective, as one account.

We may establish a threshold for the balance maintained in the checking subaccount and may transfer funds periodically from one subaccount to the other to meet that threshold and cover transactions against your account. Your account statements will not reflect the existence of the subaccounts, and our periodic reallocation of funds between subaccounts will not affect your ability to withdraw funds, the interest rate (if any), fees or other features of your checking account.

**Telephone and Electronic Communication Monitoring/Recording.** We sometimes monitor telephone conversations and electronic communications for quality and control purposes. We usually do not record conversations without notice to you. YOU ACKNOWLEDGE AND AGREE THAT WE MAY MONITOR AND RECORD COMMUNICATIONS AT ANY TIME WITHOUT FURTHER NOTICE TO THE PARTIES TO SUCH COMMUNICATIONS.

**Telephone Instructions.** We may accept or reject telephonic instructions from you that are received outside of our Bankoh by Phone services. Our understanding of your instructions and our records shall be conclusive evidence of the actual instructions given. We are not required to accept instructions or permit withdrawals by telephone, and this does not constitute an agreement by us to do so. Telephone transactions involving certain accounts are also subject to transaction limitations (see page 12). For the terms associated with our Bankoh by Phone service, see the Bankoh Consumer Electronic Financial Services Agreement and Disclosure Statement on page 23. For terms associated with our e-Bankoh and e-Bankoh Bill Pay Service, see your e-Bankoh Consumer Agreement and Disclosure Statement.

**Termination/Closing Your Account.** Any authorized signer(s) may close your account at any time, with or without cause. We are not required to provide notice of such closure to the other authorized signers on the account.

We may automatically close your account if the account balance is zero. You will receive a final statement indicating the account is closed.

You agree that we may terminate your account relationship with us at any time without prior notice, with or without cause, by giving oral, electronic or written notice to any of you. We may also terminate your account without prior notice if any of you breach any agreement with us or we have reason to suspect fraudulent activity on your account. If account funds are not withdrawn at the time of termination, we may send a check for the collected account balance to any of you at the last address we have on file for the account. Thereafter, the funds will stop earning interest (even if the check is returned or remains uncashed for any reason).

We may dishonor any check, item or transaction presented for payment after an account is closed. At our sole discretion, we may honor checks, items and orders presented or occurring after an account is closed if the transaction is guaranteed by us to third parties (e.g., under a check guarantee or as part of an electronic fund transfer arrangement) or you fail to give us a timely stop payment order for any outstanding checks. You remain responsible for such items and transactions, which may be treated as overdrafts.

If you request, and we allow you to delay the closing of your account in order to pay outstanding checks totaling a designated dollar amount ("Pending Close Status"), you agree that if your account is an interest-bearing account, that interest will no longer accrue from and after the date you notify us of your intent to close your account and request Pending Close Status.

**Transfers/Assignments.** Unless otherwise agreed by us in writing, all accounts are non-transferable and non-negotiable. You may not grant, transfer or assign any of your rights to an account without our prior written consent. If you request a change in the ownership of your account, we may require you to close the account and open a new account. We are not required to accept or recognize an attempted assignment of your account or any interest in it,

including a notice of security interest. If we agree that a security interest may be taken in your account by a third party, the account will remain subject to our prior right of setoff, unless we agree otherwise in writing.

**Unauthorized Transactions.** If you discover a check forgery, alteration or other unauthorized transaction involving your account, you must promptly notify your branch of account in writing of the relevant facts. You agree to maintain a current check or account register and to carefully and promptly review all statements and notices we send to you. If you participate in our Check SafeKeeping service, your statements will be deemed to provide sufficient information about your checks and other transactions for you to determine whether any are forged, altered or unauthorized if the statements provide you with the check number, amount and date of payment.

You are in the best position to discover and report any unauthorized debit to your account. If you fail to notify us within a reasonable time (not exceeding 21 days) of an unauthorized signature, alteration, forgery, counterfeit check or other unauthorized debit to your account, we will not be responsible for subsequent unauthorized transactions by the same wrongdoer. Without regard to care or lack of care of either you or us, if you do not discover and report any such unauthorized transaction within 60 days after your statement, transaction information or the item is made available to you, you are precluded from asserting the unauthorized transaction against us. (Note: Different liability rules apply to certain electronic fund transfers. See your Bankoh Consumer Electronic Financial Services Agreement and Disclosure Statement starting on page 23, and your e-Bankoh Consumer Agreement and Disclosure Statement for details.)

If you claim a credit or refund because of an unauthorized transaction, you agree to provide us with a declaration containing whatever reasonable information we require regarding your account, the transaction and the circumstances surrounding the claimed loss. You also agree to make a report to the police and to provide us with a copy of the report, upon request. We will have a reasonable period of time to investigate the circumstances surrounding any claimed loss. During our investigation, we will have no obligation to provisionally credit your account, unless otherwise required by law (e.g., in connection with certain consumer electronic fund transfer services).

Our maximum liability will never exceed the amount of actual damages proven by you. Our liability will be reduced: (a) by the amount of the loss that is caused by your own negligence or lack of care; (b) to the extent that damages could not have been avoided by our exercise of ordinary care; and (c) by any loss recovery that you obtain from third parties (apportioned in accordance with this provision). We will not be liable for any loss that is caused in part by your negligence if we acted with ordinary care. Unless otherwise required by law, we will not be liable for incidental, special or consequential damages, including loss of profits and/or opportunity, or for attorney's fees incurred by you, even if we were aware of the possibility of such damages.

You agree to pursue all rights you may have under any insurance policy you maintain in connection with any loss associated with your account and to provide us with information regarding coverage. Our liability will be reduced, proportionately in accordance with our responsibility for any loss, by the amount of any insurance proceeds you receive or are entitled to receive for the loss. If we reimburse you for a loss and the loss is covered by insurance, you agree to assign us your rights under the insurance policy to the extent of our reimbursement, in accordance with this provision.

(Note: Different liability rules apply to certain electronic fund transfers. See your Bankoh Consumer Electronic Financial Services Agreement and Disclosure Statement starting on page 23, and your e-Bankoh Consumer Agreement and Disclosure Statement for details.)

**Waivers.** We may delay enforcing our rights under this agreement without losing them. Any waiver by us shall not be deemed a waiver of other rights or of the same right at another time, and will not be deemed to modify the terms and conditions of this agreement. You waive diligence, demand, presentment, protest and notice of every kind, except as set forth in this agreement.

## WITHHOLDING OF INCOME TAX

Unless you are exempt under federal law, we are required to withhold a portion of your taxable interest and certain other payments (this is referred to as backup withholding) if: (1) you fail to supply us, under penalties of perjury, with your correct taxpayer identification number ("TIN") [For most individuals, the TIN is their Social Security Number. We must receive your number even if you don't have to file a tax return]; (2) you fail to provide us with the required

certified information (e.g., that you are a U.S. person and are not subject to backup withholding); (3) the IRS instructs us to withhold; or (4) the IRS notifies you that you are subject to backup withholding.

We may report interest and other payments to you to the Internal Revenue Service (IRS), along with your TIN. Both we and the IRS use the TIN for identification purposes.

We may refuse to open, and we may close, any account for which you do not provide a certified TIN, even if you are exempt from backup withholding and information reporting. To avoid possible erroneous backup withholding, an exempt payee should furnish its TIN and indicate on the signature card that it is exempt.

