IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RODNEY SMITH, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>   vs.<br><br>BANK OF HAWAII,<br><br>               Defendant. | Civ. No. 16-00513 JMS-RLP<br><br>ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT BANK OF HAWAII'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 71) AND (2) DENYING BANK OF HAWAII'S MOTION TO STRIKE DEMAND FOR JURY TRIAL (ECF NO. 72) |

**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT BANK OF HAWAII'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 71) AND (2) DENYING BANK OF HAWAII'S MOTION TO STRIKE DEMAND FOR JURY TRIAL (ECF NO. 72)**

## I. <u>INTRODUCTION</u>

In this putative class action, Plaintiff Rodney Smith ("Smith") challenges Defendant Bank of Hawaii's ("BOH") imposition of overdraft fees — specifically its use of an "available-balance method" rather than a "ledger-balance method" for assessing the sufficiency of funds in customer accounts to cover transactions. Smith contends that BOH's practice violates its Agreements with members, including the implied covenant of good faith and fair dealing. And he asserts claims based on "unjust enrichment," "Money Had and Received," and

violations of the Electronic Fund Transfers Act ("EFTA") and Hawaii Revised Statutes ("HRS") Chapter 480.

Currently before the court are BOH's Motion for Summary Judgment (the "Summary Judgment Motion") and Motion to Strike the Demand for Jury Trial (the "Motion to Strike"). ECF Nos. 71, 72. For the following reasons, the Summary Judgment Motion is GRANTED in part and DENIED in part; the Motion to Strike is DENIED.

## II. <u>BACKGROUND</u>

### A. **Factual Background**

A "ledger-balance method" for determining when an account is overdrawn takes into account "only settled transactions," whereas an "available-balance method" includes also debits to an account that are authorized but not yet settled and reflects holds on deposits that have not yet cleared. Consumer Financial Protection Bureau ("CFPB") Supervisory Highlights, Winter 2015 § 2.3, ECF No. 81-15. Thus, "transactions that would not have resulted in an overdraft (or overdraft fee) under a ledger-balance method [may] result in an overdraft (and an overdraft fee) under an available-balance method." *Id*.

///

///

BOH describes its checking accounts as having "three different

balances":

> The first is the "ledger" balance. Ledger balance is the account
> balance at the end of the banking day and the beginning of the
> next banking day. It reflects the full amount of all deposits
> made into the account throughout the day (without regard for
> whether a portion of a check deposit is on hold), less payment
> transactions that have actually posted to the account during that
> day. The second balance is referred to as "current" balance. It
> is the ledger balance plus deposits and minus payment
> transactions as they post throughout the day. The "available
> balance" is the amount the customer has available to spend. It
> is generally described as the current balance, less "holds."
> Holds are that portion of a deposit on hold until a deposited
> check clears. Holds also refer to VISA debit card payment
> transactions that have been authorized by BOH but have not yet
> been presented for payment by the merchant who sold goods or
> services to BOH's customer.

Matt Emerson Decl. ¶ 3, ECF No. 70-2. BOH customer account statements do not

show a current or ledger balance. Rather, "credits" and "debits" are listed

chronologically in separate sections, and additional sections record "daily

balances" and "overdraft/returned item fees." *See, e.g.* Statements of Account,

ECF Nos. 70-8 through 70-10.

Smith has opened multiple BOH checking accounts, the first in July 2010,

and his current account in December 2014.[1] Emerson Decl. ¶¶ 4-5. Although

---

[1] According to BOH, Smith closed his first account on January 3, 2011 and opened a new
checking account on that same day. Emerson Decl. ¶ 4. Smith states that he remembers going

(continued . . .)

3

Smith does not recall reading them at the time, Rodney Smith Decl. ¶ 4, ECF No. 81-1, BOH has submitted executed signature cards from 2011 and 2014, wherein he agreed "to all of the terms and conditions" in the Consumer Deposit Account Agreement and Disclosure Statement and Bankoh Consumer Electronic Financial Services Agreement and Disclosure Statement (the "Agreement"), ECF Nos. 70-6 and 70-7. Consumer Signature Cards ("Signature Cards"), ECF Nos. 70-4, 70-5.

That Agreement includes the following provisions, which appear on page 17 of the 36-page document, and are mentioned on page 3 of the table of contents:

> **Jury Trial Waiver. You and we each waive our respective rights to a trial before a jury in connection with any disputes related to your account or account services. This includes any claim by us or by you, claims brought by you as a class representative on behalf of others, and claims by a class representative on your behalf as a class member (so-called "class action" suits).**
>
> . . . .

---

(. . . continued)
"to one branch to notify them that there was an issue with my social security number, but since the employee I spoke to was not able to help me, I went to another branch to get it fixed. I did not realize that they had closed one account and opened another." Smith Decl. ¶ 3, ECF No. 81-1.

