IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RODNEY SMITH, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br> vs.<br><br>BANK OF HAWAII,<br><br>    Defendant. | CIV. NO. 16-00513 JAO-RLP<br><br>ORDER DENYING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT, ECF NO. 116 |

## ORDER DENYING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT, ECF NO. 116

### I. INTRODUCTION

In this putative class action, Plaintiff Rodney Smith ("Smith") challenges the adequacy of disclosures regarding the method used by Defendant Bank of Hawaii ("BOH") to impose overdraft fees. Smith contends that BOH charged him overdraft fees in a manner inconsistent with what was described in agreements he signed, by using an available-balance method rather than a ledger-balance method to assess the sufficiency of customer account funds to cover a transaction. BOH moves for summary judgment on five causes of action or, in the alternative, partial summary judgment as to actual damages on the Electronic Fund

Transfers Act ("EFTA") claim.  ECF No. 116.  For the reasons set forth below, the Court DENIES the Motion.

## II.  BACKGROUND

### A.  Factual Background

Because several prior orders describe the factual background of this case, the Court will not recount every detail here.  *See Smith v. Bank of Haw.*, 2017 WL 3597522 (D. Haw. Apr. 13, 2017) ("*Smith I*") (denying BOH's Motion to Dismiss); *Smith v. Bank of Haw.*, 2018 WL 1662107 (D. Haw. Apr. 5, 2018) ("*Smith II*") (granting in part and denying in part BOH's first Motion for Summary Judgment).

Smith alleges that BOH's use of the available-balance method rather than the ledger-balance method is "inconsistent with how BOH expressly describes the circumstances under which overdraft fees are assessed in" its contractual overdraft program documents.  FAC ¶ 28-29, ECF No. 1-1.  A ledger-balance method uses only settled transactions to determine overdraft fees.  *Smith II*, 2018 WL 1662107, at *1 (citing Consumer Financial Protection Bureau ("CFPB") Supervisory Highlights, Winter 2015 § 2.3, ECF No. 81-15).  The available-balance method includes: (1) settled transactions; (2) transactions that are authorized but not yet settled; and (3) holds on deposits that have yet to clear.  *Id.*

Accordingly, "transactions that would not have resulted in an overdraft (or overdraft fee) under a ledger-balance method [may] result in an overdraft (and an overdraft fee) under an available-balance method." *Id.* (quoting CFPB Supervisory Highlights, Winter 2015 § 2.3, ECF No. 81-15).

BOH's contractual overdraft program documents include: (1) the Consumer Deposit Account Agreement and Disclosure Statement and Bankoh Consumer Electronic Financial Services Agreement ("Account Agreement"); (2) the Fee Schedule for Personal Checking and Savings Accounts ("Fee Schedule"); and (3) "What You Need to Know about Overdrafts and Overdraft Fees" ("Opt-In Agreement") (collectively, the "Agreements").[1] *See Smith I*, 2017 WL 3597522, at *2 (describing in detail the terms of the Agreements). In the Motion, BOH argues that the Court should also consider the change-in-terms notice sent to BOH customers in January 2015 ("January 2015 CIT Notice") as an additional contract document in BOH's overdraft program. ECF No. 116-1 at 29. The January 2015 CIT Notice provided, in relevant part:

> If you do not have sufficient available funds on deposit to cover the amount of a check or transaction (e.g., an in-person withdrawal, automatic payment, ATM

---

[1] *Smith I* found that the Fee Schedule was "referenced within and is part of the Account Agreement." 2017 WL 3597522, at *2. It is therefore a contract document. *Id.*

withdrawal, BankCard or Check Card purchase, or other
electronic transfer), we may return the check or reject the
transaction without payment. We may elect, however, in
our sole discretion to create an overdraft by paying the
check or permitting the transaction. Either way, there
may be a service fee for each item or transaction as stated
in our Fee Schedule. You will be charged no more than
three Overdraft and/or Returned Item fees per
account on any one day. No Overdraft or Returned Item
fee will be imposed on any day that your end of day
available balance is or would have been overdrawn by
less than $5.

ECF No. 117-12 at 2.

In the Motion, BOH argues that there was a course of dealing between

Smith and BOH prior to when Smith received the January 2015 CIT Notice, and

that the course of dealing resolved any ambiguities concerning which balance

method BOH used. *See* ECF No. 116-1 at 32. The following facts inform the

course of dealing argument:

Smith opened his first BOH checking account on July 1, 2010.[2] *See*

BOH's Concise Statement of Facts ("CSF")[3] ¶ 3, ECF No. 117; Ex. 1, ECF No.

117-5. BOH employees were trained to explain BOH's overdraft program to

---

[2] Smith closed his first BOH account and opened a different BOH account
on the same day, January 3, 2011. CSF ¶¶ 3-4. Smith closed the second account
in August 2011. *Id.* ¶ 4. Smith opened his current BOH account in December
2014. *Id.* ¶ 5.