A non-resident alien not subject to information reporting must certify his or her exempt status by completing an appropriate IRS certification form (e.g., W-8 BEN). Non-resident aliens are required to certify their exempt status every three years (or earlier upon request) to avoid backup withholding.

You may be subject to penalties, including civil and criminal penalties if you fail to provide us with a correct TIN or falsify information with respect to withholding. For additional information on interest reporting and withholding, contact your tax advisor or the IRS.

*How to Obtain a TIN.* If you don't have a TIN or you don't know your number, apply for one on Form SS-5, Application for a Social Security Card at the local office of the Social Security Administration or the IRS.

### What Number to Give Us

| For this type account: | | Give the SSN of: |
|---|---|---|
| 1. | Individual | The individual |
| 2. | Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account |
| 3. | Custodian account of a minor (Uniform Transfers to Minors Act) | The minor |
| 4. | The usual revocable living trust (grantor is also trustee) | The grantor-trustee |

### QUESTIONS OR COMMENTS

Note: The fees, rates and benefits described in this booklet and in the accompanying fee schedule were current as of the date of publication, but are subject to change. Prices listed are subject to sales tax wherever applicable. The products and services outlined in this agreement may not be available in all areas that Bank of Hawaii serves. Please consult your branch about the availability of products and services. If you have any questions or comments, you can contact us at the telephone numbers listed below:

- In Hawaii, U.S. Mainland or Canada, call our 24-hour Bankoh by Phone toll-free at 1-888-643-3888. TTY for the hearing impaired, dial 1-888-643-9888.

- In Guam and Saipan, call our 24-hour Bankoh by Phone toll-free at 1-877-553-2424. TTY for the hearing impaired, dial 1-888-643-9888.

- In Palau, call us at (680) 488-2602.

### BANKOH CONSUMER ELECTRONIC FINANCIAL SERVICES AGREEMENT AND DISCLOSURE STATEMENT

#### Please Read and Save

This agreement and disclosure statement governs and contains important disclosures required by applicable federal law about consumer electronic financial services you now have or may receive in the future.

A. **How to Contact Us.** If you believe that your Card or your Security Code has been lost or stolen, or that someone has electronically transferred or may electronically transfer money from your Designated Account without your permission, you must tell us immediately by telephone or in writing. You may also contact us at these addresses

and phone numbers if you want to add or change Cards or Services, or if you have any questions about your Cards, Services or any transactions covered by this Agreement.

**In Hawaii, U.S. Mainland and Canada:** Call our 24-Hour Bankoh by Phone toll-free at 1-888-643-3888. If you require the use of a telephone for the hearing impaired (TTY), dial 1-888-643-9888. Or write to us at Bank of Hawaii, Card Operations, P.O. Box 71160, Honolulu, HI 96807-1160.

**In Guam and Saipan:** Call our 24-Hour Bankoh by Phone toll-free at 1-877-553-2424. If you require the use of a telephone for the hearing impaired (TTY), dial 1-888-643-9888. Or write to us at Bank of Hawaii, Card Operations, P.O. Box 71160, Honolulu, HI 96807-1160.

**In Palau:** Call us at (680) 488-2602. Or write to us at Koror Branch, P.O. Box 340, Koror, Republic of Palau, 96940.

For more information about your rights and responsibilities for disputes, errors, unauthorized transfers, and lost and stolen Cards or Security Codes, please refer to Section E.

**B. About this Agreement**
Scope

1. **WHAT IS COVERED.** This Agreement covers all Electronic Fund Transfers that you make, or authorize a third party to make, now or in the future, which are not covered by a separate agreement you have with us. Electronic Fund Transfers that you authorize us to make are also covered, except for automatic transfers between your Deposit Accounts, between accounts owned by you and members of your family or between your savings or checking account and one of our accounts. This Agreement also governs electronic financial services which we may make available to you in the future.

2. **AVAILABILITY OF PRODUCTS AND SERVICES.** The products and services described in this Agreement may not be available to all customers, or available in all areas that Bank of Hawaii serves. Please consult your Bank of Hawaii branch for more information.

3. **WHAT IS NOT COVERED.** This Agreement does not cover: (a) Transfers to and from accounts which are not primarily established for personal, family or household purposes; (b) Transfers which are originated using a check, draft or other paper instrument, except transfers made through Electronic Check Conversion; (c) Transfers sent through the Federal Reserve Communications System or other similar networks that are used primarily for transfers between financial institutions or between businesses (often called "wire transfers"); (d) Transfers to purchase or sell securities or commodities; (e) Transfer instructions we receive by telephone that are not part of a telephone or other electronic bill-payment or similar system; and (f) Transfers using our e-Bankoh and e-Bankoh Bill Pay Services. Please contact us for the agreements (e-Bankoh Consumer Agreement and Disclosure Statement, Wire Transfer Agreement) which apply to these types of transfers.

**Definitions**

4. **To make this Agreement easier to read,** we gave the following words and phrases specific meanings.

An **"Account"** is a personal Bank of Hawaii Deposit or Credit Account, as defined below, approved by us for use with the Cards and/or the Services. From time to time, we may add or delete Deposit Accounts and Credit Accounts that are eligible for use with the Cards and/or the Services.

An **"Application"** is any oral, written or electronic request for Services and/or Cards (including replacement Cards and Security Codes) in order to perform Electronic Fund Transfers to or from your Designated Accounts.

An **"ATM"** is an automated teller machine. When we use the term "ATM", it means both Bank of Hawaii ATMs and Qualified ATMs.

Our **"Business Days"** are Monday through Friday, except U.S. federal holidays.

The **"Cards"** are the Bankoh BankCard, Bank of Hawaii Visa® Check Card, Bankoh Hawaiian Airlines® Visa® Check Card and Bank of Hawaii Black Visa® Check Card.

**"Credit Accounts"** are your installment loan, residential mortgage loan, Home Equity Loan and Line of Credit Accounts. Your Home Equity CreditLine, Equity FlexLine, Home EquityLine, Personal FlexLine, Premium FlexLine Accounts and private bank lines are collectively referred to in this Agreement as your "Line of Credit Accounts."

**"Deposit Accounts"** are your checking, savings and time deposit accounts.

**"Designated Accounts"** are created when you designate one or more of your Deposit Accounts and/or Credit Accounts for use with the Cards and/or the Services on an Application.

An **"Electronic Check Conversion"** occurs when you authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to pay for purchases or pay bills.

**"Electronic Fund Transfers"** are transfers, payments and deposits made through an electronic transmission and all point-of-sale, debit card and automated teller machine transfers that affect your Bankoh personal savings and/or checking account located in the United States and which are not governed by a separate agreement with us.

Your **"Security Codes or PINs"** are the personal identification numbers (often called "PINs"), and any other secret code issued by us in the future for use with the Cards and the Services to access your Designated Account and initiate Electronic Fund Transfers.

**"Services"** are any services we offer to initiate Electronic Fund Transfers that are not covered by another agreement you have with us, including any electronic financial services which we offer in the future.

**"You" or "your"** refer to everyone who owns or is authorized to do transactions on a Designated Account. "You" and "your" also mean anyone who has received or uses Cards and/or Security Codes to make Electronic Fund Transfers.