> **Limitation on Time to Sue**.  An action or proceeding by you to enforce an obligation, duty or right arising under this agreement or by law with respect to your account or any account service must be commenced within one year after the cause of action accrues.

Agreement at 17.[2]  The Jury Trial Waiver appears again later in the Agreement, and it is also referred to in the 2014 Consumer Signature Card.  ECF Nos. 70-5, 70-6 at 32, 70-7 at 33.

## B.     Procedural Background

Smith filed his original Complaint and Demand for Jury Trial in state court on September 9, 2016, and a First Amended Complaint ("FAC") on September 13, 2016.  ECF No. 1-1, at 1 & 35.  On September 19, 2016, BOH filed a Notice of Removal.  ECF No. 1.

On November 2, 2016, BOH filed a Motion to Dismiss the FAC, arguing that its Agreement and Opt-in form for its overdraft program unambiguously disclose that it uses the available-balance method to determine overdrafts.  Def.'s Mem. at 18-25, ECF No. 16-4.  This court disagreed and denied the Motion, finding that "[e]ven construed together, the Agreements' terms are ambiguous as to BOH's choice of balance method."  *Smith v. Bank of Haw.*, 2017

---

[2] Of course, these terms appear in a much smaller font size in the Agreement.

WL 3597522, at *5 (D. Haw. Apr. 13, 2017) (describing in detail the terms of the relevant documents).

BOH also argued in the Motion to Dismiss that Smith's EFTA claim should be dismissed based on the EFTA's one-year statute of limitations. Def.'s Mem. at 37-40, ECF No. 16-4. It contended that the statutory period for the claim began to run at the time of the first overdraft charge, and it asked the court to take judicial notice of Smith's April 2015 bank statement showing an overdraft fee. *Id.* at 38; Req. Judicial Notice, ECF No. 17. The court declined to take judicial notice of the statement, however, and "[a]s a result," found that there was "nothing to indicate, even assuming the statute of limitations for all overdraft fees begins with the first overdraft fee," that Smith's first overdraft fee was charged more than a year before this suit was filed. *Smith*, 2017 WL 3597522, at *8. The court found, therefore, that "on the present record, the claims are timely." *Id.* (emphasis omitted).

BOH now asks the court to determine as a matter of law what it assumed merely for argument's sake on the Motion to Dismiss, that "[a]n EFTA claim accrues when the *first* unauthorized transfer occurs." Def.'s Mem. Supp. Mot. Summ. J. at 2-3, ECF No. 71-1. It contends, therefore, that Smith's EFTA claim is "barred in its entirety" by the EFTA's limitation period. *Id.* at 2. It also

contends that Smith's remaining claims are governed by the contractual limitation period in the Agreement. *Id*. at 2-3. It therefore requests judgment on all of Smith's claims to the extent they accrued more than one year before this action was filed. *Id.*

BOH filed the Summary Judgment Motion on December 11, 2017. ECF No. 71. Smith filed his Opposition on February 1, 2018. ECF No. 79. BOH replied on February 8, 2018. ECF No. 88.

BOH filed the Motion to Strike (based on the contractual Jury Trial Waiver) on December 11, 2017. ECF No. 72. Smith filed an Opposition on January 30, 2018. ECF No. 74. And BOH filed its Reply on February 6, 2018. ECF No. 85.

Oral argument was held on February 20, 2018.

### III. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden initially lies with the moving party to show that there is no genuine issue of material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient

to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is material if the resolution of the factual dispute affects the outcome of the claim or defense under substantive law governing the case. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex*, 477 U.S. at 323-24. "There is no genuine issue of fact if the party opposing the motion 'fails to make an adequate showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Celotex*, 477 U.S. at 322). Moreover, there is no genuine issue of material fact if, taking the record as a whole, a rational trier of fact could not find in favor of the

non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *Taylor*, 880 F.2d at 1045.

## IV.  DISCUSSION

**A.**     **Summary Judgment Motion**

*1.     Electronic Fund Transfers Act*

Congress enacted the EFTA as part of the comprehensive Consumer Credit Protection Act (the "CCPA"), Pub. L. No. 95-630 § 2001, 92 Stat. 3641 (1978), "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b).  "In enacting the [CCPA] . . . Congress intended for courts to broadly construe its provisions in accordance with its remedial purpose."  *Stout v. FreeScore, LLC*, 743 F.3d 680, 684 (9th Cir. 2014); *see also Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 350, 353 (6th Cir. 2008) (describing the CCPA as a "remedial statute accorded 'a broad, liberal construction in favor of the consumer.'" (quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998))).