[3] Where a fact is not in dispute, the court cites directly to BOH's CSF.

customers when they opened a new account, including providing a description of the "available balance." Maryellen Ing Decl. ("Ing Decl.") ¶¶ 2-4, ECF No. 117-3. Smith testified that BOH did not provide this explanation to him when he opened his account. Rodney Smith Deposition ("Smith Dep.") at 104:4-106:12, ECF No. 126-2.[4]

BOH gave Smith a copy of the Frequently Asked Questions ("FAQ") document when he opened his account and mailed him another copy of that document a few weeks later. CSF ¶¶ 32-33; Ex. 3, ECF No. 117-7; Matt Emerson Decl. ("Emerson Decl.") ¶ 6, ECF No. 117-2. The FAQ document provided, in relevant part: "You may also be assessed overdraft charges or non-sufficient funds (returned item) charges for checks, automatic bill payments, and other transactions which exceed the available balance in your account." ECF No. 117-1 at 2.

In 2010, the BOH website had an "Understanding Overdrafts" page. CSF ¶ 29; Ex. 15, ECF No. 117-19. It appears that the customer would have to click the "Personal" tab, then "Checking," then "Understanding Overdrafts" to reach that page. *Id.* Then, the customer would click on the "FAQs" tab on that page, and find the question, "How is my available balance determined?" there, "available balance" was defined, in relevant part:

---

[4] Other excerpts from the Smith Dep. can be found in ECF No. 117-23.

5

> Your current balance is your balance at the start of the
> day, plus or minus the day's transactions.  Your available
> balance is your current balance minus holds.  Holds
> include deposits with a hold on the amount and Visa
> debit card holds for purchases you've signed for or made
> online.  (Please note that for point-of-sales transactions,
> some merchants obtain authorizations for only a partial
> amount [for example, gas stations] or a greater amount
> [for example restaurants] of the purchase.  Therefore,
> until the actual amount of the transaction is debited from
> your account, you must factor in the difference.)  You
> can spend up to the amount of your available balance
> without incurring a fee for insufficient funds.

Ex. 15, ECF No. 117-19 at 5 (bracket in original).  Smith testified that he did not

remember seeing this information on the website.  Smith Dep. at 142:11-144:8.

BOH also has a mobile app, which displays the "current" and

"available" balances.  CSF ¶ 24.  Smith testified that he used the app to check his

account balance, but that he did not pay attention to or, ultimately, understand that

there were two different balances.  Smith Dep. at 86:25-87:5, 144:13-16.

Smith received an electronic account statement each month.  CSF

¶ 13; Ex. 9, ECF No. 117-13.   Amidst other information, the account statement

listed overdraft fees and the dates they were charged.  Ex. 9, ECF No. 117-13.  The

daily balances were listed near the end of each account statement.  Ex. 9, ECF No.

117-13.  Putting that information together, some of the account statements revealed

(with some deduction) a positive "daily balance" (the ledger balance) on days

when overdraft fees were imposed. CSF ¶¶ 14-15; *see, e.g.*, ECF No. 117-13 at 6-7, 11-13. Each time Smith incurred an overdraft fee, he received a mailed notice from BOH. CSF ¶ 21; Ex. 10, ECF No. 117-14. Smith testified that it was only when he received the overdraft fee notices that he would review the monthly account statements. Smith Dep. at 42:4-8, 131:5-10, 150:2-22.

On five or six occasions, Smith called BOH because he thought (1) his balance amount as displayed in the mobile app was incorrect or (2) BOH had improperly charged him an overdraft fee. *Id.* at 70:11-16, 90:8-15. Smith testified that he did not learn about BOH's balance method from these phone calls, although he admitted that a BOH employee had once mentioned holds to him. *Id.* at 70:11-25.

**B.    Procedural History**

Smith filed his Complaint and First Amended Complaint ("FAC") in the First Circuit Court of the State of Hawaiʻi on September 9 and 13, 2016, respectively. ECF No. 1-1 at 1, 35. BOH removed the action to federal court on September 19, 2016. ECF No. 1. Smith brings six causes of action: (1) violation of Hawaii Revised Statutes ("HRS") Chapter 480 for unfair or deceptive acts or practices ("UDAP"); (2) breach of contract; (3) breach of the covenant of faith and

fair dealing; (4) unjust enrichment; (5) money had and received; and (6) violation of EFTA for noncompliance with Regulation E.  ECF No. 1-1.

BOH filed a Motion to Dismiss the FAC on November 2, 2016, ECF No. 16, which Chief District Judge J. Michael Seabright denied on April 13, 2017. *Smith I*, 2017 WL 3597522, at *4, 10.  In that motion, BOH argued that the Agreements were not ambiguous because they clearly conveyed that BOH used the available-balance method.  *See id.* at *5.  *Smith I* construed the Agreements together, and found that the relevant terms in the Agreements were ambiguous.  *Id.*

BOH also argued that "Plaintiff's EFTA claim should be dismissed because: (1) BOH complied with EFTA; (2) BOH's use of the model form precludes liability; (3) imposing liability would violate due process; and (4) the claim is outside of the statute of limitations."  *Id.* at *7.  Chief Judge Seabright rejected all of BOH's arguments.  *Id.*  Having determined that the terms in the Agreements were ambiguous, Chief Judge Seabright further concluded it was unclear whether BOH complied with EFTA.  *Id.*

BOH also argued that the UDAP claim should be dismissed because the Agreements explicitly stated that BOH uses the available balance to determine overdraft fees.  *Id.* at *9.  However, Chief Judge Seabright concluded that "[b]ecause the relevant terms of the Agreements are ambiguous, it is unclear

whether BOH's conduct constituted a deceptive act or practice." *Id.* Further, Chief Judge Seabright found that Smith had adequately alleged a deceptive act or practice. *Id.*

On December 11, 2017, BOH filed its first Motion for Summary Judgment, arguing that Smith's claims were time-barred under both EFTA and the contractual limitations provision of the Account Agreement. ECF No. 71. On April 8, 2018, Chief Judge Seabright granted the Motion for Summary Judgment based on the state law contractual limitation period, but only as to overdraft fees charged before September 9, 2015. *Smith II*, 2018 WL 1662107, at *9.