**"We," "us" or "our"** refer to Bank of Hawaii.

C. **Our Electronic Financial Services**
   **ATMs**

1. **WHERE YOU CAN USE YOUR CARDS.** You can use your Cards in all ATMs branded as "Bank of Hawaii ATM" and for limited purposes in ATMs of other financial institutions ("Qualified ATMs"). Qualified ATMs are connected to one of the networks we select for your use and display the network's logo. The backs of the Cards display the logos of the networks in use when they were issued.

2. **FEATURES AVAILABLE AT ATMS.** You can use your Card at ATMs to: (a) Withdraw cash from your Designated Account; (b) Check the current balance in your Designated Accounts, where available; and (c) Access your Designated Accounts to purchase event tickets, gift certificates and other non-cash items which ATM operators make available at selected locations.

3. **ADDED FEATURES AVAILABLE ONLY AT BANK OF HAWAII ATMs.** You can use your Card at Bank of Hawaii ATMs to also: (a) Transfer money between your Designated Accounts; (b) Make deposits into your Designated Accounts at selected locations; (c) Make a payment to a Credit Account or your Bank of Hawaii issued credit cards, the Bank of Hawaii Hawaiian Airlines® Visa Signature® Credit Card and the Bank of Hawaii Hawaiian Airlines Visa® Platinum Credit Card . by depositing a check or money order along with your payment coupon at selected locations; (d) Cash a check at selected locations; and (e) Obtain a mini-statement for your Designated Account, where available.

4. **CASH WITHDRAWAL LIMITATIONS.** We may limit ATM cash withdrawals from your Deposit Accounts to a total of $600 with your Bankoh BankCard, $800 with your regular Bank of Hawaii Visa Check Card and $1,200 with your Bankoh Hawaiian Airlines Visa Check Card or Bank of Hawaii Black Visa Check Card, in any one day. ATM operators may impose lower cash withdrawal limits. At some Qualified ATMs, you can obtain a cash withdrawal only if your Designated Account is a checking account.

5. **BALANCE INQUIRY LIMITATIONS.** The balance in your Designated Account is subject to our verification of your deposits, payments and other transactions. We will not be able to process some

transactions made on holidays or after regular business hours until the next Business Day, nor can we process items which have not yet been received by us, such as those placed in a night depository. As a result, the balance displayed at an ATM may not show some of the transactions involving your Designated Account. In addition, the available balance may not include uncollected deposits or other provisional credits and debits to your Designated Account, and may not include the amount available through lines of credit connected to your Designated Accounts.

6. **DEPOSIT AND CHECK CASHING LIMITATIONS.** Deposits will not be credited to your Designated Account until we verify the deposit. When a check is included in a deposit, the amount of the check will be credited subject to collection, and we reserve the right to charge back the amount that is not collected or paid. We may elect to allow you to either immediately withdraw part of a deposit or to cash a check at a Bank of Hawaii ATM. We will set limits for immediate withdrawals and check cashing based on our account experience with you, and may adjust, suspend or revoke your privileges at anytime. If any item from a check cashing transaction is returned to us, you authorize us to immediately debit your Designated Account for the amount of the item.

7. **ELECTRONIC FUND TRANSFER LIMITATIONS.** All Electronic Fund Transfers at a Bank of Hawaii ATM will be posted to your Designated Account no later than the following business day, regardless of what time of day they are initiated.

8. **RECEIPTS.** Each time you initiate an Electronic Fund Transfer at an ATM, you can get a receipt, containing a description of the transaction and other information required by law. You should retain the receipt for comparison with your Designated Account statements, and to aid in the reporting and resolution of errors.

9. **SURCHARGES.** A Qualified ATM operator and the network used to complete a transaction may choose to charge you a fee. Such fees are called surcharges, and are in addition to any fees charged by us. Before charging you a surcharge, the operator of a Qualified ATM in the United States must notify you of the surcharge by either posting a sign near the terminal or by showing it on the machine's screen and giving you the option to continue or exit the transaction.

10. **FOREIGN ATMS.** Some ATMs located outside of the United States and in territories or possessions of the United States do not have the capability to perform certain Electronic Fund Transfers. In most cases, you will be able to access only the primary Designated Account for which your Card is validated. ATM receipts and periodic statement descriptions for Electronic Fund Transfers initiated outside of the United States may not contain all of the information typically provided for Electronic Fund Transfers initiated within the United States.

**Bankoh by Phone**

11. **FEATURES PROVIDED.** Bankoh by Phone lets you make inquiries about balances, interest, deposits and checks paid; request delivery of statements by fax; transfer funds between your Designated Accounts; and make payments on your Bank of Hawaii Credit Accounts; and for State of Hawaii residents, make payments on your Bank of Hawaii issued credit cards, the Bank of Hawaii Hawaiian Airlines® Visa Signature® Credit Card and the Bank of Hawaii Hawaiian Airlines Visa® Platinum Credit Card by using a touch-tone telephone and a Security Code.

12. **ENROLLMENT.** By signing the signature card for your Deposit Account, you will be requesting us to designate the Deposit Account for use with our Bankoh by Phone Service. If you do not have a Deposit Account with us, you will be enrolled in the Service when you obtain your Credit Account. We will notify you of the Security Code for use with Bankoh by Phone Service when you open your Deposit Account or obtain your Credit Account. If you decide that you do not want the Bankoh by Phone Service, you must contact us at the appropriate address and/or telephone number specified in Section A. Please note that your Security Code for the Bankoh by Phone Service is specific to your name and not tied to any specific Account you have with us. Therefore, in order to have the Bankoh by Phone Service for one of your Accounts, you will need to have the Service activated for all of your Accounts. This also means that, if you terminate the Bankoh by Phone Service for one of your Accounts, we will need to terminate your Security Code, and therefore, the Service will be terminated for all of your Accounts.

13. **TIMING OF TRANSFERS.** Transfers cannot be made from your time deposit accounts through Bankoh by Phone. Our cutoff hour for acting on your instructions is 11:00 p.m., Hawaii Standard Time ("HST"), each Business Day. Transfers and payments made after 11:00 p.m., HST, Monday through Friday, or on weekends and U.S. federal holidays, will be processed on the following Business Day. Payments for Bank of Hawaii issued credit cards, the Bank of Hawaii Hawaiian Airlines® Visa Signature® Credit Card and the Bank of Hawaii Hawaiian Airlines Visa® Platinum Credit Card may take up to 5 Business Days to be processed. Account balance information may not reflect recent transactions and may include funds that are not available for immediate withdrawal. The account balance information feature of Bankoh by Phone is not subject to the error resolution or liability sections set forth below.

14. **BALANCE INQUIRY LIMITATIONS.** The balance in your Account(s) is subject to our verification of your deposits, payments and other transactions. We will not be able to process some transactions made on holidays or after regular business hours until the next Business Day, nor can we process items which have not yet been received by us, such as those placed in a night depository. As a result, the balance obtained through Bankoh by Phone may not reflect recent transactions and may include funds that are not available for immediate withdrawal, including any holds placed on your account.