Rules contained in "Regulation E" implementing EFTA, *see* 12 C.F.R. § 1005.1 *et seq*, require that for accounts opened on or after July 1, 2010, a financial institution must "obtain the consumer's affirmative consent before the

institution assesses any fee or charge on the consumer's account for paying an

ATM or one-time debit card transaction pursuant to the institution's overdraft

service." 12 C.F.R. § 1005.17(c). Subject to enumerated exceptions not applicable

here, "the term 'overdraft service' means a service under which a financial

institution assesses a fee or charge on a consumer's account held by the institution

for paying a transaction (including a check or other item) when the consumer has

insufficient or unavailable funds in the account." 12 C.F.R. § 1005.17(a). And

financial institutions may not charge fees without meeting certain disclosure

requirements:

> [A] financial institution . . . shall not assess a fee or
> charge on a consumer's account for paying an ATM or
> one-time debit card transaction pursuant to the
> institution's overdraft service, unless the institution:
>
>> (i) Provides the consumer with a notice in writing,
>> or if the consumer agrees, electronically,
>> segregated from all other information, describing
>> the institution's overdraft service;
>>
>> (ii) Provides a reasonable opportunity for the
>> consumer to affirmatively consent, or opt in, to the
>> service for ATM and one-time debit card
>> transactions;
>>
>> (iii) Obtains the consumer's affirmative consent, or
>> opt-in, to the institution's payment of ATM or one-
>> time debit card transactions; and

> (iv) Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees electronically, which includes a statement informing the consumer of the right to revoke such consent.

12 C.F.R. § 1005.17(b). Moreover, disclosure must "be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1). The FAC alleges that "[t]he description of BOH's overdraft service in its opt-in agreement does not describe its actual overdraft service as required by Reg[ulation] E." FAC ¶ 85.

Individual and class actions for damages for failure to comply with the EFTA may be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g). BOH contends that this period begins to run "as soon as the *first* fee is charged after an alleged failure to obtain proper authorization." Def.'s Mem. at 26, ECF No. 71-1. And it contends that because Smith incurred his first overdraft fee more than a year before he filed suit, his EFTA claim is completely barred. *Id*. at 28-29. Smith counters that each wrongly imposed overdraft charge constitutes a separate violation, "involving its own statutory period." Opp'n at 36, ECF No. 79.

No circuit court has resolved this question. BOH relies on a Sixth Circuit case involving monthly charges to a debit card that were preauthorized by the cardholder verbally, but not in writing as the EFTA requires. *Wike v. Vertrue,*

*Inc.*, 566 F.3d 590, 591-92 (6th Cir. 2009); *see* 15 U.S.C. § 1693e(a) (requiring preauthorized transfers be "in writing" ); *accord* 12 C.F.R. § 1005.10(b). There, the question was whether the statute of limitations was "triggered" when the transfers were arranged (thirteen months before suit was filed), or five weeks later, when the transfers began. *Id*. at 592-93. Finding that the plaintiff was not injured until a transfer was made, the court concluded that "the one-year limitations period began when the first recurring transfer took place." *Id*. at 593. Because all of the transfers had been made within the one-year period, however, the court was not called upon to determine whether, had the first transfer been made outside that window, all claims based on later transfers would have been barred.

But some district courts have applied *Wike* to conclude that a pre-authorized transfer made outside of the one-year window bars all later claims. *See, e.g. Repay v. Bank of Am., N.A.*, 2013 WL 6224641, at *4 (N.D. Ill. Nov. 27, 2013); *accord Harvey v. Google Inc.*, 2015 WL 9268125, at *4 (N.D. Cal. Dec 21, 2015); *Pelletier v. Pac. WebWorks, Inc.*, 2012 WL 43281, at *6 (E.D. Cal. Jan. 9, 2012). In reaching the opposite result, *Diviacchi v. Affinion Grp., Inc.*, 2015 WL 3631605 (D. Mass. Mar. 11, 2015), found that *Repay* "overstate[d] the reach of the *Wike* decision." *Id*. at *8. And it found (also in the context of a preauthorized recurring transfer) that each transfer "constitutes a new and independent violation"

that is actionable if it falls within the limitation period regardless of whether earlier transfers stemming from the same deficient authorization fell outside that window. *Id*. at *10.

This court need not determine which view is correct in the context of preauthorized recurring transfers. But it concludes that *Wike* cannot logically be extended to the facts of this case, which involves allegedly *unauthorized* overdraft fees.[3] The difference between preauthorizing a series of transfers and opting in to an overdraft service is both significant and meaningful. In the first instance, a consumer gives express permission for a series of recurring transfers from his or her account. But in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee or charge, let alone a series of them.