On August 5, 2018, BOH filed the instant motion, its Second Motion for Summary Judgment. ECF No. 116. Smith filed his Opposition on October 1, 2018, ECF No. 125, and BOH filed its Reply on October 5, 2018, ECF No. 127. A hearing was held on November 26, 2018. On November 29, 2018, Smith filed a supplemental brief addressing two cases cited by defense counsel for the first time at the hearing. ECF No. 140. On December 3, 2018, BOH filed a reply to Smith's supplemental brief. ECF No. 144.

### III. STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

   "A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## IV. <u>DISCUSSION</u>

BOH seeks summary judgment on Smith's UDAP, breach of contract, unjust enrichment, money had and received, and EFTA claims and, in the alternative, partial summary judgment as to actual damages on the EFTA claim. Having drawn all reasonable inferences in favor of Smith, the Court finds that the contract between BOH and Smith was ambiguous, and that there are genuine issues of material fact regarding the claims.

///

///

## A. Breach of Contract

BOH moves for summary judgment on Smith's breach of contract claim, arguing that: (1) the January 2015 CIT Notice alleviated the ambiguity Chief Judge Seabright found in the contract documents concerning which balance method was used to determine overdraft fees; and (2) if the Court still finds ambiguity, extrinsic evidence clarifies the ambiguity. ECF No. 116-1 at 30-32; ECF No. 127 at 2-3.

### 1. Ambiguity in the Contract Documents

In *Smith I*, Chief Judge Seabright ruled that when the Agreements are read together, they are ambiguous as to which balance method BOH used to determine overdraft fees. *See Smith I*, 2017 WL 3597522, at *7. In *Smith II*, Chief Judge Seabright ruled that the Agreements' limitation of actions to one year from the date a claim accrues applied to Smith's state law claims and that any claims based on overdraft fees imposed prior to September 9, 2015 were time-barred. *See Smith II*, 2018 WL 1662107, at *9. BOH argues that the Court should now review the January 2015 CIT Notice (which pre-dates September 9, 2015) together with the Agreements, and that the notice resolves any ambiguity *Smith I* found in the Agreements. ECF Nos. 116-1 at 29-30; 127 at 6-7.

The determination of whether a contract is ambiguous is a question of law. *Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 130 Haw. 36, 45, 305 P.3d 452, 461 (2013) (citing *Brown v. KFC Nat'l Mgmt. Co.*, 82 Haw. 226, 239, 921 P.2d 146, 159 (1996)). Courts should seek "to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety." *Id.* (quoting *Brown*, 82 Haw. at 240, 921 P.2d at 160). "Contract terms are interpreted according to their plain, ordinary, and accepted sense in common speech." *Id.* (citing *Cho Mark Oriental Food v. K & K Int'l*, 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992)). "A contract is ambiguous when its terms are reasonably susceptible to more than one meaning." *Id.* (citing *Airgo v. Horizon Cargo Transp.*, 66 Haw. 590, 594, 670 P.2d 1277, 1280 (1983)). If the language of the contract is ambiguous, "the ambiguity raises the question of the parties' intent, which is a question of fact that will often render summary judgment inappropriate." *Wittig v. Allianz, A.G.*, 112 Haw. 195, 201, 145 P.3d 738, 744 (Haw. Ct. App. 2006) (citations omitted); *see also Found. Int'l, Inc. v. E.T. Ige Constr., Inc.*, 102 Haw. 487, 497, 78 P.3d 23, 33 (2003) ("When an ambiguity exists so that there is some doubt as to the intent of the parties, intent is a question for the trier of fact."); *Hawaiian Ass'n of Seventh-Day Adventists*, 130 Haw. at 48, 305 P.3d at 464 (holding that the terms of the contract at issue were "reasonably susceptible to

more than one interpretation, there are genuine issues of material fact regarding the intent of the drafts, and summary judgment is therefore inappropriate").

The parties debate whether the January 2015 CIT Notice is extrinsic evidence or should be read together with the Agreements as a contract document. *See* ECF Nos. 125 at 24-25, 127 at 8-9. Even if the Court were to read the January 2015 CIT Notice as part of the contract, the notice suffers from the same flaws *Smith I* identified in the Agreements. In finding ambiguity in the Agreements, *Smith I* stated:

> *At no point, in either of the Agreements, does BOH define the meaning of "available" when describing balances.* BOH apparently assumes that the customer will read the word "available" in six scattered sections spanning the thirty-six-page Account Agreement and come to a conclusion — BOH will use the available balance method when determining overdraft fees. But this assumes too much. The word "available" simply cannot shoulder the weight of all the assumptions BOH seeks to place on it, just as the court cannot expect customers to bear the burden of knowing banking terms of art when BOH never defined them.

*Smith I*, 2017 WL 3597522, at *7 (emphasis added).