**Point-of-Sale Purchases**

15. **VISA PURCHASES.** You can use your Bank of Hawaii Visa Check Card, Bankoh Hawaiian Airlines Visa Check Card or Bank of Hawaii Black Visa Check Card to pay for purchases with merchants who accept Visa branded cards (a "Visa Purchase"). Your Visa Purchases and over-the-counter withdrawals (Cash Advances) may be limited to a total of $2,500 per day when using a Bank of Hawaii Visa Check Card, $5,000 per day when using a Bankoh Hawaiian Airlines Visa Check Card, or $10,000 per day when using a Bank of Hawaii Black Visa Check Card. You agree that we have the right to deny any transaction if the transaction will cause this limit to be exceeded or exceeds the funds available in your Account. All transactions into or from the Account will be stated in U.S. dollars. For transactions outside of the U.S., American Samoa, Guam, Saipan, Palau, the U.S. Virgin Islands or Puerto Rico, an International Service Assessment Fee will be applied to the transaction amount, whether originally made in U.S. dollars or a foreign currency, as set forth in the Fee Schedule-Personal Checking and Savings Accounts. If your transaction is made in a foreign currency and converted to U.S. dollars by Visa when the item is processed, the exchange rate between the transaction currency and the billing currency used for processing international transactions is a rate selected by Visa. Visa selects the rate from the range of rates available in wholesale currency markets from the applicable central processing date, which may vary from the rate Visa itself receives or the government-mandated rate in effect for the applicable central processing date. We do not determine the currency conversion rate which is used.

16. **'ATM' OR 'DEBIT' PURCHASES.** You can use your Card for bill payments or to pay for purchases at merchant locations that have point of sale terminals displaying the logo of one of our participating networks. These purchases, often called "ATM" or "Debit" purchases may or may not require a PIN. Merchants must provide you with a processing choice if they support this option. These purchases do not qualify for the benefits of Visa Purchases. Some merchants allow you to withdraw cash from your Designated Account as part of your purchase transaction, and those merchants set all dollar limits and other rules for those transactions. Your ATM and Debit purchases may be limited to a total of $2,500 in any one day when using your Bank of Hawaii Visa Check Card or Bankoh BankCard, $5,000 in any one day when using your Bankoh Hawaiian Airlines Visa Check Card, or $10,000 in any one day when using your Bank of Hawaii Black Visa Check Card.

17. **MERCHANT DISPUTES.** We are not obligated to negotiate or settle any disputes you may have with a merchant about goods and services you purchase. Under certain circumstances, we may choose to assist you in submitting Visa Purchase disputes to the Visa dispute resolution process.

18. **STOP PAYMENTS AND RETURN OF SALES DRAFTS.** You understand and agree that you cannot stop payment on any authorized point-of-sale purchase. We will not routinely return either the original or any copy of the sales draft or cash withdrawal draft generated by a point-of-sale purchase.

**Other Electronic Fund Transfers (including Direct Deposit)**

19. **SINGLE ELECTRONIC FUND TRANSFERS.** You may directly authorize third parties to make a single Electronic Fund Transfer (such as an Electronic Check Conversion transaction or purchase over the Internet or phone) from your checking or savings account. You generally may not be able to stop payment on these single Electronic Fund Transfers in a timely manner.

20. **PERIODIC PAYMENTS.** You may authorize third parties, like utilities and merchants, in writing or some other similarly authenticated manner to periodically transfer funds from your checking or savings account (a "Periodic Payment"). These transfers are sometimes marketed by businesses using names like "automatic bill payment."

21. **PERIODIC PAYMENTS WITH VARYING AMOUNTS.** If you authorize Periodic Payments in varying amounts (for example, to pay an electric bill that changes from month to month), the third party must notify you, at least 10 days before each scheduled payment date, of the amount of the payment and the scheduled payment date. You may choose instead to receive this notice only when the electronic payment differs by more than a certain amount from the previous one or when the amount falls outside certain dollar limitations that you have set.

22. **STOP PAYMENTS.** If you authorize a Periodic Payment, you can place a stop payment on one or more payment(s) by notifying us at least three (3) Business Days before the scheduled payment date. If you notify us orally, we will also require you to put your request in writing and deliver it to us within fourteen (14) days after your oral notification. If you meet this requirement and we do not stop the payment, we will be liable to you for your losses or damages. For each stop payment order you submit to us, we will charge your Designated Account the stop payment fee listed in the applicable fee schedule.

23. **CANCELING ALL FUTURE PERIODIC PAYMENTS.** You can cancel all future Periodic Payments by revoking your authorization with the third party in accordance with the terms and conditions set forth in the authorization agreement.

24. **DIRECT DEPOSITS.** If you arrange to have deposits electronically transferred to your Designated Account at least once every 60 days from the same third party (often called a "direct deposit"), you can call us to find out whether or not the deposit has been made. This information is also available through our Bankoh by Phone Service. By law, we are not required to provide this information if the third party making the direct deposit notifies you every time a direct deposit is made. Electronic fund transfers involving an Automated Clearinghouse are not final until we receive final settlement of the deposit. We have the right to reverse direct deposits to your Designated Account if we do not receive final settlement of the deposit.

25. **REFUSAL OR DELAY IN PROCESSING.** You agree that we may refuse to process or delay processing any ACH transaction if we have reason to believe a transaction would violate any guideline, rule, policy, law or regulation of any government authority or funds transfer or payment system.

26. **ACH TRANSACTION RULES/LAWS.** Except as otherwise set forth in this agreement, you agree to be bound by all Federal Reserve and fund transfer system rules and regulations, including without limitation, the Operating Rules of the National Automated Clearing House Association, that apply to an ACH transaction. You agree not to violate the laws of the United States, including without limitation, the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control.

**D. Terms Applicable to All Electronic Fund Transfers**
**Application for Cards and Services**

1. **You may request a Bankoh BankCard, Bank of Hawaii Visa Check Card, Bankoh Hawaiian Airlines Visa Check Card or Bank of Hawaii Black Visa Check Card, replacement Card or Service from us at any branch, by telephone or Internet.** We will send the requested Card and/or Security Code to the postal address in our records for your primary Designated Account.

**Your Use of the Cards and Services**

2. **AGREEMENT.** By using the Cards and/or the Services and by making Electronic Fund Transfers, you agree to all of the terms and conditions contained in this Agreement.

3.  **CONSUMER USE ONLY.** The Cards and the Services are not specifically designed or intended for business or commercial purposes. Therefore, you may only use the Cards and Services for personal, family and household purposes, and may not use the Cards and the Services for any commercial purpose, including but not limited to making transfers or payments on behalf of any other person or entity. You agree to take full responsibility if your accounts are business or commercial accounts, and to reimburse us for any loss, costs or expenses we incur as a result of your use of the Cards and the Services for business or commercial purposes. You agree that you must be at least 16 years of age to qualify for the cards.

4.  **TIMING AND LIMITS OF ELECTRONIC FUND TRANSFERS.** Unless a different time is specified in this Agreement, all Electronic Fund Transfer requests must be received by us by 5:00 p.m. Hawaii Standard Time in order for the transfer to be completed on that Business Day. We do not limit the frequency or dollar amount of your Electronic Fund Transfers, except to the extent stated in this Agreement or disclosed through the Services.

5.  **CARD AND SECURITY CODE LIMITATIONS.**

    (a) You may only use the Cards or the Security Code for the purposes described in this Agreement to the extent the law allows and to the extent the particular Service is able to perform the transaction. You agree not to use the Cards or the Security Code to:

    (i)  Make a withdrawal of cash from your Designated Account which exceeds the maximum daily withdrawal limits under this Agreement;

    (ii) Initiate an Electronic Fund Transfer which would cause the balance of collected funds in your Designated Account to go below zero or, if your Designated Account has Bankoh CoverCheck or overdraft protection coverage, to exceed the credit limit of that protection; or

    (iii) Initiate an Electronic Fund Transfer affecting any account which is not your Designated Account.