And Regulation E reflects these differing factual circumstances. It requires a preauthorized transfer to be in writing, focusing on the authorization itself. 12 C.F.R. § 1005.10(b). But with regard to the overdraft services, it focuses not only on the requirements for a consumer's opt-in, but it also expressly prohibits "any fee or charge on the consumer's account for paying an ATM or one-time

---

[3] This court disagrees with the single district court that has done so. *See Whittington v. Mobiloil Fed. Credit Union*, 2017 WL 6988193, at *12-13 (E.D. Tex. Sept. 14, 2017) (applying *Wike* without analyzing its differing factual circumstances).

debit card transaction pursuant to the institution's overdraft service" unless proper disclosure is made. 12 C.F.R. § 1005.17(c)(2); *accord* 12 C.F.R. § 1005.17(b)(1) (providing "a financial institution holding a consumer's account *shall not assess a fee or charge* on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service *unless*" it complies with its disclosure obligations) (emphasis added). Thus, the *violation* for purposes of determining the limitation period for a preauthorized transfer may properly be characterized as an omission. But when a bank assesses overdraft fees or charges, it violates the express language of Regulation E every time it imposes a fee or charge.

*Repay* acknowledges that the type of transaction matters and that treating "some types of EFTA claims" as discrete injuries "may make sense." 2013 WL 6224641, at *4. The court there envisioned a case in which a defendant "initiated a . . . transfer not authorized by the parties' original agreement," and as such a case, and it cited *O'Brien v. Landers*, 2011 WL 221865 (N.D. Ill. Jan. 24, 2011), as an example. *Id*.

The plaintiff in *O'Brien* signed a gym membership agreement in which the gym "reserve[d] the absolute right to increase [member] dues," and he signed an electronic fund transfer authorization stating "I authorize my bank to

make my payments by the method indicated below and post it to my account."
*O'Brien*, 2011 WL 221865, at *1. Besides debiting the monthly dues, however,
the gym twice initiated transfers for one-time fees, the second of which the
plaintiff challenged in the suit. *Id.* In finding plaintiff had stated a claim under the
EFTA, the court noted that the charge "was not covered by the plain terms of the
original contract," and therefore was "outside the scope of plaintiff's
preauthorization." *Id.* at *2.

Although *O'Brien* did not raise a statute-of-limitation issue, this case
is closer to *O'Brien* than to *Wike*, and it is precisely the type of case *Repay*
imagined would make sense to treat differently — a case in which the defendant
allegedly initiated an electronic transfer (or in this case charged a fee) to which the
defendant had not agreed, *see Repay*, 2013 WL 6224641, at *4. Here, like in
*O'Brien*, Smith contends that the fees charged were outside the scope of his
Agreement: he contends that BOH did not disclose its use of an "available-balance
method" for determining overdrafts, and therefore, he thought he was opting in to
an overdraft service that used a ledger-balance method instead. Thus, it makes
sense in the overdraft context to view each fee separately — as an allegedly
unauthorized charge — whereas it might not make sense to view preauthorized
recurring transfers separately.

Accordingly, because Smith has asserted an improper overdraft fee was charged within one year of the day he filed his Complaint, BOH is not entitled to summary judgment on Smith's EFTA claim. Claims based on overdraft fees imposed outside the one-year limit, however, are barred.[4]

### 2. *State Law Contractual Limitation Period*

BOH next contends that the Agreement's one-year contractual limitation period "encompasses each of the claims alleged in Plaintiff's FAC," including the state-law claims, and that it "bars recovery of overdraft fees incurred before September 9, 2015." Def.'s Mem. at 12 (emphasis omitted). Smith argues that the limitation period is unconscionable, and therefore unenforceable. Opp'n at 19.

"Under Hawaii law, unconscionability is recognized as a general contract defense." *Narayan v. Ritz-Carlton Dev. Co.*, 140 Haw. 343, 350, 400 P.3d 544, 551 (2017). "Recent Hawaii decisions have defined unconscionability" as "'encompass[ing] two principles: one-sidedness and unfair surprise,'" which are "also characterized as procedural and substantive unconscionability." *Id*. (quoting *Balogh v. Balogh*, 134 Haw. 29, 41, 332 P.3d 631, 643 (2014)). To be found

---

[4] As explained below, even if the discovery rule applies to the EFTA as Smith contends, it would not extend the one-year statute of limitation in this case.

unconscionable, a contract generally must be both procedurally and substantively

unreasonable, but not necessarily to the same degree, and "there may be

'exceptional cases where a provision of the contract is so outrageous as to warrant

holding it unenforceable on the ground of substantive unconscionability alone.'"

*Balogh*, 134 Haw. at 41, 332 P.3d at 643 (quoting *Gillman v. Chase Manhattan*

*Bank, N.A.*, 534 N.E. 2d 824, 828-29 (N.Y. 1988)).  "Essentially a sliding scale is

invoked which disregards the regularity of the procedural process of the contract

formation . . . in proportion to the greater harshness of unreasonableness of the

substantive terms themselves."  15 Samuel Williston, *A Treatise on the Law of*

*Contracts* § 1763A (3d ed. 1972).  And the party challenging a contract provision

bears the burden of proving that the provision is unconscionable.  *Picardy v. Sky*

*River Mgmt., LLC*, 2013 WL 656808, at *3 (Haw. Ct. App. Feb. 22, 2013) (mem.).