Like the Agreements, the January 2015 CIT Notice also fails to define "available funds." The notice provides, "If you do not have *sufficient available funds* on deposit to cover the amount of a check or transaction[,] . . . . [w]e may elect . . . in our sole discretion to create an overdraft by paying the check or

permitting the transaction." ECF No. 117-12 at 2 (emphasis added). The notice also provides, "No Overdraft or Returned Item fee will be imposed on any day that your end of day *available balance* is or would have been overdrawn by less than $5." *Id.* (emphasis added). However, "available balance" is not defined, thus, the January 2015 CIT Notice does not resolve the ambiguity identified in *Smith I* concerning BOH's balance method.

### 2. *Extrinsic Evidence*

BOH next argues that the Court should consider extrinsic evidence to resolve the ambiguity in the contract, and that a course of dealing between Smith and BOH created an expectation that overdraft fees would be assessed using the "available-balance method." ECF No. 116-1 at 31-32. In a broader sense, BOH also argues that Smith understood that BOH used the available-balance method by September 9, 2015, the relevant time period established in *Smith II*. *Id.* at 4. Smith's understanding of BOH's balance method is also relevant to BOH's UDAP claim challenge, which is discussed below.

Generally, an ambiguous contract "raises a question of intent, which is a question of fact precluding summary judgment." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) ("*National Union*"); *see also San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132

F.3d 1303, 1307 (9th Cir. 1997) ("If we find a contract to be ambiguous, we 'ordinarily' are hesitant to grant summary judgment 'because differing views of the intent of parties will raise genuine issues of material fact.'") (quoting *Maffei v. N. Ins. Co.*, 12 F.3d 892, 898 (9th Cir. 1993)).  However, extrinsic evidence may be considered to resolve a contractual ambiguity on a summary judgment motion.  *See San Diego Gas & Elec. Co.*, 132 F.3d at 1307 ("[The Ninth Circuit] has not, however, adopted a rigid rule prohibiting reference to extrinsic evidence in resolving a contractual ambiguity on a summary judgment motion."). Accordingly, the Court will review extrinsic evidence, including the course of dealing and performance[5] between Smith and BOH, to see if it resolves the contractual ambiguity.

HRS § 490:1-303 provides:

---

[5]  BOH argues that a "course of dealing" created an expectation concerning the balance method, but a "course of dealing" only refers to previous transactions between the parties prior to entering into the contract.  *See* HRS § 490:1-303 (defining "course of performance" and "course of dealing").  Indeed, "[the Uniform Commercial Code] considers actual performance of a contract as the most relevant evidence of how the parties interpreted the terms of that contract." *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 785 (9th Cir. 1981) (applying Hawaii law).  The Court will review both the course of dealing and the course of performance between BOH and Smith.

(a) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:

>   (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

>   (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

(b) A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
. . .
(d) A course of performance or course of dealing between the parties . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement.
. . . .

BOH asserts that by the time that the January 2015 CIT Notice was mailed to customers, the course of dealing between Smith and BOH created an expectation that BOH used the available-balance method. ECF No. 116-1 at 32. However, none of the facts to which BOH points as extrinsic evidence resolves the contractual ambiguity.

When Smith opened his first account on July 1, 2010, BOH gave him a copy of the FAQ document and mailed him another copy of the document a few weeks later. CSF ¶¶ 32-33; Ex. 3, ECF No. 117-7; Emerson Decl. ¶ 6. BOH highlights the following language from the FAQ document to support its position that the course of dealing resolved the contractual ambiguity: "You may also be assessed overdraft charges on non-sufficient funds (returned item) charges for checks, automatic bill payments, and other transactions which exceed the available balance in your account." ECF No. 117-7 at 2. However, the FAQ document suffers from the same problems as the January 2015 CIT Notice — it does nothing to define the meaning of "available balance."[6]

BOH also points to its own website which, since 2010, has had a page entitled, "Understanding Overdrafts," which defines "available balance" under the tab "FAQs." CSF ¶ 29; Ex. 15, ECF No. 117-19. While Smith testified that he perused the BOH website a few times, he said that he did not recall seeing anything on the website about overdraft fees. Smith Dep. at 142:11-144:8. BOH offered no evidence that the contract documents referenced this page on the BOH

_____

[6] Other extrinsic documents proffered by BOH to show a course of dealing were sent to customers *before* Smith opened his first account with BOH on July 1, 2010, *see* Ex. 1, ECF No. 117-5, and thus appear irrelevant to the analysis. Those documents include: (1) the February 2010 pamphlet, Ex. 16, ECF No. 117-20; CSF ¶ 30; and (2) the March 2010 email, Ex. 17, ECF No. 117-21; CSF ¶ 31.

website, or that its employees showed Smith this page when he opened his account or mentioned it when speaking with him. Thus, the definition of "available balance" on the website does not resolve the contractual ambiguity.

Similarly, BOH also argues that its mobile app displayed both the "current" and "available" balances and therefore it should have demonstrated to Smith the difference between the two. CSF ¶ 24. Smith testified that he sometimes used the app to check his balance. Smith Dep. at 50:10-13, 92:18-93:7. However, Smith also testified that he did not pay attention to the different balances because: "[i]t's just the money [he has] in [his] account." *Id.* at 86:25-87:5. Further, Smith testified that he did not have any understanding of the difference between available balance and ledger balance. *Id.* at 144:13-16.