    (b) **Transaction Authorizations and Card Limitations.** Certain purchases and cash advances may require an authorization from us or our service bureau prior to completion of the transaction. In some cases, the Authorized User may be asked to provide identification. If the authorization system is not functioning, we or our data processor may not be able to authorize a transaction even if the Card Account has sufficient funds and you or your Authorized Users are within the established limits. We may also limit or refuse to complete an Electronic Fund Transfer if necessary for security reasons. We will not be liable to you or the Authorized User if any of these events should occur and a transaction is not authorized and completed.

    (c) **Lodging Reservations and Merchant Authorizations.** Under certain circumstances, a hotel may require the use of a Card to hold reservations, and such use may result in a hold on the collected funds in your Card Account (a "Guaranteed Reservation"). If an Authorized User cancels any Guaranteed Reservation made using the Card, the Authorized User must obtain a cancellation number. If the Authorized User fails to do so, the hold placed for the Guaranteed Reservation will not be canceled and the amount will be held against the collected balance in the Card Account. This may limit the future transactions by all Authorized Users. Further, if the hotel subsequently charges the amount of the Guaranteed Reservation to the Card Account, we will not be obligated to recredit the Card Account if the Authorized User fails to obtain a cancellation number, even though the charge was an error and you followed the error resolution procedures contained in this Agreement. In addition, authorizations issued for Card transactions at non-hotel merchant locations must be canceled when an Authorized User initiates a Card transaction and subsequently uses another form of payment for the transaction such as a credit card or cash, since failure to have the authorization canceled may also result in a hold on funds in the Card Account and limit future transactions by all Authorized Users.

    If you do any of these things, we may complete the transaction but we are not required to do so. If we do so, you agree to pay us any excess or improperly withdrawn or transferred amount immediately upon request. We reserve the right to limit the number and amount of Electronic Fund Transfers. We may also limit or refuse to complete an Electronic Fund Transfer if necessary for security reasons.

6.  **LINE OF CREDIT ACCOUNT ADVANCE LIMITATIONS.** To the extent available, you may obtain advances from your Line of Credit Accounts, except for your credit card and private bank line accounts, through the Services. Such advances must be transferred into one or more of your Deposit Accounts. You may not obtain an advance under your Line of Credit Accounts and transfer the funds to us in order to make a monthly payment on any of your Credit Accounts. All advances on your Line of Credit Accounts are subject to any minimum draw and other transaction requirements contained in the applicable Account agreements. You are not required to use the Services to obtain advances from your Line of Credit Accounts. You may still use any other method that is permitted in the Account Agreements for those accounts to obtain advances.

7.  **DEPOSIT ACCOUNT TRANSFER LIMITATIONS.**

    (a)  Transfers from your Deposit Account may not be completed if you do not have sufficient funds in your Deposit Account to do so, or the funds in your Deposit Accounts are subject to a hold on the funds pursuant to our current hold policy. If you do not have sufficient available funds on deposit to cover a transfer of funds from your Deposit Account, we may reject the transfer without payment. We may elect, however, in our sole discretion to create an overdraft by allowing the transfer. If we allow the transfer and the amount of the overdraft created exceeds your available CoverCheck or overdraft protection credit limit, if any, we will charge your Deposit Account the service fee for each transfer as stated in the Fee Schedule.

    (b)  You may not transfer funds from any of your savings Accounts which are pledged as collateral for loans you have with us or a third party. If your Designated Account is a savings Account, you are limited to making 6 transfers or withdrawals from your savings Account in any calendar month, of which no more than 3 transfers may be made to a third party by check, draft or Electronic Fund Transfer. If you exceed these transfer limits in any one month, we may refuse to honor the excessive transactions, remove your transfer privileges, close your Designated Account without prior notice to you, convert your Designated Account to another type of account, and/or impose a fee for exceeding the limits (see the Fee Schedule).

**Relationship of this Agreement to Your Account Agreements**

8.  **ENTIRE AGREEMENT.** This Agreement, along with the agreements for your Accounts (the "Account Agreements"), including but not limited to our Fee Schedule, as well as Applications and any other terms and conditions referenced in this Agreement, constitute the complete and exclusive agreement between you and us related to Electronic Fund Transfers using the Cards and the Services.

9.  **AMENDMENT OF ACCOUNT AGREEMENTS.**

    (a)  You agree that this Agreement amends your deposit agreement for your checking account and also your Bankoh CoverCheck or overdraft protection Agreement, if you have one.

    (b)  Regardless of any Account Agreement language to the contrary, you authorize us to debit or credit your checking account as appropriate for the total amount of any sales draft, cash withdrawal draft or credit voucher originated by the use of the Cards to initiate a point-of-sale transfer and/or any other Electronic Fund Transfer you authorize. Each Electronic Fund Transfer debit entry will have the same legal effect as your check written on your checking account. Each Electronic Fund Transfer credit entry will have the same legal effect as a deposit to your checking Account.

    (c)  In the event of a conflict between this Agreement, the Account Agreements, any statement by our employees or agents, or any representation or statement relating to or set forth in the Services as to matters relating to the Services, then this Agreement shall control. To the extent that any terms and conditions of this Agreement are inconsistent with the Account Agreements, the Account Agreements are amended. These amendments will automatically terminate if this Agreement and your use of the Cards and/or the Services terminates, and from that time the Account Agreements will remain in effect without the amendments made in this Agreement. Except for amendments specifically made by this Agreement, all of the terms and conditions of the Account Agreements, including but not limited to the provisions on jury trial waiver and the Fair Credit Reporting Act, remain unchanged and in full force and effect.

10. **JOINT AND INDIVIDUAL RESPONSIBILITY AND AUTHORITY.** If your Account affected by an Electronic Fund Transfer is a joint account, then each of you will be bound by this Agreement and each of you will be individually and jointly responsible for paying all amounts owed under this Agreement. In addition, unless prohibited or restricted by applicable law, you acknowledge and agree that each one of you is fully authorized to take any and all actions related to an Electronic Fund Transfer on behalf of all of you, including but not limited to obtaining, using and terminating Cards and Security Codes, and for initiating Electronic Fund Transfers to and from your Designated Account.

11. **TWO SIGNATURE LIMITATIONS.** You acknowledge and agree that we have informed you that Checking Accounts which require two signatures to make withdrawals or otherwise transact business are ineligible for Electronic Fund Transfer services. You also agree that if you submit an Application for a Card or Security Code for such a Checking Account, or if you authorize an Electronic Fund Transfer affecting that Checking Account, we can rely on the authorization of one authorized person, and such use constitutes the waiver of a second signature.

12. **STATEMENTS.** Information on all of the Card transactions and Electronic Fund Transfers made by use of the Cards and the Services during a particular month will appear on the periodic statement for the affected Accounts. If you are an e-Bankoh customer and you have elected to receive your periodic statements electronically, a notice will be sent to the email address you provided to alert you of the statement's availability and Internet web site location where the statement is available. The statement will be available for at least 90 days from the date the statement first becomes available or from the date of the notice alerting you of the statement, whichever comes later. The periodic statements for your Accounts prepared by us (your "Account Statements") are the official statements for your Accounts. You agree to promptly check and carefully review your periodic statement and compare them with any statements obtained through the Services for your Accounts. If there are discrepancies between your deposit or credit account statements and any statements obtained through the Services, you should contact us at the telephone or address in Section A.