"Procedural unconscionability, or unfair surprise, focuses on the

process by which the allegedly offensive terms found their way into the

agreement."  *Narayan*, 140 Haw. at 351, 400 P.3d at 552 (internal quotation marks

and citation omitted).  It "requires an examination of the contract formation

process and the alleged lack of meaningful choice," including "whether deceptive

or high-pressured tactics were employed, the use of fine print in the contract, the

experience and education of the party claiming unconscionability, and whether

there was disparity in bargaining power." *Id*. (quoting *Gillman*, 534 N.E. 2d at 828). "Procedural unconscionability often takes the form of adhesion contracts" because, "[a]lthough adhesion contracts are not unconscionable *per se*, they are defined by a lack of meaningful choice and, thus, often satisfy the procedural element of unconscionability." *Id*.

"Substantive unconscionability focuses on the one-sidedness of the agreement" and "'entails an analysis of the substance of the bargain to determine whether the terms [are] *unreasonably* favorable to the party against whom unconscionability is urged.'" *Id*. at 352, 400 P.3d at 553 (quoting *Gillman* 534 N.E. 2d. at 829) (emphasis added). Generally, however, "in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such a contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period." *Order of United Commercial Travelers of Am. v. Wolfe*, 331 U.S. 586, 608 (1947); *see also Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1043-44 (9th Cir. 2001) (collecting cases).

The Agreement here, at least to some degree, meets the procedural element of unconscionability. There is certainly a disparity in the parties' bargaining power, and the limitation provision is listed at page 17 of a 36-page

document.  Nonetheless, the provision is written in relatively plain English, and it is listed in the Agreement's table of contents.

But even considering the procedural unconscionability, the court finds that the time limit imposed is not substantively unconscionable — that is, it is not unreasonable under the circumstances.  Although a one-year period is significantly shorter than the applicable statutes of limitation, the contractual period is not so short as to effectively abrogate a plaintiff's right to sue.  This is especially true where the Agreement's limitation period is not tied to the event giving rise to the action but begins to run "one year after the cause of action accrues."  Agreement at 17, ECF No. 70-7.  The Hawaii Supreme Court has long defined the word "accrue" in statutes of limitation to mean the point at which "the plaintiff knew or should have known" of a cause of action.  *See Yoshizaki v. Hilo Hosp.*, 50 Haw. 150, 154, 433 P.2d 220, 223 (1967); *Agustin v. Dan Ostrow Const. Co.*, 64 Haw. 80, 83, 636 P.2d 1348, 1351 (1981).  Construing the Agreement's one-year limitation period as incorporating Hawaii's discovery rule, the provision is not substantively unconscionable.

The Agreement's provision limiting actions to within one year from the date a claim accrues is thus applicable to Smith's state-law claims.

### 3. *Application of the Discovery Rule*[5]

BOH has asked this court to determine that Smith's "claims based on overdraft fees occurring earlier than September 9, 2015 are time-barred." Def.'s Mem. at 29. Smith contends that, even if the court were to find the Agreement's limitation period valid, "the discovery rule and equitable tolling apply to all of Plaintiff's state and federal law claims throughout the class periods."[6] Opp'n at 37.

Under Hawaii's discovery rule, a limitation period does not begin to run until a plaintiff knows or has reason to know the basis of an action. *Aana v. Pioneer Hi-Bred Int'l, Inc.*, 965 F. Supp. 2d 1157, 1179-80 (D. Haw. 2013) (citing

---

[5] As an initial matter, the court rejects BOH's argument that the discovery rule does not apply to the Agreement's limitation period. Def.'s Mem. at 18. As explained above, the Agreement's period is tied to the date an action "accrues." And in Hawaii, this means the discovery rule applies. *See Hays v. City and Cty. of Honolulu*, 81 Haw. 391, 393, 917 P.2d 718, 720 (1996) (noting that "in *Yoshizaki* . . . this court adopted what has become known as the 'discovery rule.'"). Indeed, it is the incorporation of that rule that allows this court to say with relative ease that the provision here is not unconscionable.

[6] Counsel identifies the following classes and periods:
> The Positive Balance Class:
> All persons who have or have had accounts with BOH who incurred overdraft fees for transactions when the ledger balance in the checking account was sufficient to cover the transactions in the six years preceding the filing of this Complaint.

> The Regulation E Class:
> All persons who have or have had accounts with BOH who incurred overdraft fee(s) for ATM or nonrecurring debit card transactions since August 15, 2010.

Opp'n at 6.