BOH argues that Smith's conversations with BOH employees reveal Smith's knowledge of BOH overdraft practices. Maryellen Ing, Manager of Training and Support Center for BOH, declared that BOH trained its employees to explain BOH's overdraft program — including what "available balance" means — when someone opened a new account. Ing Decl. ¶¶ 2-4, ECF No. 117-3. Smith testified that on one occasion a BOH employee mentioned holds to him when he called the bank to discuss his overdraft fees. Smith Dep. at 71:1-8. However, Smith also testified that BOH employees did not explain "available balance" or

holds to him, Smith Dep. at 104:4-106:12, and so — construing the evidence in the light most favorable to Smith — BOH's practice does not resolve the contractual ambiguity.

BOH also points to overdraft notices it mailed to Smith. CSF ¶ 21; Ex. 10, ECF No. 117-14. However, nothing in these notices made clear that an available-balance method was utilized by BOH. *See, e.g.*, ECF No. 117-14 at 1. Similarly, BOH also electronically sent Smith monthly account statements, some of which show that the "daily balance," which was the ledger balance, was positive on certain days when overdraft fees were imposed. CSF ¶¶ 12, 14-15; *see, e.g.*, Ex. 9, ECF No. 117-13 at 6-7, 11-13. However, to understand that, Smith would need to review several pages of account activity on the statement to identify what day he overdrafted, *see, e.g.*, ECF No. 117-13 at 12, and then review the final page of the statement, *see, e.g.*, *id.* at 13, which lists the daily balances, in order to determine that his daily balance was positive on the day he overdrafted. While Smith testified that he reviewed his monthly account statements when he received a mailed notice about an overdraft fee, Smith Dep. at 42:4-8, 131:5-10, 150:2-22, Smith testified that he never understood the difference between available balance and ledger balance, *id.* at 144:13-16. Thus, it does not appear that Smith

conducted a detailed investigation into his account statement in which he figured

out BOH's balance method for overdraft fees.[7]

Even if the Court were to find BOH's recitation of extrinsic evidence

somewhat persuasive, other evidence creates a genuine question of fact about

whether Smith knew by September 9, 2015 that BOH used the available-balance

method. Specifically, Smith testified that, until this lawsuit, he always thought that

BOH used the ledger-balance method, and that he did not know that there was a

different method (like the available-balance method) to impose overdraft fees.

Smith Dep. at 64:11-14, 69:17-24, 105:14-106:12, 108:10-17. Smith also testified

that: (1) he often kept track of what he was spending and relied on his own mental

calculations of his account balance, *id.* at 108:25-109:21; (2) he would sometimes

---

[7] BOH asserts that Chief Judge Seabright "ruled that Plaintiff's [electronic account] statements would put him on notice that BOH did *not* use the current or ledger balance before the applicable limitations period." ECF No. 116-1 at 33-34. BOH reads too much into *Smith II*. The question in *Smith II* was whether the discovery rule barred Smith's claims under the contractual limitation period. *Smith II*, 2018 WL 1662107, at *7-8. "Under Hawaii's discovery rule, a limitation period does not begin to run until a plaintiff knows or has reason to know the basis of an action." *Id.* at *7 (citing *Aana v. Pioneer Hi-Bred Int'l, Inc.*, 965 F. Supp. 2d 1157, 1179-80 (D. Haw. 2013)). It was under that standard that Chief Judge Seabright reasoned that Smith "certainly had the tools to discover the facts supporting his claims within approximately a month of each challenged fee." *Id.* at *8. While Smith "had the tools to discover" that BOH was charging him overdraft fees when the ledger balance was positive, that does not mean that Smith actually understood that BOH used an available-balance method. As discussed above, Smith testified that he never arrived at such an understanding. *See* Smith Dep. at 144:13-16.

check his balance on the BOH mobile app before making purchases, and did not

notice or understand that there were two different balances displayed, *id.* at 50:8-

13; 86:25-87:5; 92:20-93:7; (3) he sometimes disagreed with the balance he saw on

the app, *id.* at 90:8-15; (4) he also disagreed with the charge of overdraft fees,

when his own mental calculations (using the ledger-balance method) indicated that

he had sufficient funds, *id.* at 108:10-109:21; and (5) he called BOH five or six

times to complain when he thought his balance was incorrect or he was improperly

charged an overdraft fee, *id.* at 70:11-16; 90:8-15.  Thus, a reasonable trier of fact

could conclude that there was no "common basis of understanding for interpreting"

the contract documents, and that Smith did not "accept the performance or

acquiesce in it without objection" after the formation of the contract.  HRS §

490:1-303.

        In light of the ambiguity of the Agreements and the January 2015 CIT

Notice, and the fact that the extrinsic evidence does not resolve the contractual

ambiguity here, the motion for summary judgment on the breach of contract claim

is DENIED.[8]  *See Petro Star, Inc. v. BP Oil Supply Co.*, 584 F. App'x 709, 711

---

[8]  BOH also moves for summary judgment on Smith's claims for (1) unjust
enrichment and (2) money had and received.  In those challenges, BOH relies on
its breach of contract arguments.  ECF No. 116-1 at 10 n.1.  Accordingly, those
claims fail for the same reasons stated for the breach of contract challenge, and the
(continued . . .)