13. **FEES.** You agree to pay on demand all periodic, replacement card and service fees that we may charge for or in connection with the issuance and use of Cards, Security Codes or Services. Those fees and charges are listed in the current Fee Schedule(s) we have given you. We may change those fees from time to time, and we will provide you with notice of such change as required by applicable law. We may deduct the amount of the fees from your Designated Account. If your Designated Account is a Checking Account, you will pay to us on demand any debit balance in your Designated Account caused by the deduction of fees or Electronic Fund Transfers, along with any overdraft charges.

14. **PROMISE TO PAY CREDIT EXTENDED.** You agree that you will be liable for all credit, including Bankoh CoverCheck or overdraft protection credit, extended to any authorized person using your Card or your Security Code. A debit balance in your Designated Account which activates your Bankoh CoverCheck or overdraft protection account, if any, will be repaid under the terms of your Bankoh CoverCheck or overdraft protection account agreement. If you have a Bankoh BankCard, a Bank of Hawaii Visa Check Card, a Bankoh Hawaiian Airlines Visa Check Card, a Bank of Hawaii Black Visa Check Card or a Security Code, you agree that any Bankoh CoverCheck or overdraft protection credit or other Credit Account advance issued to any minor who is a member of your family by use of your Bankoh BankCard, your Check Card and/or your Security Code shall be for a necessity of life.

15. **ATTORNEYS' FEES.** If we ever have to file a lawsuit to collect what you owe us, you agree to pay our reasonable expenses, including our attorneys' fees and costs.

**Security and Privacy**

16. **YOUR SECURITY CODE.** You are responsible for the confidentiality and use of your Security Code and any transactions initiated with your Security Code. You should not write your Security Code down at all, but if you do, do not write it on the Cards or any place where it may be found with the Cards or used to access the Services. If you disclose your Security Code to someone, you are authorizing him or her to access your Designated Account and to do anything that you could do at any time, even if you only intend to authorize him or her to perform a specific transaction.

17. **DISCLOSURE OF INFORMATION.**

(a) By submitting an Application, you authorize us to verify the information it contains. If you agree as part of a written Application, we may receive and exchange information about you, both now and in the future.

(b) We will disclose information to third parties about your Accounts with us or the Electronic Fund Transfers you make: (i) Where it is necessary for completing an Electronic Fund Transfer; or (ii) In order to verify the existence and condition of your Account for a third party, such as a credit bureau or merchant; or (iii) In order to comply with governmental agency or court order; or (iv) If you give us your written permission; or (v) To our affiliates or third parties for marketing or other legitimate business purpose, to the extent permitted by applicable law.

(c) Please refer to our Privacy Statement for additional information about our responsibility to protect the privacy of your personal financial information.

18. **RECORDING OF COMMUNICATIONS.** When you use a telephone or computer to access the Services or otherwise communicate with us, the transfer, Account inquiry, e-mail or other information you enter or speak may be recorded for confirmation or quality assurance purposes. By using the Services, you consent to such recording.

**Other Contract Terms**

19. **SERVICE EQUIPMENT.** You are responsible for obtaining, installing, maintaining and operating any telephone, computer and other electronic and telecommunication devices you use in connection with the Services. We will not be responsible for any errors or failures from the malfunction or failure of the electronic and telecommunication equipment you use to access the Services.

20. **SERVICE OUTAGES.** Although the Services are usually available 24 hours a day, 7 days a week, at certain times such as during maintenance periods, some or all of the Services may not be available.

21. **EXCLUSIONS OF WARRANTIES.** YOU AGREE THAT WE ARE PROVIDING THE CARDS AND THE SERVICES ON AN "AS IS" BASIS WITHOUT ANY WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

22. **ENDING THIS AGREEMENT.**

(a) You may terminate this Agreement at any time by calling us or writing to us at the telephone number or address in Section A and no longer using the Cards or the Services. If you terminate your use of the Services, you agree to provide us with ten (10) Business Days prior written notice. In addition, before you terminate the Services, you must separately cancel all of your checking and savings account transfers and line of credit transfers you scheduled through the Services. If you do not cancel them before you terminate the Service, those transfers may still be made.

(b) We may terminate this Agreement, your use of the Cards and/or Services or your ability to make other Electronic Fund Transfers at any time for any reason without prior notice. Your Cards and access to the Services may, for example, be terminated if your Accounts are closed for any reason, or if you do not use the Services for a continuous period of twelve (12) months or more, or we believe your Accounts and/or the Cards or the Services are being used improperly or illegally. We may also refuse to renew your Card when it expires if you have not used your Card for twelve (12) consecutive months.

(c) You agree that you will return the Cards to us when this Agreement is terminated. Whether you terminate this Agreement or we do, the termination will not affect your obligations under this Agreement, even if we allow any Electronic Fund Transfer to be completed after this Agreement has been terminated. You will be responsible for any Card or Service fees which have not been posted to your Designated Account. Termination will not affect your liability or obligations under this Agreement for Electronic Fund Transfers we process on your behalf.

23. **CHANGING THIS AGREEMENT.** We may change or add to the terms and conditions of this Agreement, and by making changes or additions to the Cards and the Services at any time by notifying you of the change by sending you a notice by U.S. Mail, sending a notice to your e-mail address, or by posting the changed

terms on the Services, or any other means permitted by applicable law. If you do not agree to the change or amendment, you must notify us prior to the effective date of the change or amendment, stop making Electronic Fund Transfers and cancel your access to the Cards and the Services. By making Electronic Fund Transfers using the Cards and the Services after the effective date of any amendment, change or addition to this Agreement, the Cards or Services, you agree to that amendment, change or addition.

24. **NOTICES.** All notices from us will be effective when we have mailed them or delivered them to the last address that we have for you in our records. Notices from you will generally be effective once we receive them at the appropriate address specified in Section A. If more than one person signed your Application, notice to or from one of the individuals who signed the Application will be effective for everybody who signed it.

25. **ASSIGNMENT.** You may not assign your rights or obligations under this Agreement to any other person. We may assign this Agreement or delegate any or all of our rights and responsibilities under this Agreement to any affiliate or third party.

26. **WAIVER.** No delay or omission by us in exercising any rights or remedies there under shall impair such right or remedy or be construed as a waiver of any such right or remedy. Any single or partial exercise of a right or remedy shall not preclude further exercise therefore or the exercise of any other right or remedy. No waiver shall be valid unless in writing signed by us.

27. **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of jurisdiction in which your Accounts are located. If any term of this agreement cannot legally be enforced, this Agreement is to be considered changed to the extent necessary to comply with the law.

E. **Errors, Disputes and Lost/Stolen Cards and Security Codes**

1. **JURY TRIAL WAIVER.** You and we each waive our respective rights to a trial before a jury in connection with any disputes related to your Accounts, your Cards or the Services. This includes any claim by us or by you, claims brought by you as a class representative on behalf of others and claims by a class representative on your behalf as a class member (so-called "class action" suits).