*Hays,* 81 Haw. at 393, 917 P.2d at 720).  Generally, that requires knowledge of the injury or harm, as well as its cause, but not the legal theory upon which recovery might be sought.  *Id.*  And a plaintiff who has reason to make an inquiry is charged with the requisite knowledge if a reasonable inquiry would reveal the underlying facts:

> As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause.  We have clarified that in this context, reasonable diligence is not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the fact upon which his right to recovery is premised.  As we have stated: "'[T]here are [very] few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.  This is what is meant by reasonable diligence.'"  Put another way, "[t]he question in any given case is not, what did the plaintiff know of the injury done him? [B]ut, what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?"

*Vidinha v. Miyaki*, 112 Haw. 336, 341, 145 P.3d 879, 884 (Ct. App. 2006) (quoting *Fine v. Checcio*, 870 A.2d 850, 858 (2005) (citations omitted)); *accord Assoc. of Apartment Owners of Newtown Meadows v. Venture 15, Inc*., 115 Haw. 232, 278, 167 P.3d 225, 271 (2007).

Thus, "the ultimate question" is whether the plaintiff's claims could have been discovered by the exercise of "reasonable diligence."  *Sheppard v.*

*Monsanto Co.*, 2016 WL 3629074, at *5 (D. Haw. June 29, 2016) (quoting

*Newtown Meadow*s, 115 Haw. at 280, 167 P.3d at 273); *Aana*, 965 F. Supp. 2d at

1179; *Hays*, 81 Haw. at 391, 917 P.2d at 720.  Although diligence is often a

question of fact, summary judgment may be granted if "reasonable minds can draw

only one conclusion from the evidence."  *Jacoby v. Kaiser Foundation Hosp.*, 1

Haw. App. 519, 527, 622 P.2d 613, 618 (1981).

> Here, there is no dispute that Smith questioned the validity of many, if

not all, of the overdraft fees he now claims were illegally charged, and he admits

having called BOH about overdraft fees "five or six times."  Smith Dep. at 70,

ECF No. 70-17.  He argues that he was unable to discover the basis for the charges

— i.e. that BOH was using an available-balance method to calculate the balance in

his account — and that further inquiry would have proved "futile."  Opp'n at 42.

But he did not need to discover the actual method BOH was using to determine his

balance.  Rather, he needed only to have discovered that — by using the method he

thought he had agreed to — he had had enough money to cover debits for which he

was charged an overdraft fee.  And this he unquestionably could have done by

looking at his statements.  Indeed, he admitted this ability during his deposition

with the following exchange:

> Q        How did you know you were assessed an overdraft fee?
>
> A        I get a email saying that a overdraft fee has been charged, so when I look at it, that's when I went into the account and looked at the statement, and I basically said that I had the money in there.
>
> Q        Okay.
>
> A        That prompted me to file a complaint.
>
> Q        Okay. So you got a notice that you had been assessed an overdraft fee; correct?
>
> A        Yes.
>
> . . .
>
> Q        And then after you got that notice, you went and looked at your statements; right?
>
> A        Yes.
>
> Q        And when you reviewed the statements, you concluded that you had enough money in your account at that time and, therefore, the fee was improper in your mind; right?
>
> A        Yes.

Smith Dep. at 150-51.  As an example, Smith's April 2015 Statement shows two overdraft fees charged for debits made on April 14, yet it shows a positive "daily balance" for that date.  ECF No. 70-10 at 6-7.  In other words, he was clearly charged an overdraft fee at a time when he had a positive ledger balance. Moreover, BOH's ATMs, its ATM receipts, and its on-line and mobile banking apps show both "available" and "current" balances for customer accounts.  ECF Nos. 70-9 through 70-13.  Given all of this information, Smith certainly had the tools to discover the facts supporting his claims within approximately a month of each challenged fee.

The record shows that at least one overdraft fee was charged (despite a positive ledger balance) within one year of the filing of the original complaint. Statement of Account September 22, 2016, ECF No. 81-12. Therefore, BOH is not entitled to summary judgment on the FAC in its entirety, and the court DENIES summary judgment as to any overdraft fees charged on or after September 9, 2016. But summary judgment is GRANTED in favor of BOH as to any fees charged before that date.[7]

///

///

---

[7] Although Smith's argument is not entirely clear, he may also seek damages outside the limitation period under the "continuing violation" doctrine. In analyzing whether this doctrine applies, "[t]he key is whether the conduct complained of constitutes a continuing pattern and course of conduct as opposed to unrelated discrete acts." *Au v. Republic State Mortg. Co.*, 2013 WL 1339738, at *13 (D. Haw. Mar. 29, 2013) (quoting *Joseph v. J.J. MacIntyre Cos.,* 281 F. Supp. 2d 1156, 1161 (N.D. Cal. 2003)). Applying this test, the court concludes that the overdraft fees represent discrete acts and not a continuing pattern. Each overdraft charge is a new event, triggered by the specific balance in Smith's BOH account. As Smith himself has conceded, each overdraft fee "requires an independent assessment" that an overdraft has occurred and a fee should be charged; fees "are not automatic, and are not part of a single transaction or decision making event." Opp'n at 34-35, ECF No. 79.