(9th Cir. 2014) (denying summary judgment because evidence of a course of

performance was insufficient to resolve the ambiguity of the contract term).

**B.    Unfair or Deceptive Acts or Practices**

BOH moves for summary judgment on Smith's UDAP claim.  Under

HRS § 480-2, "unfair or deceptive acts or practices in the conduct of any trade or

commerce are unlawful."

> Hawaii enacted section 480-2 in broad language in order
> to constitute a flexible tool to stop and prevent
> fraudulent, unfair or deceptive business practices for the
> protection of both consumers and honest businessmen.
> State courts construe this section liberally, in light of the
> state legislature's intention to encourage those who have
> been victimized by persons engaging in unfair or
> deceptive acts or practices to prosecute their claim,
> thereby affording an additional deterrent to those who
> would practice unfair and deceptive business acts.

*Compton v. Countrywide Fin. Corp.*, 761 F.3d 1046, 1052 (9th Cir. 2014) (internal

citations and editorial marks omitted).

A plaintiff must satisfy the requirements of HRS § 480-13 to state a

cause of action and recover money damages under HRS § 480-2.  To satisfy HRS

§ 480-13, the consumer must establish three elements: "(1) a violation of HRS

---

(. . . continued)
motion for summary judgment on the unjust enrichment and money had and
received claims is DENIED.

chapter 480; (2) injury to the plaintiff's business or property resulting from such violation; and (3) proof of the amount of damages."  *Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.*, 113 Haw. 77, 114, 148 P.3d 1179, 1216 (2006) (footnotes omitted).  BOH essentially argues that Smith has not met the first two elements. ECF No. 116-1 at 27.

### 1.    *Violation of HRS Chapter 480*

BOH argues that Smith did not establish the first required element to satisfy HRS § 480-13 — a violation of HRS chapter 480 — because the contract between Smith and BOH was neither deceptive nor unfair.  *See* ECF No. 116-1 at 34.

The Hawaiʻi Supreme Court stated the following about proving a violation of HRS chapter 480:

> "Deceptive" acts or practices violate HRS § 480-2, but HRS ch. 480 contains no statutory definition of "deceptive."  This court has described a deceptive practice as having "the capacity or tendency to mislead or deceive," but, beyond noting that federal cases have also defined deception "as an act causing, as a natural and probable result, a person to do that which he or she would not do otherwise," we have not articulated a more refined test.

*Courbat v. Dahana Ranch, Inc.*, 111 Haw. 254, 261, 141 P.3d 427, 434 (2006) (citations and brackets omitted).  Accordingly, the Hawaiʻi Supreme Court then

adopted the test from *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)

("*Cliffdale Assocs.* test"), which provides that a deceptive act or practice is: "(1) a

representation, omission, or practice that (2) is likely to mislead consumers acting

reasonably under the circumstances where (3) the representation, omission, or

practice is material." *Id.* at 262, 141 P.3d at 435 (original editorial marks omitted)

(quoting *F.T.C. v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006)). Under this

test, "[a] representation, omission, or practice is considered 'material' if it involves

'information that is important to consumers and, hence, likely to affect their choice

of, or conduct regarding, a product.'" *Id.* (quoting *Novartis Corp. v. FTC*, 223

F.3d 783, 786 (D.C. Cir. 2000)). Further, the test "is an objective one, turning on

whether the act or omission is likely to mislead consumers, as to information

important to consumers, in making a decision regarding the product or service."

*Id.* (citation and quotation marks omitted). As an additional matter, the adoption of

the *Cliffdale Assocs.* test did not change the existing Hawaiʻi rule that the plaintiff

"need not establish an intent to deceive on the part of the defendant, nor any actual

deceit." *Id.* at 262 n.9, 141 P.3d at 435 n.9 (citations omitted).

  The Hawaiʻi Supreme Court discussed how to apply the *Cliffdale*

*Assocs.* test in the context of summary judgment: "[t]he application of an objective

'reasonable person' standard, of which the *Cliffdale Assocs.* test is an example, is

ordinarily for the trier of fact, rendering summary judgment "often inappropriate." *Id.* at 263, 141 P.3d at 436 (quoting *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 107, 839 P.2d 10, 24 (1992)). Thus, it is only when "evidence is so clear that no reasonable person would determine the issue in any way but one" that the court does not leave "a question of interpretation" to the trier of fact. *Id.* (original editorial marks omitted) (quoting *Amfac, Inc.*, 74 Haw. at 108, 839 P.2d at 24).

BOH first argues that it did not engage in deception because any ambiguity concerning the balance method was resolved when Smith received disclosures from BOH that clarified BOH's balance method. ECF No. 116-1 at 35-36. As discussed above, the Court does not find that such disclosures clarified the balance method.

BOH next argues that, even if the contract documents were ambiguous, ambiguity alone is not a deceptive practice. *Id.* at 36. BOH asserts that Smith must also show that BOH's actions were likely to mislead, and that Smith has failed to make that showing. *Id.* *Smith I* already addressed this issue and concluded that a jury could find that BOH's actions were likely to mislead:

> It is certainly possible that a trier of fact could resolve
> this ambiguity against BOH and find that the Agreements
> contained a deceptive representation. That is, a jury
> could find that the Agreements' terms use ledger balance

when determining overdraft fees, and because BOH
actually used available balance, this would constitute a
material representation likely to mislead consumers
under § 480-2. Separately, the jury could find that the
Agreements simply omit the applicable balance
calculation method, which is sufficient to constitute a
deceptive act or practice and possibly trigger UDAP
liability. *See Courbat*, 111 Haw. at 262, 141 P.3d at 435.