2. **IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUND TRANSFERS.** In case of errors or questions about your Electronic Fund Transfers, contact us at the appropriate telephone number and address listed in Section A as soon as you can, if you think your statement or receipt is wrong or if you need more information about an Electronic Fund Transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

    (a) Tell us your name and your account number;

    (b) Describe the error or the Electronic Fund Transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information; and

    (c) Tell us the date and dollar amount of the suspected error.

    If you tell us orally, we may require that you send us a signed written statement of your complaint or question within 10 Business Days. We will tell you the results of our investigation within 10 Business Days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will provisionally credit your Designated Account within 10 Business Days for the amount you think is in error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 Business Days, we may not provisionally credit your Designated Account. For errors involving transfers initiated at point-of-sale terminals or outside the United States, the periods referred to above are 10 Business Days and 90 days instead of 45 days to investigate your complaint or question. If your account is a "new account," the bank has 20 Business Days instead of 10 Business Days to issue provisional credit, and 90 days instead of 45 days to complete their investigation. The extended time periods apply to Electronic Fund Transfers made during the first 30 calendar days after the first deposit to the account is made. If we decide that there was no error, we will send

you a written explanation of our findings within 3 Business Days after we finish our investigation and a notice of your right to request copies of the documents that we used in our investigation. If we provisionally credited your Designated Account, we will also notify you that the credit has been reversed and that we will honor up to the amount in dispute, without imposing any overdraft charges, any checks, drafts or other similar paper instruments drawn on your Designated Account and any preauthorized Electronic Fund Transfers from your Designated Account for a period of 5 Business Days after our notice of reversal is sent to you or provide you notice that the credit will be reversed in five days.

3. **OUR LIABILITY FOR FAILING TO COMPLETE YOUR ELECTRONIC FUND TRANSFERS.** If we do not complete an Electronic Fund Transfer to or from your Designated Account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

   (a) If through no fault of ours, you do not have enough money in your Designated Account to make the Electronic Fund Transfer;

   (b) If the Electronic Fund Transfer will exceed your Bankoh CoverCheck or overdraft protection credit limit;

   (c) If, through no fault of ours, we have not actually received enough money to cover an electronic deposit from a third party;

   (d) If the funds in your Designated Account are subject to legal process or other encumbrances restricting the Electronic Fund Transfer;

   (e) If the ATM where you are making the Electronic Fund Transfer does not have enough cash;

   (f) If our processing system was not working properly and you knew about the problem when you started the Electronic Fund Transfer;

   (g) If circumstances beyond our control (such as fire or flood) prevent the Electronic Fund Transfer, despite reasonable precautions that we have taken;

   (h) If this Agreement is terminated and/or if your Cards, Services and/or Security Codes are canceled pursuant to the terms of this Agreement;

   (i) If the authorization for your Electronic Fund Transfer is revoked by law or court order (in case of death or incompetence, for example); or

   (j) If the Services, your telephone, your computer or other telecommunication link you use to access the Services is not working properly and you knew about the malfunction when you started the Electronic Fund Transfer;

   (k) You have not provided us with the correct transfer information;

   (l) If other exceptions are provided in other agreements we have with you or by applicable law. We will rely on the identifying numbers you provide us in processing your Electronic Fund Transfers. We will not be responsible for any conflict between these numbers and the identity of the parties or accounts involved.

4. **CREDIT REPORTING.** If you believe that we may have reported inaccurate information about your Designated Account or your Electronic Fund Transfers to a consumer reporting agency, write to your branch of account whose address is provided on the front of your Designated Account Statement or call our 24-Hour Customer Service Center (numbers provided in Section A). Please include an identification of the information and why you feel it is inaccurate.

5. **LOSS OF YOUR CARD, PIN, OR CODE OR USE OF INFORMATION FROM YOUR CHECK; YOUR LIABILITY FOR UNAUTHORIZED ELECTRONIC FUND TRANSFERS.** You must tell us AT ONCE if you believe your Card or your Security Code has been lost or stolen, or if you believe that an Electronic Fund Transfer has been made without your permission using information from your check. Telephoning is the best way of reducing your possible losses. You could lose all the money in your

Designated Account plus the maximum amount of your Bankoh CoverCheck or overdraft protection service. If you tell us within 2 Business Days, after you learn of the loss or theft of your Card or Security Code you can lose no more than $50 if someone used your Card or your Security Code without your permission. If you do NOT tell us within 2 Business Days after you learn of the loss or theft of your Card or your Security Code and we can prove we could have stopped someone from using your Card or your Security Code without your permission if you had told us, you could lose as much as $500. Also, if your account statement shows Electronic Fund Transfers that you did not make, including those made by card, code or other means, you must tell us AT ONCE. If you do not tell us within 60 days after the statement was mailed or delivered to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time period.

6.  **UNAUTHORIZED USE OF YOUR CHECK CARD FOR POINT OF SALE TRANSACTIONS.** If you believe your Check Card has been lost, stolen or compromised and has or will be used for an unauthorized point-of-sale transaction at a merchant location which displays the Visa logo, you must notify us AT ONCE by calling us at the numbers or writing us at the address listed in Section A Your card will be deactivated and a new card issued. You will not be liable for any unauthorized use that occurs after you notify us unless we reasonably determine that you were grossly negligent or fraudulent in handling your Check Card.

7.  **ZERO LIABILITY BENEFIT FOR VISA POINT OF SALE CHECK CARD TRANSACTIONS.** Upon notification from you of an unauthorized Visa transaction, we will immediately evaluate your claim, and will limit your liability to zero provided that you were not grossly negligent or fraudulent in the handling of your Card. Written notification must be received within 60 calendar days of the mailing date of the first statement showing any unauthorized transactions. We may increase this limit if, based upon substantial evidence, it is reasonably determined that you were grossly negligent or fraudulent in the handling of your Card. We will provide you with provisional credit for unauthorized Visa transactions within five business days from receipt of written notification as indicated above, unless circumstances warrants us to withhold or delay provisional credit. An 'unauthorized Visa transaction' EXCLUDES either or both: (1) any transaction by a cardholder or person authorized by a cardholder; and/or (2) any transaction by a cardholder that exceeds the authority given by the Visa check card account holder. This Zero Liability Benefit does not apply to ATM Transactions or non-Visa purchases made using the 'ATM' or 'Debit' functions of a merchant terminal (also known as 'PIN-based' purchases).

## WIRE AND OTHER FUND TRANSFERS

The following terms apply to funds transfers ("payment orders") that are governed by Article 4A of the Uniform Commercial Code of Hawaii. Generally speaking, this includes transfers to or from you or your accounts through Fedwire or other fund transfer systems. These provisions do not apply to ACH transactions or to transfers by check, draft or similar instrument or any electronic fund transfer subject to the Electronic Fund Transfer Act or Regulation E. If you have a separate agreement with us with respect to payment orders, such as wire transfers, the terms of that agreement will supersede any conflicting terms in this section.

**Processing Orders.** At our discretion, we will transfer funds at your direction to another account with us or to an account maintained at another financial institution. We reserve the right to reject any payment order without cause or prior notice, and may notify you of the rejection orally, electronically or in writing. We generally send a rejection notice by the end of the business day following the business day on which the order would have been processed.

**Payment Order Accuracy.** You must accurately describe the beneficiary of your payment order and the beneficiary's financial institution. If you describe any beneficiary or institution inconsistently by name and account number, we and other institutions may process the order solely on the basis of the account number, even if the order identifies a person or entity different from the named beneficiary or institution. We may also process incoming fund transfers based on the account number, rather than on any inconsistent name reflected in the payment order. If you give us a payment order that is erroneous in any way, you agree to pay the amount of the order whether or not the error could have been detected by any security procedure we employ.