Finally, Smith also makes passing reference to equitable tolling, without offering any analysis. Regardless, he has not presented evidence supporting a question of fact as to equitable tolling. "In order to toll a statute of limitations for a complaint filed after its expiration, a plaintiff must demonstrate (1) that he . . . has been pursuing his right diligently, and (2) that some extraordinary circumstance stood in his way. Extraordinary circumstances are circumstances that are beyond the control of the complainant and make it impossible to file a complaint within the statute of limitations." *Office of Hawaiian Affairs v. State,* 110 Haw. 338, 360, 133 P.3d 767, 789 (2006) (internal quotations and citations omitted). For the reasons stated above, Smith has met neither prong.

**B.      Motion to Strike Demand for Jury Trial**

"The Seventh Amendment guarantees the right to a jury trial '[i]n Suits at common law[.]'" *Palmer v. Valdez*, 560 F.3d 965, 968 (9th Cir. 2009) (quoting U.S. Const. amend. VII). "Like other constitutional rights, the right to a jury trial in civil suits can be waived." *Id.* (citations omitted). But courts "'indulge every reasonable presumption against waiver' of the jury trial right." *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1064 (9th Cir. 2005) (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937)).

Under federal law, pre-dispute contractual waivers of a jury trial right are permitted "as long as the parties waived their rights knowingly and voluntarily." *In re Cty. of Orange*, 784 F.3d 520, 526 (9th Cir. 2015) (citing *Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977)); s*ee also Palmer*, 560 F.3d at 968 ("A valid waiver in a civil trial 'must be made knowingly and voluntarily based on the facts of the case.'") (citing *Tracinda Corp. v. DaimlerChrysler AG,* 502 F.3d 212, 222 (3d Cir. 2007) (other citation omitted)); *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 756 (6th Cir. 1985) ("Those cases in which the validity of a contractual waiver of jury trial has been in issue have

///

///

overwhelmingly applied the knowing and voluntary standard.") (citations omitted).[8]

In determining whether a contractual jury waiver was "knowing and voluntary," courts apply the following types of factors:

> (1) whether there was a gross disparity in bargaining power between the parties; (2) the business or professional experience of the party opposing the waiver; (3) whether the opposing party had an opportunity to negotiate contract terms; and (4) whether the clause containing the waiver was inconspicuous.

*Parris v. Wyndham Vacation Resorts, Inc.*, 2013 WL 1296231, at *1 (D. Haw. Mar. 28, 2013) (quoting *Phoenix Leasing Inc. v. Sure Broadcasting, Inc.*, 843 F. Supp. 1379, 1384 (D. Nev. 1994)).  Federal courts across the country consistently use these types of factors "to determine whether a waiver was knowing, voluntary, and intelligent."  *Breham v. Asset Acceptance, LLC*, 2010 WL 1735147, at *1 (D. Ariz. Apr. 28, 2010).  *See, e.g.*, *Nat'l Equip. Rental*, 565 F.2d at 258 (considering

---

[8] If a federal court is sitting in diversity, state law principles of waiver can apply if they are "more protective than federal law of the jury trial right."  *In re Cty. of Orange*, 784 F.3d at 524 (holding that "*Erie* [*R. Co. v. Tompkins*, 304 U.S. 64 (1938)]'s federalism principle requires federal courts sitting in diversity to import, as the federal rule, state law governing jury trial waivers where . . . state law is even more protective than federal law of the jury trial right").  Plaintiff appears to rely on this distinction in pointing out that Hawaii law may be "more protective than federal law" regarding the right to a jury trial.  Opp'n at 7, ECF No. 74.  But Plaintiff cites no authority indicating that the rule would apply to supplemental claims where, as here, the action is otherwise brought under 28 U.S.C. § 1331.  In any event, the court does not rely on Hawaii principles in denying Defendant's Motion to Strike.

conspicuousness, negotiability, and gross inequality in bargaining power); *Miller v. Sun Capital Partners, Inc.*, 2016 WL 4941989, at *5 (D. Del. Sept. 15, 2016) ("A contractual waiver is knowing and voluntary when the facts of the case show that '(1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous.'") (quoting *First Union Nat'l Bank v. United States*, 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001)).