*Smith I*, 2017 WL 3597522, at *9 (emphasis omitted). None of BOH's arguments

meaningfully challenge this reasoning.

Thus, drawing all reasonable inferences in favor of Smith, there is a

genuine issue of material fact concerning whether BOH's practices were a

violation of HRS chapter 480.

## 2. *Injury Resulting from a Violation of HRS Chapter 480*

BOH also argues that Smith has not established the second element

required under HRS § 480-13 — an injury to the plaintiff's business or property

resulting from a HRS chapter 480 violation. ECF No. 116-1 at 37-38.

To satisfy HRS § 480-13, the injury to the plaintiff's business or

property must be an "injury in fact" that is the result of or fairly traceable to the

defendant's wrongful conduct. *See Cieri v. Leticia Query Realty, Inc.*, 80 Haw. 54,

66, 905 P.2d 29, 41 (1995); *Flores v. Rawlings Co., LLC*, 117 Haw. 153, 167, 177

P.3d 341, 355, *opinion amended on reconsideration*, 119 Haw. 287, 196 P.3d 289

(2008) ("[T]he mere existence of [an HRS § 480-2] violation is not ipso facto to

27

support the action; forbidden acts cannot be relevant unless they cause private damage." (citation and original emphasis omitted)). "HRS § 480-13(a)'s requirement of alleging an injury to business or property incorporates the fundamental standing requirement that a plaintiff must allege an injury in fact, but narrows it so that a plaintiff must specifically allege an injury in fact to his or her 'business or property.'" *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423, 437, 228 P.3d 303, 317 (2010). The Ninth Circuit defined an "an injury in fact" as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 (9th Cir. 2013) (defining "injury in fact" in the context of Article III standing) (citation and quotation marks omitted).

In asserting that Smith did not suffer an injury in fact to his property that is fairly traceable to BOH's alleged wrongful conduct, BOH makes the same arguments that it made concerning Smith's breach of contract claim: that, by September 9, 2015, Smith understood that BOH used the available-balance method and overdrafted anyway. ECF No. 116-1 at 32. BOH also offers an additional argument that Smith's frequent overdrawing of his accounts, even when both the available balance *and* ledger balance were negative, demonstrates that Smith "was

fully aware of how BOH assessed overdrafts." *Id.* Perhaps if Smith never challenged his overdraft fees this would be a closer call, but Smith testified that he called the bank on several occasions because he thought the overdraft fees were wrongly imposed. Smith Dep. at 70:11-16; 90:8-15. For this reason and for the reasons stated above in Part IV.A.2., the question of whether Smith knew by September 9, 2015 how BOH assessed overdrafts is most appropriately left to the trier of fact.

Thus, the motion for summary judgment of the UDAP claim is DENIED.

## C.    EFTA

BOH moves for summary judgment on Smith's EFTA claim, arguing that: (1) while Regulation E requires BOH to describe its overdraft service, the regulation does not require BOH to disclose its balance method; and (2) Smith did not suffer any actual damages resulting from an EFTA violation. ECF No. 116-1 at 41-42.

EFTA was enacted as part of the Consumer Credit Protection Act ("CCPA"), along with other consumer-protection statutes like the Truth in Lending Act ("TILA"). Pub. L. No. 95-630 § 2001, 92 Stat. 3641 (1978). EFTA "provide[s] a basic framework establishing the rights, liabilities, and

responsibilities of participants in electronic fund and remittance transfer systems," and its "primary objective . . . is the provision of individual consumer rights." 15 U.S.C. § 1693(b). "Congress intended for courts to broadly construe [CCPA's] provisions [like EFTA and TILA] in accordance with its remedial purpose." *Stout v. FreeScore, LLC*, 743 F.3d 680, 684 (9th Cir. 2014) (citing *Brothers v. First Leasing*, 724 F.2d 789, 793 (9th Cir. 1984)); *see also Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 353 (6th Cir. 2008) (applying a "a broad, liberal construction in favor of the consumer" to EFTA).

Each of these statutes shares the common purpose "to protect consumers with respect to financial credit, [therefore] courts draw upon case law interpreting one statute for persuasive authority for another statute." *Clemmer*, 539 F.3d at 353 (citing as an example *Johnson v. W. Suburban Bank*, 225 F.3d 366, 379 (3d Cir. 2000)). While the Ninth Circuit has not broadly addressed EFTA, it stated the following about TILA: "[t]o effectuate TILA's purpose, a court must construe 'the Act's provisions liberally in favor of the consumer' and require absolute compliance by creditors." *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009) (quoting *In re Ferrell*, 539 F.3d 1186, 1189 (9th Cir. 2008) and citing *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1989) ("Even technical or minor violations of the TILA impose liability on the creditor.")).