**Cutoff Hours.** Our processing hours for payment orders vary based on location, transaction type and other factors. Information about our processing hours is available upon request. We may process any payment order we receive on a non-business day or after our processing cutoff hour on our next funds transfer business day. Our business days are Monday through Friday, excluding holidays.

**Cancellation and Amendment of Payment Orders.** You do not have a right to cancel or amend any payment order after we receive it. Although we may attempt to act on any amendment or cancellation request you make (e.g., if it is received in a time and manner which permits us to do so), we assume no responsibility for failing or refusing to do so, even if we could have effected the change or cancellation. You agree to indemnify, defend and hold us harmless from any loss, damage, claim, action and liability that results, and any charges and costs we incur, in connection with any request by you to amend or cancel a payment order.

**Unauthorized Payment Orders.** We may process any payment order we believe is transmitted or authorized by you if we act in compliance with a security procedure agreed upon by you and us. Such payment orders will be deemed effective as if made by you, and you will be obligated to pay us in the amount of such orders, even though they are not transmitted or authorized by you. Unless we agree on another security procedure, you agree that we may confirm the authenticity and content of payment orders (among other ways) by placing a call to any of you. If we cannot reach you or if the payment order is not confirmed or approved in the manner we require, we may refuse to execute the payment order.

**Notice of Errors.** You agree to review all statements and notices promptly to confirm the accuracy and authorization of each payment order. You will notify us immediately if there is any discrepancy between your payment order and any confirmation or statement of account, or if you discover any other problem with respect to a transfer. You must send a written notice to us of the discrepancy or other problem, including a statement of the relevant facts, within a reasonable time (not to exceed 14 days from the date you first discover the problem or receive a statement or notice reflecting the problem, whichever occurs first).

**Limitation of Liability.** Our liability for any act or failure to act shall not exceed any direct resulting loss, if any, which you incur and payment of interest. Unless otherwise required by law, we will not be liable for any consequential, indirect or special damage that you incur in connection with payment orders, even if we are aware of the possibility for such damages. We will not be liable for any failure or delay in processing a payment order which occurs, directly or indirectly, as a result of any strike or labor dispute, interruption of communication facilities, computer or equipment failure, fire, flood, war, riot, emergency condition, the actions or omissions of third parties, or any cause which is beyond our reasonable control. You agree that we may refuse to process or delay processing any payment order if the order would violate any guideline, rule, policy, law or regulation of any government authority or funds transfer system.

**Funds Transfer System Rules/Laws.** Except as otherwise set forth in this agreement, you agree to be bound by all Federal Reserve and fund transfer system rules and regulations that apply to a payment order. You agree not to violate the laws of the United States, including without limitation, the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control.





EQUAL HOUSING
**LENDER**

MEMBER FDIC

Exhibit 2

# What You Need to Know about Overdrafts and Overdraft Fees

An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we (Bank of Hawaii) pay it anyway.  We can cover your overdrafts in two different ways.

1. We have <u>standard overdraft practices</u> that come with your account.
2. We also offer <u>overdraft protection plans</u>, such as Overdraft Protection from Savings, which may be less expensive than our <u>standard overdraft practices</u> and for consumer accounts, CoverCheck, a line of credit to help cover overdrafts.  To learn more, ask us about these plans.

This notice explains our <u>standard overdraft practices</u>.

➤ **What are the <u>standard overdraft practices</u> that come with my account?**

We <u>do</u> authorize and pay overdrafts for the following types of transactions:
- Checks and other transactions made using your checking account number
- Automatic bill payments

We <u>will not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
- ATM transactions
- Everyday (or one-time) debit card transactions

We pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction.

If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined.

➤ **What fees will I be charged if Bank of Hawaii pays my overdraft?**

Under our standard overdraft practices:
- We will charge you a fee of **$26** each time we pay an overdraft.
- Also, for each continuous 7-day period the end of day balance in your account remains below $0 we may charge you $10.
- There is <u>no limit</u> on the total fees we can charge you for overdrawing your account.

➤ **What if I want Bank of Hawaii to authorize and pay overdrafts on my ATM and everyday (one-time) debit card transactions?**

If you also want us to authorize and pay overdrafts on ATM and everyday (one-time) debit card transactions, call 1-888-643-3888, visit boh.com or complete the form below and mail it to Bank of Hawaii, P. O. Box 2900, Honolulu, HI 96846, or bring it to any nearby Bank of Hawaii branch.

---

☐ I want Bank of Hawaii to authorize and pay overdrafts on my ATM and everyday (one-time) debit card transactions.

☐ I <u>do not</u> want Bank of Hawaii to authorize and pay overdrafts on my ATM and everyday (one-time) debit card transactions.

| Account Number [Complete one form for each account] | Print Your Name |
|---|---|
| Signature | Date |

Please complete this form and return it to any nearby Bank of Hawaii branch <u>or</u>
mail it to:  Bank of Hawaii, P. O. Box 2900, Honolulu, HI 96846
For questions, call 1-888-643-3888 or visit boh.com

/h **Bank of Hawaii**

DDA-746_SOH_E (4-2010) No Date-Authorization

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| RODNEY SMITH, individually and on behalf of all others similarly situated, | CIVIL NO. 16-1-1712-09 GWBC (Other Civil Action) |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| v. | |
| BANK OF HAWAI'I and DOES 1 through 10, | |
| Defendants. | |

## DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all issues so triable.

DATED:  Honolulu, Hawai'i, September 13, 2016.

_____

Margery S. Bronster
Robert M. Hatch
BRONSTER FUJICHAKU ROBBINS

Richard D. McCune
McCUNEWRIGHT LLP

Taras Kick
THE KICK LAW FIRM, APC

Attorneys for Plaintiff
Rodney Smith and the Putative Class

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

RODNEY SMITH, individually and on behalf of all others similarly situated,

                    Plaintiff,

          v.

BANK OF HAWAIʻI and DOES 1 through 10,

                    Defendants.

CIVIL NO. 16-1-1712-09 GWBC
(Other Civil Action)

**SUMMONS**

## SUMMONS

STATE OF HAWAII

TO THE ABOVE-NAMED DEFENDANT(S):

You are hereby summoned and required to file with the Court and serve upon Margery S. Bronster, Esq., Robert M. Hatch, Esq., Plaintiffs' attorneys, whose address is BRONSTER, FUJICHAKU ROBBINS, 1003, Bishop Street, Suite 2300, Honolulu, HI 96813, an answer to the First Amended Class Action Complaint which is herewith served upon you, within twenty (20) days after service of this Summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be rendered against you for the relief demanded in the First Amended Class Action Complaint.

This Summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the

above-entitled court permits, in writing on this Summons, personal delivery during those hours.

A failure to obey this Summons may result in an entry of default and default judgment against the disobeying person or party.

DATED: Honolulu, Hawaii, _____SEP 1 3 2016_____.

N. MIYATA

CLERK OF THE ABOVE ENTITLED COURT

---

In accordance with the Americans with Disabilities Act and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the First Circuit Court Administration Office at PHONE NO. 539-4333, FAX 539-4322, or TTY 539-4853, at least ten (10) working days prior to your hearing or appointment date.

2