Circuits are split, however, as to who has the burden of proof to establish whether a jury waiver was knowing and voluntary. *See, e.g.*, *Parris*, 2013 WL 1296231, at *1 ("The Ninth Circuit has not addressed [the burden] issue, and there is a split among circuits regarding which party has the burden of proof.") (citing cases and placing burden on the party seeking enforcement of the waiver). But district courts in the Ninth Circuit appear to "have uniformly placed the burden on the party seeking to enforce the waiver[.]" *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, 2012 WL 2682761, at *3 (E.D. Cal. July 6, 2012) (citation omitted). The court is likewise convinced — given the constitutional nature of the right at stake — that BOH has the burden here. *See Leasing Serv. Corp. v. Crane,* 804 F.2d 828, 833 (4th Cir. 1986) (agreeing "with those courts that have held that

the party seeking enforcement of the waiver must prove that consent was both voluntary and informed.") (citing *Nat'l Equip. Rental*, 565 F.2d at 258).

Applying these principles, Plaintiff did not "knowingly and voluntarily" waive his Seventh Amendment right. The record is clear — regardless of which side has the burden — that the waiver or references to it were non-negotiable terms in standard forms (both in the Agreements and in one of the Consumer Signature Cards). *See* Smith Decl. ¶ 13, ECF No. 74-1. As BOH necessarily concedes (in arguing that Plaintiff could "negotiate" by taking his business elsewhere), the standard jury-waiver term was a take-it-or-leave-it proposition. Def.'s Mem. at 8-9, ECF No. 72-1. In this situation, a "gross disparity in bargaining power" exists between BOH and its individual customers. Plaintiff was not, for example, a business entity negotiating terms of a specific loan agreement,[9] or a prospective employee with the ability to negotiate terms of an employment agreement.[10]

---

[9] *See, e.g.*, *Phoenix Leasing*, 843 F. Supp. at 1384-85 (upholding a waiver provision in a negotiated loan between a commercial lender and a sophisticated business borrower).

[10] *See, e.g.*, *Parris*, 2013 WL 1296231, at *2 (enforcing waiver in employment contract with experienced broker, recruited by the employer, with no gross disparity in bargaining power).

Also weighing — but only slightly — in favor of Plaintiff is the relative inconspicuousness of the provision. BOH stresses that the specific waiver in the Agreements was in bold print. Agreement at 17, ECF Nos. 70-6, 70-7. And it was written in plain English.[11] But in another respect it was mixed with other boilerplate in a 36-page, single-spaced, non-negotiated form. Although that fact, standing alone, certainly does not render the term unenforceable — terms in the "fine print" of a consumer contract are not invalid just because the consumer does not read them — the term's conspicuousness is a factor that must be considered (along with others) in determining whether Plaintiff "knowingly and voluntarily" waived his constitutional right to a jury trial. It is the fundamental nature of that right that gives pause. *See, e.g.*, *Nat'l Equip. Rental*, 565 F.2d at 258 (rejecting a jury waiver that was "set deeply and inconspicuously in the contract," reasoning that "this printed form provision buried in a multitude of words is too weak an imitation of a genuine agreement to be treated as a waiver of so important a

---

[11] In this regard, the court gives little weight to Plaintiff's overblown statement that "[d]ue to the size of the type face and the length of the Deposit Agreements, I am unable to identify the jury waiver provision unless it was specifically pointed out to me." Smith Decl. ¶ 9, ECF No. 74-1. During oral argument, counsel for Plaintiff conceded that Smith knows how to read. If he had read the document, he obviously would have identified it. The court, however, accepts Plaintiff's statement as an indication that the waiver provision is inconspicuous because it is part of the fine print on page 17 of a 36-page single-spaced document, and that he didn't understand its meaning.

constitutional safeguard[.]") (quoting *Nat'l Equip Rental, Ltd. v. Szukhent*, 375 U.S. 311, 332-33 (1964) (Black, J., dissenting)); *Dreiling v. Peugeot Motors of Am., Inc.*, 539 F. Supp. 402, 403 (D. Colo. 1982) ("A constitutional guarantee so fundamental as the right to jury trial cannot be waived unknowingly by mere insertion of a waiver provision on the twentieth page of a twenty-two page standardized form contract.").

In short, considering all the relevant factors applied in caselaw, the court concludes that Plaintiff did not knowingly and voluntarily waive his Seventh Amendment right to a jury trial. BOH's Motion to Strike Jury Demand is DENIED.

///

///

///

///

///

///

///

///

///

# V. **CONCLUSION**

For the foregoing reasons, BOH's Motion for Summary Judgment is GRANTED in part and DENIED in part. Judgment is GRANTED in favor of BOH on all counts based on overdraft fees charged before September 9, 2016, but summary judgment is DENIED as to all counts based on overdraft fees charged on or after that date.

BOH's Motion to Strike Demand for Jury Trial is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 7, 2018.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Smith v. Bank of Haw.,* Civ. No. 16-00513 JMS-RLP, Order (1) Granting in Part and Denying in Part Defendant Bank of Hawaii's Motion for Summary Judgment (ECF No. 71) and (2) Denying Bank of Hawaii's Motion to Strike Demand for Jury Trial (ECF No. 72)

31