The Bureau of Consumer Financial Protection issued Regulation E to carry out the purposes of EFTA.  12 C.F.R. § 1005.1.  Regulation E has requirements for overdraft services, including an opt-in requirement.[9]

### 1.    *EFTA (Regulation E) Violation*

*Smith I* already addressed BOH's argument that it met all EFTA requirements, and determined that Smith made a plausible claim that BOH failed to describe its overdraft service in a clear and readily understandable manner.

---

[9]  Regulation E provides the following about the opt-in requirement:

> (1) General. Except as provided under paragraph (c) of this section, a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:

> (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service . . . .

12 C.F.R. § 1005.17(b)(1).
Regulation E provides that notice required by (b)(1)(i) "shall be substantially similar to Model Form A-9."  *Id.* § 1005.17(d).  Model Form A-9 states in relevant part, "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  12 C.F.R. Pt. 1005, App. A.
This notice must be "clear and readily understandable."  12 C.F.R. § 205.4; *see Smith I*, 2017 WL 3597522, at *8 ("Regulation E does require a 'clear and readily understandable' description of the overdraft service." (citation omitted)).

*Smith I*, 2017 WL 3597522, at \*7-8 ("Although it is true that neither [Regulation E nor the Model Form A-9] explicitly reference balance-computation methods, Regulation E *does* require a 'clear and readily understandable' description of the overdraft service. And Smith makes a plausible claim that BOH has failed to do so." (citation omitted)). As the instant Motion does not offer any new arguments, and the moving party bears the burden of showing there are no genuine issues of material fact, this challenge fails. *See, e.g.*, *Gunter v. United Fed. Credit Union*, 2017 WL 4274196, at \*3 (D. Nev. Sept. 25, 2017) (denying a similar motion for summary judgment on an EFTA claim).

### 2. *Actual Damages Resulting from Violation*

BOH also argues that Smith's actual damages did not result from an EFTA violation. ECF No. 116-1 at 41-43. BOH asks the Court to use the detrimental reliance standard, citing cases interpreting EFTA's notice provisions. *Id.* at 41-42 (citing *Brown v. Bank of Am., N.A.*, 457 F. Supp. 2d 82, 85-90 (D. Mass. 2006); and *Voeks v. Pilot Travel Centers*, 560 F. Supp. 2d 718, 725 (E.D. Wis. 2008)). The Court agrees that detrimental reliance is required to prove actual damages for an EFTA claim. While the Ninth Circuit has not directly addressed this issue, a number of other courts have. The Third Circuit stated that "actual damages for violations of EFTA's 'notice' provisions, . . . which are analogous to

32

violations of TILA disclosure provisions, require a showing of detrimental reliance." *Vallies v. Sky Bank*, 591 F.3d 152, 161 (3d Cir. 2009) (citations omitted). A majority of district courts have found that, in a claim of actual damages under EFTA, proof of causation requires detrimental reliance. *See In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 165 (D.S.C. 2018) (collecting cases). Further, the Ninth Circuit has held that under TILA, a plaintiff must establish detrimental reliance to show causation. *In re Smith*, 289 F.3d 1155, 1157 (9th Cir. 2002).

BOH argues that Smith did not detrimentally rely on the language in the Opt-In Agreement[10] when he incurred overdraft fees. ECF No. 116-1 at 42. Specifically, BOH argues that the "enough money" language in the Opt-In Agreement "had no impact on Plaintiff's understanding of BOH's overdraft program nor did it affect his conduct."[11] *Id.* However, Smith testified that he

---

[10] The relevant Opt-In Agreement language is: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we (Bank of Hawaii) pay it anyway." Ex. 1, ECF No. 117-5 (emphasis omitted).

[11] To show that Smith did not detrimentally rely on the language "enough money in the account," BOH also reasserts several arguments that the Court has already addressed in Part IV.A.2. of this order, and the Court will not readdress those arguments again. *See* ECF No. 116-1 (BOH argues that "[Smith] incurred many fees when his ledger balance was positive. [Smith] admits when he got fees,

(continued . . .)

remembered reading the relevant Opt-In Agreement language, and at the time, he understood it to mean, "[i]f I don't have *enough money* in my account, they cover it." Smith Dep. at 134:12-17 (emphasis added). Smith testified that he understood "enough money" to mean "I have enough money in the account. I shouldn't be [sic] overdraft." *Id.* at 134:21-135:1. Smith also testified that the Opt-In Agreement did not say anything about holds and "what may be not [sic] available." *Id.* at 104:4-105:24. Smith testified that he often used his own mental calculations using the ledger-balance method to determine his spending, and was surprised when that spending resulted in overdraft fees. *Id.* at 108:10-109:21.

Based on Smith's testimony and drawing all reasonable inferences in favor of Smith, there is a genuine issue of material fact as to whether: (1) Smith relied on the Opt-In Agreement language to mean that BOH used a "ledger-balance method"; and (2) that this reliance was to his detriment because he then incurred overdraft fees based on that understanding.

Accordingly, the motion for summary judgment of the EFTA claim is DENIED.

---

(. . . continued)
he checked his balance and therefore knew he had sufficient ledger balance but still got an overdraft fee.").

# V.  CONCLUSION

For the foregoing reasons, the Second Motion for Summary Judgment

is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, January 31, 2019.

Jill A. Otake
United States District Judge

*Smith v. Bank of Haw.*, Civ No. 16-00513 JAO-RLP, Order Denying Defendant's Second Motion for Summary Judgment, ECF No. 116